**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION AT MEMPHIS**

| | |
|---|---|
| CECIL CANNADAY and RONALD GODFREY, Derivatively on behalf of Nominal Defendant HELIOS ADVANTAGE INCOME FUND, INC., CECIL CANNADAY, Derivatively on behalf of Nominal Defendant HELIOS HIGH INCOME FUND, INC., RONALD GODFREY, Derivatively on behalf of Nominal Defendant HELIOS MULTI-SECTOR HIGH INCOME FUND, INC., CECIL CANNADAY and RONALD GODFREY, Derivatively on behalf of HELIOS STRATEGIC INCOME FUND, INC., | Case No. 2:11-cv-02935 <br><br> **Jury Demand** <br><br><br> **VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **JUDGE SAMUEL H. MAYS, JR.** |
| Plaintiffs, | |
| v. | |
| MORGAN ASSET MANAGEMENT, INC., J. KENNETH ALDERMAN, CARTER E. ANTHONY, JACK R. BLAIR, THOMAS R. GAMBLE, ALBERT C. JOHNSON, JAMES C. KELSOE, JR., CHARLES D. MAXWELL, JAMES STILLMAN R. MCFADDEN, ALLEN B. MORGAN, JR., W. RANDALL PITTMAN, MARY S. STONE, BRIAN B. SULLIVAN, DAVID H. TANNEHILL, JOSEPH C. WELLER, J. THOMPSON WELLER, ARCHIE W. WILLIS, III and MICHELE F. WOOD, | |
| Defendants, | |
| and | |
| HELIOS ADVANTAGE INCOME FUND, INC., HELIOS HIGH INCOME FUND, INC., HELIOS MULTI-SECTOR HIGH INCOME FUND, INC. and HELIOS STRATEGIC INCOME FUND, INC., | |
| Nominal Defendants. | |

| This Document Relates to: | ) |
| | ) |
| *In re Helios Closed-End Funds Derivative* | ) |
| *Litigation*, No. 2:10-cv-02188-SHM-dkv | ) |

Plaintiffs Cecil Cannaday ("Cannaday") and Ronald Godfrey ("Godfrey," and together with Cannaday, "Plaintiffs"), by the undersigned attorneys, submit this Verified Shareholder Derivative Complaint against the defendants named herein, and allege upon personal knowledge with respect to themselves, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, and an investigation undertaken by Plaintiffs' counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought for the benefit of nominal defendants Helios Advantage Income Fund, Inc., formerly known as RMK Advantage Income Fund, Inc. ("Helios Advantage" or "RMA"), Helios High Income Fund, Inc., formerly known as RMK High Income Fund, Inc. ("Helios High" or "RMH"), Helios Multi-Sector High Income Fund, Inc., formerly known as RMK Multi-Sector High Income Fund, Inc. ("Helios Multi-Sector" or "RHY") and Helios Strategic Income Fund, Inc., formerly known as RMK Strategic Income Fund, Inc. ("Helios Strategic" or "RSF") (collectively, the "Funds," and each, a "Fund") against certain of the former officers and directors of the Funds, the Funds' former investment advisor, Morgan Asset Management, Inc. ("MAM"), and the Funds' former lead and assistant portfolio managers, defendants James C. Kelsoe, Jr. ("Kelsoe") and David H. Tannehill ("Tannehill," and together with Kelsoe, the "Portfolio Manager Defendants").

2.      The Action seeks to remedy Defendants' (as defined herein) violations of law, including breaches of fiduciary duty, unjust enrichment and breaches of contract arising out of a

scheme and wrongful course of business, spanning from at least 2006 through 2007, in connection with the improper investment of the Funds' assets in high-risk, illiquid structured debt instruments, such as asset-backed securities ("ABSs") and mortgage-backed securities ("MBSs"), often the lowest, most subordinated tranches of such illiquid investments. Indeed, due to substantial evidence demonstrating Defendants' egregious misconduct (described herein), there have been numerous investigations and subsequent administrative and governmental proceedings brought against certain defendants, including by the Securities and Exchange Commission ("SEC"), Financial Industry Regulatory Authority ("FINRA"), and securities regulators in the states of Alabama, Arkansas, Georgia, Kentucky, Mississippi, South Carolina and Tennessee.

3. From at least 2006 through 2007, Defendants knowingly and deliberately orchestrated a prolonged scheme to improperly invest in certain illiquid structured debt instruments in violation of each Fund's policies and procedures as disseminated to its shareholders and to improperly manipulate the true value of the Funds. Specifically, Defendants knowingly: (a) overstated and manipulated the values of the securities in the Funds' portfolios, thereby overstating each Fund's net asset value ("NAV")[1]; (b) violated the Funds' Offering Materials (as defined herein), which imposed a cap on the percentage of Fund assets that could be concentrated in any one industry, by over-concentrating the percentage of the Funds' assets in violation of such policies; and (c) violated the Funds' Offering Materials by failing to seek shareholder approval before investing in certain illiquid structured debt instruments in contravention of the Funds' Offering Materials. In addition, MAM, the Officer Defendants (as

---

[1] NAV represents a fund's per share market value and is derived by dividing the total value of all the cash and securities in a fund's portfolio, less any liabilities, by the number of shares outstanding.

defined herein) and the Portfolio Manager Defendants disseminated statements that did not accurately reflect: (i) the true financial condition of the Funds; (ii) an appropriate benchmark index to which the Funds could be compared; (iii) the proper classification of ABSs, which were instead classified as less risky investments such as corporate bonds and preferred stocks; (iv) the Funds' true NAVs; and (v) the extent of the Funds' exposure to such securities and the risks associated therewith; and the Director Defendants (as defined herein) failed to properly oversee the dissemination of such statements.

4.     The Funds are closed-end management investment companies registered under the Investment Company Act of 1940 (as amended, the "1940 Act").  Each of the four Funds was managed by MAM, a subsidiary of Regions Financial Corporation ("Regions") and an affiliate of Morgan Keegan & Company, Inc. ("Morgan Keegan"), also a subsidiary of Regions.

5.     At all relevant times, defendant Kelsoe served as each Fund's lead portfolio manager and defendant Tannehill served as the assistant portfolio manager.  Both defendants Kelsoe and Tannehill were employees of MAM.  In addition, each Fund's officers consisted of employees of MAM, Morgan Keegan, and/or Regions.  Furthermore, the Funds had identical Boards of Directors (the "Boards"), and several members were also officers of MAM, Morgan Keegan and/or Regions.  The SEC's press release announcing the initiation of administrative proceedings against defendant Kelsoe, among others, described him as one of the "scheme['s] two architects – a portfolio manager responsible for lies to investors about the true value of the assets in his funds."

6.     Each of the Funds, at its inception, had filed with the SEC on Form N-2 and Form N-2As and disseminated to investors Registration Statements and amended Registration Statements.  Subsequently, the Funds filed with the SEC Prospectuses (the "Prospectuses"),

which explicitly incorporated by reference Statements of Additional Information ("SAIs") attached thereto and all other exhibits (collectively, the "Offering Materials").

7.     In the Offering Materials, as well as in subsequent SEC filings, the Funds touted the diversification of their portfolios. Specifically, the Prospectuses described the Funds as *diversified*, closed-end management investment funds. Pursuant to the Prospectuses, the investment objective and strategy of each of the Funds was to invest in a *diversified* portfolio of debt securities offering attractive yield and capital appreciation potential.

8.     The Funds' Offering Materials included the Funds' investment strategy and policies and provided explicit limitations and restrictions on investments. Specifically, as known by Defendants, the Offering Materials established the limitation that they would not concentrate more than 25% of each Fund's assets in the same industry. The Offering Materials stated that the Funds would remain fully diversified and not concentrated in any particular industry, and that this policy could only be changed through a vote of a majority of the Funds' outstanding shares.

9.     However, despite their statements to shareholders, Defendants knowingly caused the Funds to invest heavily in ABSs, MBSs and other illiquid securities well beyond the 25% limitation which was in clear violation of the Funds' stated policies. For example, as of March 31, 2007, the Funds had invested approximately 65-70% of their assets in the ABSs industry.

10.     Moreover, MAM, the Officer Defendants and the Portfolio Manager Defendants did not accurately disclose the extent of the Funds' exposure to ABSs, MBSs and other illiquid securities and the risks associated therewith. Specifically, such defendants did not accurately disclose that these investments were the riskiest types, or lowest tranches, of these structured finance deals. In furtherance of their scheme, these defendants classified hundreds of millions of

dollars of ABSs as corporate bonds and preferred stocks in the Funds' SEC filings, thereby making the Funds seem more diversified and less risky than they actually were.

11.    In addition, MAM, the Officer Defendants and the Portfolio Manager Defendants compared the performance of the Funds to that of a benchmark index that, in contrast to the Funds' high concentration in ABSs and MBSs, did not contain either.

12.    As a result of the above misconduct, the Funds were not the low-risk, diversified bond funds that MAM, the Officer Defendants and the Portfolio Manager Defendants claimed they were, rendering the Funds' financial statements inaccurate from 2006 to 2008.

13.    Furthermore, in egregious violation of their fiduciary duties, MAM, the Officer Defendants and the Portfolio Manager Defendants perpetrated their scheme by knowingly allowing defendant Kelsoe and others to manipulate the stated values of the Funds' illiquid and subprime securities, resulting in the overstatement of each Fund's NAV, so that shareholders were unaware of the true value of the Funds which were much lower than their stated values.

14.    When the full extent of the Funds' exposure to risky securities and the proper fair values of such securities came to light, the Funds had suffered overwhelming losses totaling over $1 billion during 2007.

15.    As summarized in a 2009 report titled "Regions Morgan Keegan:  The Abuse of Structured Finance" by Craig McCann, PhD, CFA (the "McCann Report"), a copy of which is attached hereto as Exhibit A, these losses "were not the result of a 'flight to quality' or a 'mortgage meltdown,'" but rather "because [the Funds] held concentrated holdings of low-priority tranches in structured finance deals backed by risky assets" of which investors were unaware.

16.     In August 2007, the Funds announced that they had retained an independent valuation consultant to assist them with valuing the Funds' portfolio holdings.  The independent valuation resulted in substantial write-downs of many of the securities held by the Funds.  The write-down revealed that the Funds had suffered significant losses in their MBS and ABS investments and a significant drop in NAVs, as disclosed in the Funds' Semi-Annual Shareholder Report for the six months ending September 30, 2007, filed with the SEC on December 5, 2007 (the "FY2008 Semi-Annual Report").

17.     On April 7, 2010, the SEC initiated administrative proceedings (the "SEC Action") against defendant Kelsoe, the Funds' former portfolio manager; defendant J. Thompson Weller ("Thompson Weller"), their former Treasurer and Assistant Secretary; defendant MAM; and Morgan Keegan.  Specifically, the SEC Complaint[2] alleged that the defendants violated certain securities laws and SEC regulations by failing to perform their responsibilities for pricing the Funds' securities in accordance with the policies and procedures adopted by the Funds with respect to valuation.

18.     On the same date, FINRA also filed a complaint against Morgan Keegan (the "FINRA Complaint") similarly alleging that Morgan Keegan violated multiple National Association of Securities Dealers rules by, *inter alia*, using false and misleading sales materials in 2007 which failed to disclose that the Funds' portfolios were "acutely affected by then-current economic conditions" and portraying the Funds as safer investments than they actually were,

---

[2] The term "SEC Complaint" refers to the Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Sections 4C, 15(b) and 21C of the Securities Exchange Act of 1934, Sections 9(b) and 9(f) of the Investment Company Act of 1940, Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940 and Rule 102(e)(1)(iii) of the Commission's Rules of Practice issued by the SEC against MAM, Morgan Keegan, Kelsoe and Thompson Weller on April 7, 2010, a copy of which is attached hereto as Exhibit B.

despite being aware of the risks.  A copy of the FINRA Complaint is attached hereto as Exhibit C.

19.     Finally, also on April 7, 2010, securities regulators in Alabama, Kentucky, Mississippi and South Carolina initiated joint administrative proceedings (the "Joint State Action") against MAM, Morgan Keegan, Kelsoe and certain other defendants, alleging that such defendants violated each state's securities laws and regulations by "failing to disclose the risks associated with the Funds; misrepresenting the nature of the Funds; misclassifying the securities held within the Funds; comparing the performance of the Funds to inappropriate peer groups (benchmarks); failing to accurately represent the amount of structured debt securities held in the Funds; and after the collapse of the Funds, recommending that investors should hold and/or continue to buy the Funds."

20.     Prior to the commencement of the Joint State Action, those states had participated in an extensive multi-state investigation of the defendants' misconduct.  In addition to the Joint State Action, Tennessee commenced a separate administrative action (the "Tennessee Action") against MAM, Morgan Keegan and Kelsoe.  The administrative proceedings brought against MAM, Morgan Keegan, Kelsoe and their affiliates by the SEC, FINRA, and the states of Alabama, Kentucky, Mississippi, South Carolina and Tennessee are collectively referred to herein as the "Governmental Actions."

21.     On June 22, 2011, it was announced that certain of the defendants in the Governmental Actions, specifically, Morgan Keegan and defendants MAM, Kelsoe and Thompson Weller, had agreed to a settlement.  Under the terms of the settlement, Morgan Keegan and MAM were required to pay a total of $200 million, plus up to $10 million in penalties, to the SEC and the states of Alabama, Arkansas, Georgia, Kentucky, Mississippi,

South Carolina and Tennessee, and defendants Kelsoe and Thompson Weller were required to pay fines of $500,000 and $50,000, respectively. In addition, defendant Kelsoe has been banned from the securities industry for life and Morgan Keegan, MAM and Thompson Weller have been suspended from various activities.

22.     Also in connection with the settlement of the Governmental Actions, a consent order was entered in each of the Governmental Actions containing certain findings of fact made by the respective authorities. These findings included, *inter alia*, that certain of the defendants: failed to employ reasonable procedures for pricing the Funds' portfolio securities and as a result, did not properly calculate current NAVs for the Funds; signed SEC filings containing material misstatements with respect to the Funds' performance; and did not adequately disclose in SEC filings and/or sales materials the risks of subordinated tranches of structured debt instruments and high concentration of the Funds' assets in such investments in the Funds. These findings made by the respective authorities in the Governmental Actions, as discussed in greater detail below, further evidence that defendants MAM, Kelsoe, Sullivan, Thompson Weller and Wood breached their fiduciary and other duties owed to the Funds and their shareholders.

23.     As a result of Defendants' breaches of fiduciary duties described herein, the Funds have sustained and will continue to sustain damages including, but not limited to, severe losses in value, excessive management fees paid to defendants MAM and Kelsoe based on inflated asset values, and costs and expenses incurred in connection with restating the Funds' financial statements and participating in the various governmental investigations; and the costs of defending the pending securities class action arising from Defendants' misconduct.

24.     On November 23, 2009 and November 25, 2009, Plaintiffs made demands upon the Board of each Fund (each of which consist of the same members) to take action against the

Defendants (collectively, the "Demands"), copies of which are attached hereto as Exhibits D-I. The President of the Funds at the time, John J. Feeny, Jr. ("Feeny"), responded to Plaintiffs' counsel by letters dated January 12, 2010, copies of which are attached hereto as Exhibits J-K, acknowledging receipt of the Demands and stating that the Board was conducting an investigation.

25.     On March 18, 2010, Plaintiffs filed a shareholder derivative action on behalf of each Fund, captioned *Cannaday v. Sullivan, et al.*, No. 2:10-cv-02188; *Cannaday, et al. v. Sullivan, et al.*, No. 2:10-cv-02190; *Cannaday, et al. v. Sullivan, et al.*, No. 2:10-cv-02191; and *Godfrey v. Sullivan, et al.*, No. 2:10-cv-02192.  On December 6, 2010, pursuant to this Court's Order dated November 5, 2010, Plaintiffs filed a Verified Consolidated Derivative Complaint under the consolidated caption, *In re Helios Closed-End Funds Derivative Litigation*, No. 2:10-cv-02188.

26.     On January 24, 2011, the defendants filed motions to dismiss the action and the nominal defendant Funds filed a motion to stay the action.  On February 9, 2011, the Court entered an Order staying the action until April 6, 2011.  On April 6, 2011, Plaintiffs and the Funds filed a joint motion to further stay the action until June 6, 2011, which was granted by the Court on April 8, 2011.  After the stay was lifted on June 6, 2011, the parties completed briefing with respect to the defendants' motions to dismiss.

27.     On September 9, 2011, the Court granted without prejudice the motion to dismiss filed by certain of the defendants on the sole basis that the Board had not yet completed its investigation, and the Court declined to address any of the other issues raised by the defendants in their motions to dismiss.  A copy of the September 9, 2011 Order is attached hereto as Exhibit L.

28.     On October 12, 2011, the Funds, through their counsel, wrote a letter to Plaintiffs'
counsel advising them that the Board had determined to permit Plaintiffs to proceed with the
litigation against the Defendants on behalf of the Funds.  A copy of the October 12, 2011 letter is
attached hereto as Exhibit M.  Accordingly, Plaintiffs have commenced the instant action on
behalf of the Funds to recover for the benefit of the Funds the damages suffered as a result of
Defendants' egregious misconduct.

## JURISDICTION AND VENUE

29.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in
that Plaintiffs and Defendants are citizens of different states and the matter in controversy
exceeds $75,000, exclusive of interests and costs.  This Court has supplemental jurisdiction over
the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a
collusive one to confer jurisdiction on a court of the United States, which it would not otherwise
have.

30.     Venue is proper in this district because a substantial portion of the transactions
and wrongs complained of herein, including Defendants' primary participation in the wrongful
acts detailed herein, occurred in this district.  One or more of the Defendants either resides in or
maintains executive offices in this district, and Defendants have received substantial
compensation in this district by engaging in numerous activities and conducting business here,
which had an effect in this district.

## PARTIES

31.     Plaintiff Cannaday is a shareholder of Helios Advantage, Helios High and Helios
Strategic, was a shareholder of such Funds at the time of the wrongdoing alleged herein, and has
been a shareholder of such Funds continuously since that time.  Plaintiff Cannaday is a citizen of
the State of Arkansas.

32.     Plaintiff Godfrey is a shareholder of Helios Advantage, Helios Multi-Sector and Helios Strategic, was a shareholder of such Funds at the time of the wrongdoing alleged herein, and has been a shareholder of such Funds continuously since that time.  Plaintiff Godfrey is a citizen of the State of Washington.

33.     Nominal defendant Helios Advantage is a closed-end management investment company registered under the 1940 Act and is incorporated in the State of Maryland.  Helios Advantage was organized on or about September 7, 2004 and began trading on or about November 8, 2004 under the NYSE ticker symbol RMA.  Its principal executive offices were formerly located at 50 North Front Street, Memphis, Tennessee 38103 and are currently located at Three World Financial Center, 200 Vesey Street, 10th Floor, New York, New York 10281-1010.

34.     Nominal defendant Helios High is a closed-end management investment company registered under the 1940 Act and is incorporated in the State of Maryland.  Helios High was organized on or about April 16, 2003 and began trading on or about June 27, 2003 under the ticker symbol RMH.  Its principal executive offices were formerly located at 50 North Front Street, Memphis, Tennessee 38103 and are currently located at Three World Financial Center, 200 Vesey Street, 10th Floor, New York, New York 10281-1010.

35.     Nominal defendant Helios Multi-Sector is a closed-end management investment company registered under the 1940 Act and is incorporated in the State of Maryland.  Helios Multi-Sector was organized on or about November 14, 2005 and began trading on or about January 19, 2006 under the ticker symbol RHY.  Its principal executive offices were formerly located at 50 North Front Street, Memphis, Tennessee 38103 and are currently located at Three World Financial Center, 200 Vesey Street, 10th Floor, New York, New York 10281-1010.

36.     Nominal defendant Helios Strategic is a closed-end management investment company registered under the 1940 Act and is incorporated in the State of Maryland.  Helios Strategic was organized on or about January 16, 2004 and began trading on or about March 18, 2004 under the ticker symbol RSF.  Its principal executive offices were formerly located at 50 North Front Street, Memphis, Tennessee 38103 and are currently located at Three World Financial Center, 200 Vesey Street, 10th Floor, New York, New York 10281-1010.

37.     Defendant MAM served as the investment advisor to each of the Funds from its inception through July 29, 2008, when Hyperion Brookfield Asset Management, Inc. became the Funds' investment advisor.  Defendant MAM is incorporated in the State of Tennessee.  MAM's principal executive offices were located at Fifty North Front Street, Memphis, Tennessee 38103 during the time it served as investment advisor to the Funds and are currently located at 1901 6th Avenue North, 4th Floor, Birmingham, Alabama 35203.  Defendant MAM is an affiliate of Morgan Keegan and a wholly-owned subsidiary of MK Holding Inc., which, like Morgan Keegan, is a wholly-owned subsidiary of Regions.  Along with Morgan Keegan, defendant MAM is a defendant in the SEC Action, the Joint State Action, the Tennessee Action, the Arkansas Action (as defined herein) and the Georgia Action (as defined herein).  Morgan Keegan is also a defendant in the FINRA Action.  In connection with the settlement of the Governmental Actions, MAM and Morgan Keegan agreed to pay a total of approximately $210 million to the SEC and to Alabama, Arkansas, Georgia, Kentucky, Mississippi, South Carolina and Tennessee.

38.     Defendant Kelsoe served as lead portfolio manager for the Funds from each Fund's inception through July 29, 2008.  At the time, defendant Kelsoe was a senior portfolio manager for MAM and had been with MAM since 1991.  Defendant Kelsoe is a defendant in the

SEC Action, the Joint State Action and the Tennessee Action.  Indeed, the SEC's press release announcing the initiation of administrative proceedings against defendant Kelsoe described him as one of the "scheme['s] two architects – a portfolio manager responsible for lies to investors about the true value of the assets in his funds."   In connection with the settlement of the Governmental Actions, defendant Kelsoe has been banned from the securities industry for life and must pay penalties totaling $500,000.  Upon information and belief, defendant Kelsoe is a citizen of the State of Tennessee.

39.     Defendant J. Kenneth Alderman ("Alderman") served as a director of each of the Funds from its inception through July 29, 2008.  Defendant Alderman served as chairman of the Boards from, upon information and belief, the beginning of 2008 through July 29, 2008.  At the time, defendant Alderman had also served as Chief Executive Officer ("CEO") of MAM since 2002 and as an Executive Vice President of Regions, the ultimate parent company of MAM, since 2000.  In addition, defendant Alderman had served as President of MAM affiliate Regions Morgan Keegan Trust Company since 2002 and previously served Regions as Senior Vice President and Capital Management Group Director and investment adviser to the Regions proprietary fund family from 1995 to 2000.  Upon information and belief, defendant Alderman is a citizen of the State of Alabama.

40.     Defendant Carter E. Anthony ("Anthony") served as President of each of the Funds from its inception through 2006.  Defendant Anthony also served as President and Chief Investment Officer of MAM from 2002 through 2006.  Previously, defendant Anthony served as an Executive Vice President and Director of the Capital Management Group at Regions, from 2000 through 2002.  Upon information and belief, defendant Anthony is a citizen of the State of Alabama.

41.    Defendant Thomas R. Gamble ("Gamble") served as Vice President of each of the Funds from its inception through July 29, 2008.  At the time, defendant Gamble had been an executive at Regions since 1981.  Specifically, defendant Gamble had served as a Corporate IRA Manager from 2000 to 2001 and a Senior Vice President and Manager of Employee Benefits at the Birmingham Trust Department of Regions Bank from 1981 to 2000.  Upon information and belief, defendant Gamble is a citizen of the State of Alabama.

42.    Defendant Charles D. Maxwell ("Maxwell") served as Secretary and Assistant Treasurer of each of the Funds from its inception through July 29, 2008.  At the time, defendant Maxwell had also served as Secretary and Treasurer of MAM since 1993 and as Executive Managing Director, Chief Financial Officer ("CFO"), Treasurer and Secretary of Morgan Keegan since 2006.  Previously, defendant Maxwell had served in various executive roles at Morgan Keegan:  as a Managing Director from 1998 to 2006, Assistant Treasurer and Assistant Secretary from 1994 to 2006, and a Senior Vice President from 1995 to 1997.  Upon information and belief, defendant Maxwell is a citizen of the State of Tennessee.

43.    Defendant Allen B. Morgan, Jr. ("Morgan") served as a director of the Funds from each Fund's inception through, upon information and belief, the end of 2007.  Upon information and belief, defendant Morgan also served as Chairman of the Board of each Fund during such time.  Defendant Morgan founded Morgan Keegan in 1969 and served as its Chairman and Executive Managing Director from 1969 until his retirement on December 31, 2007.  He had served as Morgan Keegan's CEO from 1969 to 2003.  Prior to his retirement, defendant Morgan had also served as a Director of MAM since 1993 and as a Director and Vice Chairman of Regions since 2001 and 2003, respectively.  Upon information and belief, defendant Morgan is a citizen of the State of Tennessee.

-14-

44.     Defendant Brian B. Sullivan ("Sullivan") served as President of each of the Funds from November 10, 2006 through July 29, 2008.  Defendant Sullivan has also served as President and Chief Investment Officer of MAM since 2006.  Defendant Sullivan is also a defendant in the Joint State Action, which, upon information and belief, remains pending against him.  Upon information and belief, defendant Sullivan is a citizen of the State of Alabama.

45.     Defendant Tannehill served as assistant portfolio manager of the Funds and part of defendant Kelsoe's team from 2004 through July 29, 2008.  At the time, defendant Tannehill had been a portfolio manager for MAM since 2004, and had eight years of prior experience with Morgan Keegan in investment research of equity and fixed-income securities.  Upon information and belief, defendant Tannehill is a citizen of the State of Tennessee.

46.     Defendant Joseph C. Weller ("Joseph Weller") served as Treasurer of each of the Funds from its inception through 2006.  At the time, defendant Joseph Weller had served as a director of MAM since 1993.  In addition, as one of the founders of Morgan Keegan, he had served as Executive Vice President, CFO, Treasurer, Secretary and Executive Managing Director thereof from 1969 through approximately July 12, 2006, when he was named Vice Chairman. Thereafter, defendant Joseph Weller continued to serve on Morgan Keegan's Executive Management Committee and maintained a supervisory role over several Morgan Keegan affiliates.  Defendant Joseph Weller is the father of defendant Thompson Weller.  Upon information and belief, defendant Joseph Weller is a citizen of the State of Tennessee.

47.     Defendant Thompson Weller served as the Assistant Secretary of each of the Funds from its inception through July 29, 2008 and as Treasurer of each of the Funds from November 10, 2006 through July 29, 2008.  At the time, defendant Thompson Weller had served in various executive roles at Morgan Keegan since 1992, including as a Managing Director and

Controller since October 2001.  Defendant Thompson Weller is a defendant in the SEC Action. Indeed, when announcing the commencement of the SEC Action, the SEC identified defendant Thompson Weller as the other of the scheme's "two architects" in addition to defendant Kelsoe, describing him as "the head of fund accounting who turned a blind eye to the fund[s'] bogus valuation process."  In connection with the settlement of the Governmental Actions, defendant Thompson Weller has been suspended from the securities industry and as an accountant and must pay penalties totaling $50,000.  Defendant Thompson Weller is the son of defendant Joseph Weller.  Upon information and belief, defendant Thompson Weller is a citizen of the State of Tennessee.

48.     Defendant Michele F. Wood, formerly Michele L. Fowler ("Wood") served as Chief Compliance Officer of each of the Funds from 2006 through July 29, 2008.  At the time, defendant Wood had served as the Chief Compliance Officer of MAM since 2006 and was also a Senior Vice President at Morgan Keegan.  She had previously served as a Senior Attorney and First Vice President of Morgan Keegan from 2002 to 2006.  Defendant Wood is a defendant in the Joint State Action, which, upon information and belief, remains pending against her.  Upon information and belief, defendant Wood is a citizen of the State of Tennessee.

49.     Defendants Kelsoe, Alderman, Anthony, Gamble, Maxwell, Morgan, Sullivan, Tannehill, Joseph Weller, Thompson Weller and Wood are referred to collectively herein as the "Individual Defendants."  The Individual Defendants and MAM are referred to collectively herein as "Defendants."

## DUTIES OF THE DEFENDANTS

50.     By reason of their positions as officers and/or directors and/or the investment advisor and/or the portfolio managers of the Funds and because of their ability to control the business and affairs of the Funds, each of the defendants owed the Funds and their shareholders

the fiduciary obligations of good faith, trust, loyalty and due care, and were required to use their utmost ability to control and manage the Funds in a fair, just, honest and equitable manner.  The Defendants were required to act in furtherance of the best interests of the Funds and their shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each of the Defendants owed to the Funds and their shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Funds and in the use and preservation of their property and assets, and the highest obligations of fair dealing.

51.    To discharge their duties, the Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Funds.  By virtue of such duties, the Defendants were required to, *inter alia*:

a.    manage, conduct, supervise and direct the business affairs of the Funds in accordance with all applicable law (including federal and state laws, government rules and regulations and the Funds' own governing documents);

b.    exercise good faith in ensuring that the affairs of the Funds were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of the Funds;

c.    exercise good faith in ensuring that the Funds were operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, as well as the Funds' own governing documents;

d.    neither engage nor knowingly permit any officer or director of the Funds or Fund affiliate or its employees to engage in self-dealing with respect to the Funds;

e.    neither violate nor knowingly permit any officer or director or manager of the Funds or Fund affiliate to violate applicable laws, rules and regulations;

f.    remain informed as to the status of the Funds' operations, including practices in relation to the investment of the Funds' assets in accordance with the Offering Materials and the valuation of the Funds' portfolio

holdings in accordance with the Offering Materials, all other governing documents, and U.S. generally accepted accounting principles ("GAAP"); and, upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith and take steps to correct such conditions or practices and make such disclosures as are necessary to comply with federal securities laws and their duty of candor to the Funds' shareholders;

g. prudently protect the Funds' assets, including taking all necessary steps to recover corporate assets improperly paid to MAM and Kelsoe together with the related costs (professional fees) proximately caused by the illegal conduct described herein;

h. establish and maintain systematic and accurate records and reports of the business and affairs of the Funds and procedures for the reporting of the business and affairs to the Boards and periodically investigate, or cause independent investigation to be made of, said reports and records;

i. maintain and implement an adequate, functioning system of internal legal, financial and accounting controls such that the Funds' financial statements – including expenses, schedules of portfolio holdings and NAVs – would be accurate and the actions of the Funds' directors would be in accordance with all applicable laws;

j. exercise control and supervision over the Funds' public reports;

k. when put on notice of problems with the Funds' business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and

l. supervise the preparation and filing of any financial reports or other information required by law from the Funds, examine and evaluation any reports of examinations, audits or other financial information concerning the financial affairs of the Funds and make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

52.      In addition to these traditional fiduciary obligations, the Defendants owed heightened fiduciary duties to the Funds and their shareholders because the Funds are closed-end funds.   The structure of closed-end funds makes them susceptible to abuses, as a fund's investment advisor supervises its daily operations and often appoints affiliated persons to serve

on its board of directors.  Conflicts of interest are thus inherent in the relationship between a closed-end fund and its investment advisor.

53.     Defendant MAM, its directors, officers and employees, including defendants Kelsoe, Tannehill, Alderman, Anthony, Maxwell, Morgan, Sullivan, Joseph Weller and Wood, owed fiduciary duties to the Funds arising out of MAM's role as the investment advisor to the Funds.

54.     These fiduciary duties are evident in the policies behind the 1940 Act and its companion legislation, the Investment Advisers Act of 1940 (as amended, the "Advisers Act"). Indeed, in adopting the 1940 Act, Congress found that "the national public interest and the interest of investors are adversely affected" in the following instances:

> (1) when investors purchase, pay for, exchange, receive dividends upon, vote, refrain from voting, sell, or surrender securities issued by investment companies without adequate, accurate, and explicit information, fairly presented, concerning the character of such securities and the circumstances, policies, and financial responsibility of such companies and their management;

> (2) when investment companies are organized, operated, managed, or their portfolio securities are selected, in the interest of directors, officers, investment advisers, depositors, or other affiliated persons thereof, in the interest of underwriters, brokers, or dealers, in the interest of special classes of their security holders, or in the interest of other investment companies or persons engaged in other lines of business, rather than in the interest of all classes of such companies' security holders;

> *          *          *

> (4) when the control of investment companies is unduly concentrated through pyramiding or inequitable methods of control, or is inequitably distributed, or when investment companies are managed by irresponsible persons;

> (5) when investment companies, in keeping their accounts, in maintaining reserves, and in computing their earnings and the asset value of their outstanding securities, employ unsound or misleading methods, or are not subjected to adequate independent scrutiny.

15 U.S.C. § 80a-1(b).

-19-

55.     As stated by the United States Supreme Court, the Advisers Act "reflects a congressional recognition of the delicate fiduciary nature of an investment advisory relationship." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191 (1963) (internal quotation omitted).

56.     In addition, federal rules issued by the SEC require that investment advisors such as MAM "establish, maintain and enforce a written code of ethics that, at a minimum, includes":

> (1) A standard (or standards) of business conduct that you require of your supervised persons, ***which standard must reflect your fiduciary obligations and those of your supervised persons***;
>
> (2) Provisions requiring your supervised persons to comply with applicable Federal securities laws;
>
> (3) Provisions that require all of your access persons to report, and you to review, their personal securities transactions and holdings periodically as provided below;
>
> (4) Provisions requiring supervised persons to report any violations of your code of ethics promptly to your chief compliance officer or, provided your chief compliance office also receives reports of all violations, to other persons you designate in your code of ethics; and
>
> (5) Provisions requiring you to provide each of your supervised persons with a copy of your code of ethics and any amendments, and requiring your supervised persons to provide you with a written acknowledgment of their receipt of the code and any amendments.

17 C.F.R. § 275.204A-1(a) (emphasis added). [3]   Accordingly, MAM, as well as its "supervised persons," including defendants Kelsoe, Tannehill, Alderman, Anthony, Maxwell, Morgan, Sullivan, Joseph Weller and Wood, were required to comply with a code of ethics that reflected their fiduciary duties owed to the Funds.

---

[3] Section 202(a)(25) of the Advisers Act defines "supervised person" as "any partner, officer, director... or employee of an investment adviser, or other person who provides investment advice on behalf of the investment adviser and is subject to the supervision and control of the investment adviser."

57.     Indeed, the Investment Advisory Agreements entered into between each of the Funds and MAM (collectively, the "Advisory Agreements"),[4] required MAM to adopt a Code of Ethics that complied with both the 1940 Act and the Advisers Act.

58.     Additionally, the Funds had adopted a Code of Ethics for Principal Executive and Principal Financial Officers of the Funds (the "Code of Ethics"), which applied to defendants Anthony, Sullivan, Joseph Weller and Thompson Weller, in each defendant's capacity as President or Treasurer of the Funds, the stated purpose of which was to promote the following principles, with respect to each Fund:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- full, fair, accurate, timely and understandable disclosure in reports and documents that the Fund files with, or submits to, the Securities and Exchange Commission ("SEC") and in other public communications made by the Fund;

- compliance with applicable laws and governmental rules and regulations;

- the prompt internal reporting of violations of the Code to an appropriate person or persons identified in the Code; and

- accountability for adherence to the Code.

59.     Specifically, the Code of Ethics provided that defendants Anthony, Sullivan, Joseph Weller and Thompson Weller were required to comply with the following with respect to each Fund:

### III.    Disclosure & Compliance

- Each Covered Officer should familiarize himself with the disclosure requirements generally applicable to the Fund;

---

[4] Attached hereto as Exhibits N, O, P and Q, respectively, are copies of the Advisory Agreements between MAM and Helios Advantage, Helios High, Helios Multi-Sector and Helios Strategic.

- Each Covered Officer should not knowingly misrepresent, or cause others to misrepresent, facts about the Fund to others, whether within or outside the Fund, including to the Fund's directors/trustees and auditors, and to governmental regulators and self-regulatory organizations;

- Each Covered Officer should, to the extent appropriate within his area of responsibility, consult with other officers and employees of the Fund and the Fund's adviser or any sub-adviser with the goal of promoting full, fair, accurate, timely and understandable disclosure in the reports and documents the Fund files with, or submit[s] to, the SEC and in other public communications made by the Fund; and

- It is the responsibility of each Covered Officer to promote compliance with the standards and restrictions imposed by applicable laws, rules and regulations.

60.    In addition, the Funds' directors, including defendants Alderman and Morgan (collectively, the "Director Defendants"), as well as defendant MAM and its employees, including defendants Kelsoe, Tannehill, Alderman, Anthony, Maxwell, Sullivan and Wood, were responsible for pricing the Funds' securities in accordance with the Funds' valuation policies and procedures, which are discussed in further detail below.

61.    Specifically, the Morgan Keegan Policies and Procedures Manual (the "Policies and Procedures Manual") required that the securities in the Funds' portfolios for which market quotations are readily available were to be valued at current market value, and securities for which market quotations were not readily available were to be valued at "fair value" as determined in good faith by MAM.  The Policies and Procedures Manual stated:

> The Board of Directors/Trustees ("Board") of each of Morgan Keegan Select Fund, Inc., Regions Morgan Keegan Select Funds, RMK Advantage Income Fund, Inc., RMK High Income Fund, Inc., RMK Multi-Sector High Income Fund, Inc. and RMK Strategic Income Fund, Inc. (each, a "Fund") has delegated to Morgan Asset Management, Inc. (the "Adviser") the responsibility for carrying out certain functions relating to the valuation of portfolio securities and other instruments in connection with calculating the net asset value per share ("NAV") for the Fund.  The Adviser assumes these delegated responsibilities in accordance with the procedures and controls set forth below ("Procedures").

## I.      GENERAL PRICING POLICY

For purposes of determining the NAV of the Fund portfolio securities for which market quotations are readily available are valued at current market value.  All other portfolio securities will be valued at "fair value" as determined in good faith b the Adviser as described below.

## II.      DETERMINATION OF CURRENT MARKET VALUE

The sources of determining the current market value of a portfolio security include organized exchanges, over-the-counter ("OTC") markets, independent pricing services and broker-dealers.

*        *        *

## III.      FAIR VALUE DETERMINATION

When price quotations for certain securities are not readily available from the sources above in Section II or if the available quotations are not believed to be reflective of market value, those securities shall be valued at "fair value" as determined in good faith by the Adviser's Valuation Committee.   Such determinations shall be made in accordance with the procedures set forth below.

A.      **General Factors**.  The Valuation Committee should generally consider the following in determining the fair value of the securities:

- the fundamental analytical data relating to the investment;

- the nature and duration of restrictions on disposition of the securities; and

- an evaluation of the forces which influence the market in which these securities are purchased and sold,

B.      **Specific Factors**.   Among the more specific factors that should be considered by the Valuation Committee in determining the fair value of a security are:

- type of security;

- financial statements of the issuer;

- cost at date of purchase (generally used for initial valuation);

- size of the Fund's holding;

- for restricted securities, any discount from market value of unrestricted securities of the same class at the time of purchase;

- the existence of a shelf registration for restricted securities;

-23-

- information as to any transactions or offers with respect to the security;

- special reports prepared by analysts;

- the existence of merger proposals, tender offers[ ] or similar events affecting the security; and

- the price and extent of public trading in similar securities of the issuer or comparable companies.

C.    **Notification of Need for Fair Valuation**.   The Adviser's investment, trading and accounting personnel shall monitor the need for determining the fair value of portfolio securities and notify the Valuation Committee or its delegates if fair value is to be determined in accordance with these Procedures.

D.    **Written Reports of Fair Value Determinations**.   Upon making a determination as to the fair value of a security, the Valuation Committee shall maintain a written report documenting the manner in which the fair value of a security was determined and the accuracy of the valuation made based on the next reliable public price quotation for that security.   Quarterly reports listing all securities held by the Fund that were fair valued during the quarter under review, along with explanatory notes for the fair values assigned to the securities, shall be presented to the Board for its review.

E.    **Effectiveness of Valuation Committee Determinations**.    A determination by the Valuation Committee that a particular portfolio security held by the Fund should be valued in a particular manner shall be effective for all subsequent calculations of the Fund's net asset value until such time as:

- either the Fund no longer owns the portfolio security in question;

- a market price becomes available because the portfolio security commences or resumes trading;

- a market price becomes available because a previously unregistered security becomes registered; or

- the Valuation Committee determines to modify or terminate its prior determination with respect to the portfolio security.

## IV.   PRICE VALIDATION

The Adviser shall monitor the reliability of pricing data supplied by various sources and identify potential valuation issues through the Procedures described below.

**A.      Periodic Monitoring Procedures.**

1.      **Review of Independent Pricing Service Data**.   The Adviser shall periodically cross-check the prices of individual securities received from an independent pricing service, selected on the basis of potential impact on the NAV of the Fund, against quotations from other pricing services; quotations from dealers making a market in the particular securities; prices from actual sales in the particular securities, when and if they occur; and/or Prices for comparable securities.   Where significant variances appear, the Adviser shall further analyze the appropriateness of the price used in Calculating NAV.   Any price overrides and their justification shall be documented, consistent with the Procedures indicated below.

2.      **Review of Broker-Dealer Supplied Prices**.    The Adviser shall periodically crosscheck the prices of individual securities received from broker-dealers, selected on the basis of potential impact on the NAV of the Fund against quotations from other broker-dealers making a market in the particular securities; prices from actual sales in the particular securities, when and if they occur; and/or prices for the comparable securities.   Where significant variances appear, the Adviser shall further analyze the appropriateness of the price used in calculating NAV.   Any price overrides and their justification shall be documented consistent with the Procedures indicated below.

3.      **Review of Fair Value Prices**.   For each portfolio security fair valued, the Valuation Committee shall check and refine the valuation methodology by comparing the fair value of the security with values that are available from other sources (if any).   The Valuation Committee shall document in a report such comparisons when they are made.

**B.      Price Override Procedures.**   The Adviser may override prices provided by a pricing service or broker-dealer only when it has a reasonable basis to believe that the price provided by the pricing source does not accurately reflect the fair value of the portfolio security.   The basis for overriding the price shall be documented and provided to the Valuation Committee for its review.   The Valuation Committee will take such action as it deems necessary or appropriate with respect to price overrides.

**C.      Executive Valuation Committee.**   The Adviser also has a separate Executive Valuation Committee, which consists of a member of the Board of Directors/Trustees, senior management, and the portfolio managers.   The Executive Valuation Committee only meets in extraordinary circumstances when no pricing data is available.

62.      As discussed in detail in an expert report commissioned by the SEC by Cindy W.

Ma, Ph.D. (the "Ma Report"), a copy of which is attached hereto as Exhibit R, Defendants were

required to comply with GAAP, as established by the Financial Accounting Standards Board

("FASB"), with respect to valuation of fair-valued securities:

> The Statement of Financial Accounting Standards No. 107, "Disclosure about Fair Value of Financial Instruments," ("FAS 107") was applicable at the time of the Funds' operation and addresses disclosures about fair value of financial instruments. FAS 107 defines the fair value of a financial instrument as "the amount at which the instrument could be exchanged in a current transaction between willing parties, other than in a forced or liquidation sale." FAS 107 requires entities to disclose the fair value of financial instruments for which it is practicable to estimate fair value and also states that quoted market prices are the most reliable and verifiable source for determination of fair value. In addition, the Investment Company Act of 1940 specifies that for securities and assets for which market quotations are not readily available, the investments should be carried at "fair value… as determined in good faith by the board of directors."

*      *      *

> In 2007, there were several sources that Respondents could reference to identify sound practices for valuation. A portfolio manager or Fund Accounting manager could reasonably have been expected to have knowledge of minimally acceptable standards from the broader investment industry. The Alternative Investment Management Association Limited Guide to Sound Practices for Hedge Fund Valuation ("AIMA Guide") was a prominent industry publication on valuation best practices. The AIMA guide builds on asset pricing research released by AIMA in 2005. The intention of the AIMA Guide was to recommend practices for the hedge fund industry. It is my professional opinion that many of the valuation practices articulated in the AIMA Guide embody standards that should have been applied to the valuation of the Funds' securities. There were also a number of other regulations and industry standards that could have been applied to the Respondents' valuation practices during the Relevant Period. These include publications from the Investment Company Institute's Fair Valuation Series, Accounting Series Release 113, Accounting Series Release 118, and FAS 107. Many of the valuation practices recommended by the AIMA Guide are also key recommendations of certain of these other publications.

> Hedge fund investors are generally wealthy individuals or institutions and they are deemed to be more sophisticated than mutual fund investors. Logically, in order to provide sound protection for retail investors, even stricter valuation policies and procedures would apply to the mutual fund industry. Since many mutual funds invest in liquid equity and bonds, practices for valuation are straightforward given available market data. However, the Funds admittedly "invest[ed] in higher yielding thinly traded securities, which … need[ed] to be 'fair valued' by Fund Accounting." Accordingly, the practices recommended in both of the AIMA Guide and in AIMA 2005, especially those related to the valuation process for illiquid securities, should have been followed by those

Respondents who were involved in valuing securities. … [T]he Respondents' practices did not meet these guidelines and, as a result, there were material shortcomings in the Respondents' practices with respect to proper valuation procedures, pricing transparency and conflicts of interest.  Because of their illiquid and complex nature, many of the securities in which the Funds were invested did not have readily-ascertainable market values, and therefore the investment values used to calculate the Funds' NAVs were susceptible to being measured improperly.

63.    Defendants owed to the Funds their fiduciary duties of good faith, honesty and loyalty to ensure that the Funds' financial reporting was fairly presented, in all material respects, the operations and financial condition of the Funds.  In order to adequately carry out these duties, it was necessary for Defendants to know and understand the material non-public information to be either disclosed or omitted from the Funds' public statements.  This material non-public information included the problems each Fund faced because of its deficient internal controls. The Officer Defendants and the Portfolio Manager Defendants had ample opportunity to discuss this material information with their fellow officers and portfolio managers at management meetings and via internal corporate documents and reports.  The Director Defendants had ample opportunity to discuss this material information with fellow directors at any of the scores of Board meetings that occurred during the relevant time, from 2006 through 2007.

64.    Defendants, because of their positions of control and authority as officers, directors or the investment advisor of the Funds, and the directors, officers and employees thereof, including the Portfolio Manager Defendants, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

## SUBSTANTIVE ALLEGATIONS

### The Inception of the Funds and the Organization of Their Operations

65.    The Funds were formed and the Offering Materials were disseminated to investors between 2003 and 2006.  Specifically, Helios High was incorporated on or about April

-27-

16, 2003; Helios Strategic was incorporated on or about January 16, 2004; Helios Advantage was incorporated on or about September 7, 2004; and Helios Multi-Sector was incorporated on or about November 14, 2005.

66.     On or about April 16, 2003, Helios High filed with the SEC on Form N-2 and disseminated to investors a Registration Statement.  Thereafter, on or about May 28, 2003 and June 23, 2003, Helios High filed Form N-2As with the SEC and disseminated to investors amended Registration Statements.  Subsequently, on June 26, 2003, Helios High filed with the SEC a Prospectus (collectively, these documents are referred to as the "Helios High Prospectus").  The Helios High Prospectus explicitly incorporated by reference an SAI attached thereto and all other exhibits.

67.     The Helios High Prospectus set forth the investment strategy of the Fund, stating that "[t]he Fund will seek to achieve its investment objectives by investing a majority of its total assets in a diversified portfolio of below investment grade debt securities offering attractive yield and capital appreciation potential."

68.     On or about January 16, 2004, Helios Strategic filed with the SEC on Form N-2 and disseminated to investors a Registration Statement.  Thereafter, on or about February 26, 2004 and March 17, 2004, Helios Strategic filed Form N-2As with the SEC and disseminated to investors amended Registration Statements.  Subsequently, on March 22, 2004, Helios Strategic filed with the SEC a Prospectus (collectively, these documents are referred to as the "Helios Strategic Prospectus").  The Helios Strategic Prospectus explicitly incorporated by reference an SAI attached thereto and all other exhibits.

69.     The Helios Strategic Prospectus sets forth the investment strategy of the Fund, stating that "[t]he Fund will seek to achieve its investment objectives by investing in a

diversified portfolio of securities that offers attractive yield and capital appreciation potential and consists primarily of debt securities and secondarily of equity securities."

70.     On or about September 7, 2004, Helios Advantage filed with the SEC on Form N-2 and disseminated to investors a Registration Statement.  Thereafter, on or about October 20, 2004 and November 5, 2004, Helios Advantage filed Form N-2As with the SEC and disseminated to investors amended Registration Statements.  Subsequently, on November 10, 2004, Helios Advantage filed with the SEC a Prospectus (collectively, these documents are referred to as the "Helios Advantage Prospectus").  The Helios Advantage Prospectus explicitly incorporated by reference an SAI attached thereto and all other exhibits.

71.     The Helios Advantage Prospectus sets forth the investment strategy of the Fund, stating that "[t]he Fund will seek to achieve its investment objectives by investing a majority of its total assets in below investment grade debt securities offering attractive yield and capital appreciation potential.  The Fund also may invest up to 15% of its total assets in foreign debt and equity securities and up to 25% of its total assets in domestic equity securities, including common and preferred stocks.  The Fund will invest in a wide range of below investment grade debt securities, including corporate bonds, mortgage- and asset-backed securities and municipal and foreign government obligations, as well as securities of companies in bankruptcy reorganization proceedings or otherwise in the process of debt restructuring."

72.     On or about November 14, 2005, Helios Multi-Sector filed with the SEC on Form N-2 and disseminated to investors a Registration Statement.  Thereafter, on or about January 9, 2006 and January 18, 2006, Helios Multi-Sector filed Form N-2As with the SEC and disseminated to investors amended Registration Statements.  Subsequently, on January 23, 2006, Helios Multi-Sector filed with the SEC a Prospectus (collectively, these documents are referred

to as the "Helios Multi-Sector Prospectus").   The Helios Multi-Sector Prospectus explicitly incorporated by reference an SAI attached thereto and all other exhibits.

73.     The Helios Multi-Sector Prospectus set forth the investment strategy of the Fund, stating that "[t]he Fund will seek to achieve its investment objectives by investing in a diversified portfolio consisting primarily of debt securities that [MAM] believes offer attractive yield and capital appreciation potential."

74.     Each Fund's Prospectus also described the management structure of the Funds. Specifically, the Funds' Boards, including the Director Defendants, provided broad supervision over the affairs of the Funds, including supervision of the duties performed by MAM, the Officer Defendants and the Portfolio Manager Defendants.   "[MAM] will be responsible for the investment of the Fund's portfolio in accordance with the Fund's investment objectives and policies.  [MAM] will make all investment decisions for the Fund, subject to oversight by the [Board]."   The officers of the Funds, *i.e.*, defendants Anthony, Gamble, Maxwell, Sullivan, Joseph Weller, Thompson Weller and Wood (collectively, the "Officer Defendants"), were responsible for the Funds' operations.

75.     MAM provided the Funds with investment research and advice and furnished the Funds with investment programs consistent with the Funds' respective investment objectives and policies.  MAM determined which portfolio securities would be purchased or sold, arranged for the placing of orders for the purchase or sale of portfolio securities, selected brokers or dealers to place those orders, maintained books and records with respect to the Funds' securities transactions and reported to the Board on the Funds' investments and performance.  However, the day-to-day management of the Funds' portfolios was the responsibility of a team led by defendant Kelsoe.

76.     Defendants Kelsoe, Sullivan and Wood, as defendants in the Joint State Action, have expressly admitted that they were responsible for ensuring that each Fund complied with the requirements set forth in its Prospectus.

77.     Specifically, defendant Kelsoe has admitted that he was "responsible for selecting and purchasing certain holdings for the Funds… his job was to manage the Funds, i.e., to buy and sell securities in each Fund's portfolio in accordance with the investment guidelines set forth in the prospectus."  Indeed, defendant Kelsoe has admitted that he "knew or should have known what types of securities he was purchasing for the Funds and the amounts of those securities in the Funds."

78.     Defendant Sullivan has stated that his responsibilities with respect to the Funds included "*ensur[ing] that [Kelsoe] followed the investment guidelines for each fund, which are outlined in the Funds' prospectuses*."  (emphasis added).  Specifically, defendant Sullivan has admitted in the Joint State Action that:

> As part of his supervisory responsibilities, which related to monitoring the make-up of the assets in the Funds, Mr. Sullivan regularly discussed the Funds with Mr. Kelsoe.  These discussions included, among other topics, specifics on the assets Mr. Kelsoe purchased for the Funds and why Mr. Kelsoe thought the assets fit with the Funds' value-investing approach.  With respect to mortgage-backed bonds, Mr. Sullivan and Mr. Kelsoe reviewed default rates, delinquencies, and the nature of the underlying assets [ ].

79.     Defendant Wood has admitted in the Joint State Action that her "primary responsibility was *to oversee MAM's and the Funds' compliance with their respective policies and procedures and ethics rules*," which included the following:

> To fulfill her compliance responsibilities, Ms. Wood monitored the personal trading by access persons of MAM and the Funds and provided compliance support to MAM's eighty Portfolio Managers and other MAM employees.  On a quarterly basis, *Ms. Wood worked with fund accounting and MAM's Portfolio Managers to review whether each of the funds managed by MAM (including the Funds) adhered to applicable requirements and their prospectuses*.  Finally, Ms. Wood was responsible for review of emails to and from MAM employees,

> which were selected automatically for review based on specific search terms. With respect to all of her compliance responsibilities related to the Funds, Ms. Wood reported to the Board of Directors for both the Funds and MAM.

(Emphasis added).  In addition, defendant Wood has testified in connection with an arbitration proceeding that she reviewed sales materials and had an opportunity to review and comment on SEC filings for the Funds and certain open-end funds for which she also served as Chief Compliance Officer.

80.     As stated in the Prospectuses, under the Advisory Agreements, each Fund would pay to MAM monthly, as compensation for the services rendered and expenses paid by it, a fee equal on an annual basis to 0.65% of the Fund's average daily Managed Assets.  Under separate administration agreements, pursuant to which MAM provided the Funds with "facilities, equipment and personnel… as well as certain stockholder, stockholder-related and other services," each Fund would pay to MAM monthly, as compensation for the services rendered and expenses paid by it, a fee equal on an annual basis to 0.15% of the Fund's average daily Managed Assets.  Pursuant to the Prospectuses, "Managed Assets" was defined as a Fund's average daily total assets (including any assets attributable to any leverage) minus the sum of accrued liabilities other than debt entered into for purposes of leverage.

81.     The Prospectuses also stated that, under the supervision of the Board, MAM determined the liquidity of the Funds' investments and, through reports from MAM, the Board monitored investments in illiquid instruments.  The Prospectuses further described how the Funds valued illiquid investments such as sub-prime loans, which are investments that cannot be sold or disposed of in the ordinary course of business at approximately the prices at which they are valued, namely, that in the absence of market quotations, illiquid investments were priced at fair value as determined in good faith by a committee appointed by the Boards.

82.     The Funds were created between 2003 and early 2006.  As detailed above, each Fund's Prospectus set forth investment objectives, strategies and policies, including the limitation that no more than 25% of each Fund's assets could be concentrated in one industry. The Funds were marketed as low-risk, diversified investments.  Throughout all relevant times, defendant Kelsoe was the portfolio manager for the Funds and, with the assistance of defendant Tannehill, was tasked with investing each Fund's assets in compliance with its Prospectus.

### The Subprime Meltdown

83.     Beginning in mid-2005, the subprime mortgage market was beginning to unravel. From August 2005 into 2006, higher borrowing costs started to impact the United States housing market and the real estate boom began to slow down tremendously.

84.     By mid-2006, news reports increased warning about the increased numbers of defaults on sub-prime mortgages.  For example, as noted in an October 10, 2006 article in *Investor's Business Daily*, entitled "Risky New Loans Add Unknowns As Banks Size Up Housing Drop; Defaults likely will top rates in past downturns -- but by how much?," the number of mortgage foreclosures had increased dramatically.  For instance, "[f]or August [2006], foreclosures surged to 115,292 -- 24% higher than in July and 53% higher than a year earlier."  Moreover, the Mortgage Bankers Association's delinquency data cited a notable uptick in defaults among subprime loans, particularly those with adjustable rates.

85.     On December 19, 2006, the Dow Jones International News published an article, entitled "US Housing Policy Group Warns of Subprime Mortgage Foreclosures," stating in relevant part:

> U.S. subprime mortgage foreclosures may rise sharply in the years ahead, with defaults expected for about 15% of the 14 million subprime home loans made in the 1998-2006 period, according to a new forecast from a home finance advocacy group.

"As this year ends, 2.2 million households in the subprime market either have lost their homes to foreclosure or hold subprime mortgages that will fail over the next several years," according to a study released Tuesday by the Center for Responsible Lending. "These foreclosures will cost homeowners as much as $164 billion, primarily in lost home equity."

Lenders typically offer subprime loans to borrowers with impaired credit, charging higher interest rates to compensate for higher credit risk.

The Center for Responsible Lending found subprime mortgages today often include particularly risky attributes such as adjustable rates that are especially low in the early years of repayment, then balloon much higher over time.

The CRL study projects that as housing prices cool, fewer delinquent borrowers will have the home equity to refinance or to sell to avoid foreclosure. For subprime loans made in the past two years, the eventual foreclosure rate will be about 19%, even higher than the rate of the past nine years, it says . . . .

86.     On December 19, 2006, *PR Newswire* also reported on the subprime mortgage crisis in an article entitled "Report Reveals 2.2 Million Borrowers Face Foreclosure on Subprime Home Loans; Billions of Home Ownership Wealth to be Lost by Minority Americans; Chart Contains Detailed MSA-Specific Projections of Home Foreclosure Impacts," stating in relevant part:

A new Center for Responsible Lending (CRL) study reveals that 2.2 million American households will lose their homes and as much as $164 billion due to foreclosures in the subprime mortgage market. Titled, "Losing Ground: Foreclosures in the Subprime Market and Their Cost to Homeowners," the CRL study is the first comprehensive, nationwide review of millions of subprime mortgages originated from 1998 through the third quarter of 2006.

CRL's research suggests that risky lending practices have triggered the worst foreclosure crisis in the modern mortgage market, projecting that one out of five (19.4%) subprime loans issued during 2005-2006 will fail.

"In the subprime sector, the most vulnerable borrowers are sold the most dangerous loans," said Mike Calhoun, CRL president. "At $164 billion, the losses from foreclosures could pay for the college educations of four million kids. For families who lose their houses because their loans fail, savings and economic security will be way out of reach."

The report discusses a number of factors that drive subprime foreclosures -- in the majority of cases, borrowers receive high-risk loan features, packed into an

-34-

adjustable rate mortgage with a low start rate, that is approved without considering whether the homeowner can afford to pay the loan after the rate rises.

Adjustable rate mortgages known as 2/28s (or "exploding ARMs") operate with an initial "teaser" rate for two years, followed by a steep payment increase. And, regardless of a borrower's credit history, the almost one-quarter of American families who get subprime loans find them crammed with other high-risk terms such as prepayment penalties, limited income documentation, and no escrow for property taxes and hazard insurance . . . .

87.    As noted in a January 26, 2007 *New York Times* article entitled "More People With Weak Credit Are Defaulting on Mortgages," investors in the subprime market continued to be impacted by the rising mortgage default rates:

Wall Street's big bet on risky mortgages may be souring a lot faster than had been previously thought.

The once booming market for home loans to people with weak credit -- known as subprime mortgages and made largely to minorities, the poor and first-time buyers stretching to afford a home -- is coming under greater pressure. ***The evidence can be seen in rising default rates, increasingly strained finances at mortgage lenders and growing doubts among investors.***

***Now, Wall Street firms, which had helped fuel the growth in the market by bankrolling and investing in subprime mortgage lenders, have begun to pinch off the money spigot.***

Several mortgage lenders have recently collapsed.  While the failures so far are small in number, some industry officials are concerned that they could be the first in a wave.  The subprime sector, which produced loans worth more than $500 billion in the first nine months of last year, could shrink significantly.

***A sharp contraction in subprime mortgages would have ripple effects, reducing consumers' access to credit and affecting investors like foreign central banks, pensions and mutual funds that have been big buyers of mortgage-backed securities.***

\*        \*        \*

"Pick a company -- small, medium or large -- they all have the same problem: capital," said Marc A. Geredes, who runs a small mortgage company, LownHome Financial, in San Jose, Calif.  "The economics of the business do not make sense right now."

Wall Street firms were attracted to such lenders because they helped feed a pipeline of securities backed by the mortgages, a market bigger than the one for

-35-

United States Treasury bonds and notes. Merrill Lynch, for example, securitized $67.8 billion in residential mortgages in the first nine months of 2006, up 58.4 percent from the period a year earlier.

But an increasing number of borrowers are defaulting on subprime loans earlier now than they did a year ago, often within six months of having taken the loan out, shaking Wall Street's confidence in its subprime partners.

In one indication that investors are losing their taste for mortgages, hedge funds that specialize in mortgage-backed securities had an outflow of $1.8 billion in 2006, down from an inflow of $1.8 billion in 2005, according to Hedge Fund Research. It was the only category of hedge funds to have a negative flow for the year.

"We have been and continue to be cautious about the subprime market -- its lending standards, decline in home price appreciation, other deteriorating credit fundamentals," said Jim Higgins, chief executive of Sorin Capital Management.

(Emphasis added).

88. On March 5, 2007, HSBC Holdings plc, Europe's biggest bank, said that the U.S. subprime market was "unstable" and in a "downturn." A week later, on March 12, 2007, shares in New Century Financial Corp. ("New Century"), one of the country's biggest subprime lenders, were suspended amid bankruptcy fears. Indeed, on April 2, 2007, New Century filed for bankruptcy protection after being overwhelmed by customer defaults. In July, two Bear Stearns Co. hedge funds that were heavily invested in collateralized debt obligations backed by subprime mortgage loans collapsed. Thereafter, Federal Reserve Chairman Ben Bernanke stated that losses associated with subprime mortgage products could reach $100 billion.

89. On August 3, 2007, U.S. stock markets fell heavily amid fears about financial firms' exposure to problems in the subprime market. The following week, France's largest bank, BNP Paribas S.A., suspended withdrawals from three investment funds because it was unable to fairly value their holdings. Subsequently, on August 17, 2007, the Federal Reserve lowered the interest rate at which it lends to banks. This measure proved not to be enough, and on August 22, 2007, Countrywide Financial Corp. ("Countrywide") sold $2 billion of preferred stock to

Bank of America Corp. ("BOA") to bolster its finances (later, in January 2008, BOA agreed to purchase Countrywide for approximately $4 billion).

90.     Despite the foregoing, during this same time, the Funds were curiously outperforming their peers.  However, unknown to shareholders, it turned out that the reason the Funds were doing so well was because defendant Kelsoe was manipulating the values of the fair-valued securities in the Funds' portfolios, thus causing the Funds' NAVs to be improperly inflated.  Indeed, neither defendant Kelsoe nor any of the other defendants, had taken any steps to protect the Funds when problems began to arise in the subprime markets such as divesting the Funds' risky, subprime holdings; rather, they continued to *over-concentrate* the Funds' assets in such securities in direct violation of the Offering Materials and subsequent SEC filings.

91.     Furthermore, MAM, the Officer Defendants and the Portfolio Manager Defendants did not accurately disclose these violations of the Funds' Offering Materials.

### Defendants' Manipulation of the Funds' NAVs

*Calculation of NAVs and Valuation of Fair-Valued Securities*

92.     MAM, the Officer Defendants and the Portfolio Manager Defendants knowingly failed to price the Funds' illiquid investments, including MBSs and CDOs, at "fair value" and the Director Defendants failed to properly oversee such pricing practices.  As the SEC concluded in the SEC Consent Order,[5] each Fund's Board "was responsible for pricing the Funds' securities in accordance with the Funds' valuation policies and procedures."   The Funds' high

---

[5] The term "SEC Consent Order" refers to the Corrected Order Making Findings and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Section 15(b) of the Securities Exchange Act of 1934, Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940, and Sections 9(b) and 9(f) of the Investment Company Act of 1940, and Imposing Suspension Pursuant to Section 4C of the Securities Exchange Act of 1934 and Rule 102(e)(1)(iii) of the Commission's Rules of Practice dated June 22, 2011, a copy of which is attached hereto as Exhibit S.

concentrations in such assets "increased the need for proper resources to generate fair value for these securities."

93.     According to the Funds' SEC filings and the Policies and Procedures Manual, MAM was responsible for valuing the Funds' securities used to calculate the Funds' NAVs.  The filings stated that, with respect to investments "for which market quotations are not readily available, or available quotations which appear not to accurately reflect the current value of an investment," such investments were "valued at fair value as determined in good faith by [MAM's] Valuation Committee using procedures established by and under the direction of the Fund's Board of Directors."  As defined in the Funds' Prospectuses, "[f]air value is the valuation of a security determined on the basis of factors other than market value in accordance with procedures approved by the Fund's Board."

94.     Although the Funds' SEC filings and the Policies and Procedures Manual stated that MAM would price the securities, according to the SEC Consent Order, this responsibility was delegated to Morgan Keegan, which priced each portfolio's securities and calculated its daily NAV through its Fund Accounting Department ("Fund Accounting").  Fund Accounting, in turn, frequently received pricing information from defendant Kelsoe.

95.     Defendant Thompson Weller, Morgan Keegan's Controller and the Funds' Treasurer and Assistant Secretary, served on the Valuation Committee that oversaw Fund Accounting's processes and evaluated the prices assigned to securities.  Defendant Wood, the Funds' Chief Compliance Officer, also served on the Valuation Committee.

96.     Pursuant to the Prospectuses, the market price of illiquid securities generally is more volatile than that of more liquid securities, which may adversely affect the price that the

Funds pay for or recover upon the sale of illiquid securities.  Illiquid securities are also more difficult to value, and thus MAM's judgment plays a greater role in the valuation process.

97.     The SEC Consent Order described the Funds' valuation procedures:

The Funds' valuation procedures for fair-valued securities mandated that such securities should be valued in "good faith" by the Valuation Committee, considering a series of general and specific factors including, among others, fundamental analytical data relating to the investment, an evaluation of the forces which influence the market in which the securities are purchased or sold and events affecting the security.  The procedures required the Valuation Committee to maintain a written report documenting the manner in which the fair value of a security was determined and the accuracy of the valuation made based on the next reliable public price quotation for that security.  The procedures also required that prices assigned to securities be periodically validated through, among other means, broker-dealer price confirmations.

(Internal quotations omitted).

98.     In addition, the Policies and Procedures Manual also explained the valuation procedures:

I.      GENERAL PRICING POLICY

For purposes of determining the NAV of the Fund portfolio securities for which market quotations are readily available are valued at current market value.  All other portfolio securities will be valued at "fair value" as determined in good faith b the Adviser as described below.

                              *        *        *

III.    FAIR VALUE DETERMINATION

When price quotations for certain securities are not readily available… or if the available quotations are not believed to be reflective of market value, those securities shall be valued at "fair value" as determined in good faith by the Adviser's Valuation Committee.   Such determinations shall be made in accordance with the procedures set forth below.

[Setting forth factors for Valuation Committee to consider in determining the fair value of such securities].

C.      Notification of Need for Fair Valuation.  The Adviser's investment, trading and accounting personnel shall monitor the need for determining the fair

value of portfolio securities and notify the Valuation Committee or its delegates if fair value is to be determined in accordance with these Procedures.

D.     Written Reports of Fair Value Determinations.     Upon making a determination as to the fair value of a security, the Valuation Committee shall maintain a written report documenting the manner in which the fair value of a security was determined and the accuracy of the valuation made based on the next reliable public price quotation for that security.   Quarterly reports listing all securities held by the Fund that were fair valued during the quarter under review, along with explanatory notes for the fair values assigned to the securities, shall be presented to the Board for its review.

99.     The Policy and Procedures Manual set forth the procedures for validating and monitoring prices of securities held by the Funds, including in the event that MAM desired to override a price quote provided by a broker-dealer:

Price Override Procedures.   The Adviser may override prices provided by a pricing service or broker-dealer only when it has reasonable basis to believe that the price provided by the pricing source does not accurately reflect the fair value of the portfolio security.   The basis for overriding the price shall be documented and provided to the Valuation Committee for its review.   The Valuation Committee will take such action as it deems necessary or appropriate with respect to price overrides.

*Defendants' Failure to Properly Determine Fair Values and Purposeful Miscalculation of NAVs*

100.     The SEC retained Dr. Ma to analyze the valuation practices used by MAM, Morgan Keegan, Kelsoe and Weller with respect to the Funds' portfolio holdings.   In her report Dr. Ma opined, *inter alia*, that:

1.     The valuation practices used by the Respondents could not have generated an accurate NAV for the Funds during the Relevant Period [defined as January 1, 2007 to June 30, 2007 for purposes of the Ma Report].   The practices utilized by Morgan Keegan and Morgan Asset personnel, as they related to the "fair-valued securities" in the Funds' portfolios, were so deficient that they could not reasonably be expected to have produced accurate prices for those securities during the Relevant Period and, therefore, could not reasonably be expected to have produced reliable NAVs for the Funds during the Relevant Period.   The deficiencies in Morgan Keegan's practices included: (i) allowing bond values to remain unchanged for months in a volatile market without obtaining updated information (i.e., stale pricing); (ii) using prices higher than the broker quotes for specific securities with no apparent valid basis for doing so; (iii) allowing the portfolio manager to effectively set marks of fair-valued securities without any

-40-

documentation or explanation to Fund Accounting; (iv) failing to employ any meaningful and consistent valuation procedures for the fair-valued securities; and (v) "smoothing" the values of at least 41 securities that were being carried at unreasonable levels by lowering the prices over a number of consecutive or nearly consecutive days, typically upon receipt of a broker quote indicating that the carrying value was too high.

2.      As a result of the inadequate practices employed by Morgan Keegan, Morgan Asset, the Valuation Committee, Fund Accounting and Mr. Weller, Mr. Kelsoe manipulated the marks at which a number of the fair-valued securities were held, which resulted in inflated reported NAVs for the Funds.

        a.      Respondent Kelsoe provided approximately 283 written price adjustments (affecting approximately 129 bonds) and an indeterminate number of verbal price adjustments during the Relevant Period, many of which lacked a documented reasonable basis.  Mr. Kelsoe's price adjustments were usually accepted, without changes, as valid marks for the securities held by the Funds and were used to establish the Funds' reported NAVs.  Fund Accounting did not produce any documentation showing that the group had questioned the reasonableness and validity of such adjustments.  No supporting documentation related to the basis for these security prices was maintained by Fund Accounting, which violated Morgan Keegan's own policies and procedures.

        b.      Respondent Kelsoe took advantage of his position as the asset manager to exert undue influence in a supposedly independent and objective price collection and validation process.  In a number of instances, evidence indicates that Respondent Kelsoe (i) purposely manipulated price quotes from third parties to "smooth" the substantial price declines of certain securities over an extended period of time, (ii) failed to report or caused the delay or failure of the reporting of unfavorable quotes to Fund Accounting, and (iii) provided unjustifiable price adjustments.

        c.      The actual valuation practices implemented by the Respondents lacked objectivity, independence, transparency and proper documentation.

        d.      Respondents did not have a consistent approach in deriving the fair value of the fair-valued securities and did not maintain appropriate written documentation to support the values at which they carried the investments.

        e.      During the Relevant Period, there was a rapid deterioration in many financial markets accompanied by significant observed market volatility.  Instead of paying special attention to the price collection and validation process, Fund Accounting simply accepted price quotes with no additional scrutiny or reality check.  Respondents held prices for certain securities unchanged for extended periods of time despite evidence that the Funds would be unable to realize such prices in such market conditions.  Respondents should have been skeptical about any prices that remained unchanged and should have performed

more rigorous due diligence and analyses in examining the reasonableness of the carrying values of many of the Funds' investments.

*       *       *

5.      Many of the Funds held more than half of their NAV in structured products, according to the Funds' financial reports.  Marketing material for the Funds claimed that the Respondents performed analysis of the collateral and cash flow characteristics of the structured products, but for most of the Relevant Period, we found no evidence to support this and no documentation of the basis for the values attributed to the fair-valued securities by the Respondents.  In addition, our analysis of the securities indicated that a reasonable investor who performed a collateral analysis would have been unable to justify the values at which the securities were held by the Funds.  For example, in general, yield fluctuations will cause prices of fixed income securities to fluctuate.  However, a severe drop in value of a fixed income security often indicates a perception of increased risk of principal loss.  The elevated levels at which the Funds carried many of the securities we analyzed were inconsistent with the expected principal loss that a simple analysis of the collateral performance of these securities would reveal.

6.      The deficiencies in the Respondents' valuation practices and Mr. Kelsoe's deliberate manipulation of the valuation of certain securities resulted in the over-valuation of the Funds' NAVs during the Relevant Period, in violation of generally accepted accounting principles ("GAAP").

*       *       *

8.      We performed several different analyses to evaluate the values at which the securities held by the Funds were carried for NAV calculation purposes.  Each of these analyses supports the premise that many of the fair-valued securities held by the Funds were carried at levels that were unjustifiably high during the Relevant Period, which indicates that the Funds' NAVs were overstated during that time.

101.    Indeed, the SEC concluded in its findings that "Morgan Keegan and defendant Weller failed to adequately fulfill Morgan Keegan's responsibilities, as delegated by the Funds' Boards of Directors, to price the Funds' securities in accordance with their valuation policies and procedures regarding valuation."

-42-

102.    The Ma Report opines that it is "sound industry practice" for a fund's NAV to be produced independently of its investment advisor to avoid conflicts of interest, particularly where the investment advisor is responsible for valuation of hard-to-value securities.

103.    Despite this industry practice, based upon the testimony of Fund Accounting employee Amy Walker, Kelsoe routinely instructed Fund Accounting to make pricing adjustments, without providing any supporting documentation, and Fund Accounting generally did not request further verification.  As known by Kelsoe, his price adjustments were routinely entered into a spreadsheet used to calculate the NAVs of the Funds.  As stated in the Ma Report, "[t]he accuracy of the NAV is contingent on the reliability of the value assigned to each security in the investment portfolio."  Accordingly, defendant Kelsoe knew that the NAVs could not have accurately represented the securities' fair values as he knew that the values that he assigned were being used without any further inquiry.

104.    Pursuant to the Funds' procedures, prices were often validated through broker-dealer quotes.  The Policies and Procedures Manual specified that prices obtained from a broker-dealer could only be overridden when there was "a reasonable basis to believe that the price provided did not accurately reflect the fair value of the portfolio security."  Whenever a price was overridden, the procedures mandated the basis for overriding the price to be "documented and provided to the Valuation Committee for its review."

105.    In violation of the required procedures, Kelsoe actively screened and manipulated broker-dealer quotes.  After requesting broker-dealer quotes, Fund Accounting was to review the quotes and determine if any prices varied from portfolio prices by more than five percent.  In cases where prices varied, Kelsoe decided on maintaining the current price or assigning a new price to the security, as discussed in further detail below.

*Defendant Kelsoe's Manipulation of Fair-Valued Security Prices*

106.   The Ma Report found that defendant Kelsoe acted improperly with respect to the valuation of the Funds' holdings by: (i) failing to document his valuation analysis appropriately; (ii) lacking a consistent valuation methodology; (iii) lacking transparency with respect to Fund Accounting; (iv) lacking transparency with respect to the Valuation Committee; and (v) engaging in inappropriate dealings with Greenwich Capital Markets, Inc. ("Greenwich Capital").

107.   Specifically, the Policies and Procedures Manual provided that the "'basis for overriding [a quoted] price shall be documented and provided to the Valuation Committee for its review.'"  However, defendant Kelsoe admitted that "he did not have a specific methodology for making price observations or determining price adjustments" and "did not have a formal note-taking process and therefore did not adequately document his correspondence when talking with brokers and when communicating with Morgan Keegan."  As a result, defendant Kelsoe failed to properly document his valuation activities.

108.   In addition, defendant Kelsoe improperly influenced the quotes that brokers provided to Fund Accounting.  The Ma Report specifically discusses the relationship between Kelsoe and Dan Derby ("Derby"), a broker at Greenwich Capital, pursuant to which Kelsoe would "regularly preview[ ] and negotiate[ ] specific prices with Greenwich Capital before Greenwich Capital responded to Fund Accounting's requests for quotes to use in the calculation of [the Funds'] NAV."  In other words, defendant Kelsoe negotiated with Greenwich Capital to provide higher prices than would have otherwise been quoted.  Furthermore, "Mr. Kelsoe acknowledged that he did not call any member of Fund Accounting after Fund Accounting had received prices from Greenwich Capital to tell them that he had previously discussed the price quotes with Greenwich."

109.   Defendant Kelsoe conspired with Derby to gradually write down the price of a

security that had declined in value, despite the GAAP requirement and industry practice that

valuations should be reset to lower price levels as soon as it becomes known that the current

value of such a security had been reduced.[6]  The Ma Report cites to defendant Kelsoe's own

testimony in its discussion of this scheme:

> Mr. Kelsoe entered into an agreement with Greenwich Capital to write down the
> price of certain securities in a series of intermediate steps over time, rather than
> immediately mark the price at the "true" fair value.  In a discussion with Mr.
> Derby at Greenwich Capital, Mr. Kelsoe proposed a "smoothing" scheme of
> marking a bond at a higher level than the quote provided by Greenwich Capital,
> but with the plan to reduce the price of that bond gradually down to the level of
> Greenwich Capital's initial quote.  Mr. Kelsoe and Mr. Derby agreed to "smooth"
> the write-down of bonds over a three-month period…. Mr. Kelsoe created false
> interim "step-downs" to lower prices gradually in order to avoid a sudden decline
> in the Funds' NAVs.

*      *      *

> In a conversation regarding one of the Long Beach RMBS identified by CUSIP
> 54239WAB5 that had been marked at 50, Mr. Kelsoe asked Mr. Derby, "Is there
> any way you can do anything with that one?"  Mr. Derby agreed to mark the Long
> Beach bond at "65 or something, and then you'll have it at 50 meaning do half of
> that at one time and go from there."  In cases like this, Mr. Derby would keep a
> spreadsheet of the price level provided by the Greenwich Capital trader compared
> to the price level at which he would mark it as an interim step to keep track of
> "what we've got to get to."  Mr. Kelsoe testified that he did not know why he did
> not submit a price observation of 50 to Fund Accounting immediately.
> Furthermore, the price observations that Mr. Kelsoe sent to Fund Accounting in
> April 2007 and May 2007 for the Long Beach bond were 72 and 71, respectively,
> which were both higher than the mark of 65 agreed upon with Mr. Derby as an
> interim step.  Without providing any documentary support or market evidence
> from sources other than Greenwich Capital, Mr. Kelsoe stated that the higher
> prices he reported to Fund Accounting were correct in his opinion.

110.   Defendant Kelsoe's gradual reduction of the values of securities which he knew

had been reduced was not limited to quotes received from Greenwich Capital.  For example,

according to the Ma Report, on April 5, 2007, Fund Accounting received a broker quote from

---

[6] *See* Ma Report at 21-27 (explaining how Defendants' valuation practices fell short of GAAP
requirements and industry standards).

Stifel, Nicolaus & Co. ("Stifel") of 10% of par value for a security, identified by CUSIP 3623412S7, that had previously been valued at 59.5%.  "Mr. Kelsoe then provided Fund Accounting with a price adjustment of 51% on April 10, 2007" and proceeded to override the Stifel price and "gradually smooth[ ] his price down over the span of more than two months."

111.    Another example of defendant Kelsoe's misconduct related to an improper deal with Greenwich Capital relating to two tranches of Knollwood CDO II, a synthetic CDO (identified by CUSIPs 49916RAG5 and 49916TAA4).  According to the Ma Report, Kelsoe and Derby agreed that:  Greenwich Capital would sell the two securities to the Funds at a price of 92% of par for the equity tranche; the Funds would hold the securities for six months; the Funds would receive interest payments in October 2006 and January 2007; and at the end of the six months in January 2007, Greenwich Capital would offer a locked market on the securities.  A telephone call between Kelsoe and Derby relating to this agreement was recorded, in which Kelsoe said "I wouldn't do that on this kind of collateral without a lot more work and a lot more price discovery."  According to the Ma Report, Greenwich Capital did not end up buying the securities back from the Funds.

112.    Moreover, Kelsoe and Derby reached an agreement on May 16, 2007, that if Greenwich was unable to provide a quote for the Knollwood securities of 87.5% of par or higher, it would not provide a quote at all.  At the time, Fund Accounting continued to price the equity tranche at its purchase price of 92% of par.  Greenwich Capital could not provide a quote higher than 53%-71% of par, so it did not do so; consequently Fund Accounting's price remained at 92% until June 7, 2007, when Kelsoe instructed Fund Accounting to reduce it to 88% – still far higher than the actual quote that Greenwich Capital would have provided in the absence of Kelsoe and Derby's illicit agreement.

113.    The above instances of defendant Kelsoe's manipulation of the fair valued securities, and thus the Funds' NAVs, are just a handful of examples of his misconduct.  The Ma Report states that it analyzed a set of investments held by the Funds and/or the similarly-invested open-end funds and each investment met one or more of the following criteria:

> (1) Morgan Keegan used a value for the investment for NAV purposes that was kept constant over the Relevant Period or fluctuated by an immaterial amount; (2) the [SEC] received recordings of conversations between Mr. Kelsoe and a broker in which there was a disagreement between the two parties about the value of the investment, and subsequently the broker sent price confirmation statements to Fund Accounting with a value that was different than the value it had discussed with Mr. Kelsoe; (3) the [SEC] noted that Mr. Kelsoe issued a price adjustment to Fund Accounting that was higher than the broker quote that Fund Accounting had received shortly before; (4) the [SEC] reviewed recorded conversations in which Mr. Kelsoe participated and the specific investment was discussed; and (5) the [SEC] identified other fair-valued securities whose pricing was questionable. These investments… were a subset of all investments that fit these categories, not a comprehensive list.

*Kelsoe, Thompson Weller, Fund Accounting and the Valuation Committee's Failure to Follow Procedures to Properly Determine Fair-Valued Security Prices*

114.    In addition to defendant Kelsoe's misconduct, Fund Accounting and the Valuation Committee, including defendants Thompson Weller and Wood, also failed to follow proper procedures for pricing fair-valued securities.

115.    For example, the Funds' FY2007 Annual Report stated that RMA, RMH and RSF each held 2,000 shares, or $1,800,000, and RHY held 3,500 shares, or $3,150,000, of WEBS CDO 2006-1 PS, identified by CUSIP 94769U107 (which, as discussed below, was incorrectly classified as a preferred stock), representing a per share price of $900.  According to the Ma Report, Fund Accounting valued this security at $900/share from January 2007 through May 2007, despite receiving a quote of $750 from Greenwich Capital in March 2007.  Moreover, Fund Accounting finally marked it down in June 2007 to a price of $775, which was higher than both the March 2007 quote and a subsequent June 2007 quote of $685.

116.    Similarly, the Funds FY2007 Annual Report stated that RMA and RSF each held

$1,560,000 and RMH held $780,000 in Soundview Home Equity Loan Trust 2005-1 B3,

indentified by CUSIP 83611MCY2.  According to the Ma Report,

> Fund Accounting did not change the mark from January 2007 to May 2007, despite receiving significantly lower broker quotes in March 2007 and May 2007. The variance between the broker quote and Fund Accounting's price was in excess of the 5% variance threshold that … [was] the point at which further investigation should have been conducted… There is no evidence to suggest that any additional market analysis was conducted, for this bond in particular or generally for cases where the broker quote and internal mark differed by 5% or more.  When Fund Accounting finally did change the mark in June 2007, it selected a price of 65%, which was higher than both the broker quote of 50% in May 2007 and the broker quote of 40% in June 2007.

117.    The SEC made the following findings with respect to the defendants' non-

compliance with the Funds' valuation policies and procedures, as set forth in the SEC Consent

Order:

> (i) the Valuation Committee left pricing decisions to lower level employees in Fund Accounting who did not have the training or qualifications to make fair value pricing determinations;
>
> (ii) *Fund Accounting personnel relied on Kelsoe's "price adjustments" to determine the prices assigned to portfolio assets, without obtaining a reasonable basis for or documentation supporting the price adjustments* or applying the factors set forth in the procedures;
>
> (iii) Fund Accounting personnel gave Kelsoe discretion beyond the parameters of the valuation procedures in validating the prices of portfolio securities by *allowing him to determine which dealer price confirmations to use and which to ignore, without obtaining documentation to support his adjustments;* and
>
> (iv) *the Valuation Committee and Fund Accounting did not ensure that the fair value prices assigned to many of the portfolio securities were periodically re-evaluated, allowing them to be carried at stale values for months at a time.*
>
> *       *       *
>
> *The head of Fund Accounting reported to Weller, and Weller was a member of the Valuation Committee.  He knew, or was reckless in not knowing, of the deficiencies in the implementation of the valuation procedures set forth above, and failed to remedy them or otherwise make sure fair-valued securities were*

***accurately priced and the Funds' NAVs were accurately calculated.*** During the period from January through July 2007, Weller was aware that:

(i) the Valuation Committee did not adequately supervise Fund Accounting's application of the valuation factors;

(ii) Kelsoe was supplying fair value price adjustments for specific securities to Fund Accounting but the members of the Valuation Committee did not generally know which securities Kelsoe supplied fair values for or what those fair values were, and did not generally receive supporting documentation for those values; and

(iii) the only other pricing test regularly applied by the Valuation Committee was a "look back" test, which compared the sales price of any security sold by a Fund to the valuation of that security used in the NAV calculation for the five business days preceding the sale. The test only covered securities after they were sold; thus, at any given time, the Valuation Committee never knew how many securities' prices could ultimately be validated by it. Weller nevertheless signed the Funds' annual and semi-annual financial reports on Forms N-CSR, filed with the [SEC], including certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.

(Emphasis added).

118.    Indeed, defendant Anthony stated in an interview with state securities regulators that the practice at MAM and Morgan Keegan was not to question the actions of defendant Kelsoe:

Time and time again I was told by [defendant] Morgan and [President and CEO of Morgan Keegan, Doug] Edwards ["]leave Kelsoe alone, he's doing what we want him to do, he's also a little bit strange, he gets mad easy, leave him alone["]; and I left him alone. I did what I was told to do.

*       *       *

Q.    When Morgan Keegan was acquired [by Regions], you then had discussions that Mr. Kelsoe would not be under your supervision or management?

A.    Leave him alone.

Q.    Okay.

A.    He's a strange guy, leave him alone.

Q.    Is there a specific meeting or was that explained to you with a memo or –

-49-

A.      It probably occurred in the first meeting and it occurred times after that, to just, you know, leave him alone, which is fine.

119.    Like defendants Kelsoe, Thompson Weller and Wood, MAM also breached its fiduciary duties owed to the Funds by engaging in actions that forestalled declines in the NAVs of the Funds that would have occurred as a result of the deteriorating market absent Kelsoe's misconduct.

120.    Specifically, the SEC found that MAM "had adopted its own procedures to determine the actual fair value to assign to portfolio securities and to 'validate' those values 'periodically.'  Among other things, those procedures provided that '[q]uarterly reports listing all securities held by the Funds that were fair valued during the quarter under review, along with explanatory notes for the fair values assigned to the securities, shall be presented to the Board for its review.'"  However, MAM intentionally failed to fully implement this provision of its pricing policy.

121.    The SEC further found with respect to MAM that:

On various dates from January 2007 through July 2007, [MAM], through Kelsoe, screened and influenced the price confirmations obtained from at least one broker-dealer ("the Submitting Firm").  Among other things, the Submitting Firm was induced to provide interim price confirmations that were lower than the values at which the Funds were valuing certain bonds, but higher than the initial confirmations that the Submitting Firm had intended to provide.  The interim price confirmations enabled the Funds to avoid marking down the value of securities to reflect current fair value.  Kelsoe was aware that use of the interim price confirmations was inconsistent with the valuation procedures and did not reflect fair value, that the Submitting Firm would be providing lower price confirmations in response to future pricing validation requests, and that the Funds would be required to further mark down the value of the securities to reflect their already diminished value, but that information was not disclosed to Fund Accounting, the Funds' Boards of Directors or the Independent Auditor.  In some instances, even after causing the Submitting Firm to increase its price confirmations, Kelsoe subsequently provided price adjustments to Fund Accounting that were higher than even the Submitting Firm's increased price confirmations.  These adjustments were not consistent with the Funds' procedures.  In other instances, the Submitting Firm was induced to not provide price confirmations to Fund Accounting (or, depending on the period, to the

-50-

Independent Auditor), where those price confirmations would have been significantly lower than the Funds' current valuations of the relevant bonds. Fund Accounting and the Funds' Boards were not advised that the Submitting Firm had proposed price confirmations which were lower than the current valuations recorded by the Funds, and that the Submitting Firm had refrained from submitting price confirmations to Fund Accounting or had submitted price confirmations at higher prices than it had originally planned.

122.    Furthermore, in evaluating the NAVs of the Funds, Defendants knowingly excluded relevant and available information that clearly indicated that the stated values of the Funds' assets were too high. As early as the end of 2006, industry analysts recognized that subprime mortgage foreclosures were on the rise and predicted trouble in the mortgage market, which signaled enormous risks and potential losses to investors.

123.    As stated in the SEC Complaint, Kelsoe forestalled declines in the NAVs of the Funds that would have occurred as a result of the deteriorating subprime market if the NAVs were accurately reported.

124.    Despite this material information clearly indicating that the values of the Funds' MBSs, ABSs and CDOs had declined dramatically, Defendants, in breach of their fiduciary duties as directors, officers, the investment advisor and portfolio managers of the Funds and in violation of GAAP, and, with respect to defendants Anthony, Sullivan, Joseph Weller and Thompson Weller, in breach of their duties pursuant to the Code of Ethics, knowingly and improperly delayed writing down the value of these investments and did not accurately disclose the true financial performance of the Funds to their shareholders.

125.    Furthermore, MAM's advisory fees, and, upon information and belief, defendant Kelsoe's compensation, were based on the assets held by the Funds, and therefore, MAM and Kelsoe were unjustly enriched based on the Funds' improperly inflated asset values. Specifically, pursuant to the Advisory Agreements, MAM received 0.65% of the Funds' Managed Assets, which, upon information and belief, totaled approximately $30 million per year

for the four Funds and the three similarly-invested open-end funds that MAM and Kelsoe also managed.  Upon information and belief, Kelsoe received approximately 20% of the advisory fees received by MAM.

126.   Through their positions of authority over the Funds, Defendants knew that they were required to disclose truthful, accurate and timely information to the Funds' shareholders and to not conceal the true financial condition of the Funds.  However, MAM, the Officer Defendants and the Portfolio Manager Defendants did not ensure that such information was accurately disseminated.

127.   As a direct and proximate result of Defendants' breaches of fiduciary duties, the Funds have sustained significant damages, including, but not limited to, significant losses of value in the Funds, the excessive advisory fees paid to MAM and Kelsoe based on the inflated values of the Funds' portfolio securities provided by defendant Kelsoe, and the costs and expenses incurred in connection with the various governmental investigations and the restatement of the Funds' financial statements, as set forth herein.

### Defendants' Over-Concentration of the Funds' Assets in MBSs, ABSs and Other Illiquid Securities

128.   The Prospectuses specifically touted the diversification of the Funds' portfolios in discussing MAM's investment philosophy.  Specifically, the Prospectuses for Helios Advantage and Helios High stated that "[i]n managing the Fund's portfolio, [MAM] will employ an active management approach that will emphasize the flexibility to allocate assets across a wide range of asset classes and thereby provide the advantages of a widely diversified high income portfolio."

129.   Likewise, Helios Strategic's Prospectus stated that "[MAM] believes that the opportunity to invest in a diverse set of assets will contribute to improved yield or total return and a more stable net asset value for the Fund than would result from investments concentrated

in a single category of assets."  The Prospectus for Helios Multi-Sector similarly stated that "[MAM] believes that the opportunity to acquire a diverse set of assets will contribute to higher total returns and a less volatile net asset value for the Fund than would result from investing in a single sector of the debt market."

130.    Each of the Funds' Prospectuses provided investment limitations that could not be changed without the approval of the holders of a majority of the respective Funds' outstanding voting securities.  The corresponding SAIs explicitly stated that a Fund could not "purchase the securities of any issuer (other than securities issued or guaranteed by the U.S. government or any of its agencies or instrumentalities) if, as a result, 25% or more of the Fund's total assets would be invested in the securities of companies the principal business activities of which are in the same industry."

131.    However, beginning in 2007, without the necessary shareholder approval and contrary to the statements made in the Prospectuses, Defendants knowingly caused or allowed each of the Funds to be over-concentrated in structured debt instruments,[7] including MBSs and ABSs, and to invest more than 25% of its assets in the same industry.

132.    For example, Defendants knowingly caused or allowed the Funds to invest heavily in CDOs, which are a type of structured ABSs whose value and payments are derived from a portfolio of fixed-income underlying assets.  As of June 30, 2006, Helios Advantage

---

[7] As explained in the Joint State Complaint (as defined herein):

> In structured debt instruments, an issuer takes a pool of assets, such as mortgages, credit card debt, or aircraft leases, which are used as collateral to issue securities. Instead of letting each investor own a share of the entire pool, the issuer divides the pool into several slices, or "tranches."  The issuer defines which tranches receive payment priority and enjoy certain loss protections.  Generally, payment priority is in order from the top tranche down, while losses are suffered in reverse order from the bottom tranches up.

invested 12.8% of its assets in CDOs; Helios High invested 12.9%; Helios Multi-Sector invested 10.9%; and Helios Strategic invested 12.9%. However, as of June 30, 2007, just one year later, each of the Funds had increased its investment in CDOs by almost three times. Specifically, by June 30, 2007, Helios Advantage invested 34.4% of its assets in CDOs; Helios High invested 37.8%; Helios Multi-Sector invested 31.6%; and Helios Strategic invested 37.8%.

133.   In addition, as known by Defendants, as of December 31, 2007, each of the Funds invested more than 25% of its assets in MBSs. Specifically, Helios Advantage invested 31.2% of its assets in MBSs; Helios High invested 27%; Helios Multi-Sector invested 32%; and Helios Strategic invested 30.9%. The foregoing over-concentration of assets in CDOs and MBSs was in clear violation of the Funds' 25% limitation on concentration of investments in a certain industry.

134.   The Officer Defendants were responsible for the Funds operations, and ensuring that the Funds were not in violation of their Offering Materials. However, defendant Anthony, who served as President of the Funds, admitted in an interview with state regulators that, in practice, he had no knowledge of what the Funds were invested in:

> Q.     You previously said that you didn't know what was in Kelsoe's funds, you knew what was in your files. Did you ever try to find out or investigate what the makeup of the Kelsoe funds were?
>
> A.     I can almost ask you why would I have done that? I can throw it back at you. Why would I have done that? During the time that I was there, his returns were the best in the country. I had been told to leave him alone. He was out there on the corner of the building with his staff around him. I don't know anything about junk bonds. I have never bought a bond that turned into junk. I have never bought a junk bond on the front end, so, no, I did not investigate. I was told not to. I was told to leave him alone. I did.

135.   Defendants, including Kelsoe, were aware of the turmoil in the subprime markets. Nevertheless, defendant Kelsoe continued to over-concentrate the Funds' assets in risky, subprime securities, without the knowledge or approval of the Funds' shareholders.

**The Dissemination of Statements in Violation of GAAP by MAM, the Officer Defendants and the Portfolio Manager Defendants**

136.    MAM, the Officer Defendants and the Portfolio Manager Defendants knowingly caused or allowed the Funds to issue statements in their SEC filings, including on Forms N-CSR, N-CSRS and N-Q, that violated GAAP and other rules and regulations.

137.    The Funds' financial results for fiscal years 2006-2007 were included in reports filed with the SEC and in other shareholder reports.  In these reports, defendants (specifically defendants Kelsoe, Anthony, Sullivan, Joseph Weller and Thompson Weller) represented that the Funds' financial results were presented in a fair manner and in accordance with GAAP.

138.    However, the financial information reported in the Funds' SEC filings was not prepared in conformity with GAAP, nor was the financial information "a fair presentation" of the Funds' financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

139.    GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time.

140.    Specifically, Defendants touted the Funds' purported diversified portfolios, while in reality Defendants had caused the Funds to invest heavily in risky ABSs, MBSs and other illiquid securities, surpassing the 25% cap in violation of the Funds' policies.  Defendants failed to accurately disclose the full extent to which the Funds were invested in such securities, particularly the lowest tranches thereof, and the associated risks.

141.    Defendants misclassified ABSs and MBSs as less risky corporate bonds and preferred stock in the Funds' quarterly schedules of portfolio holdings, and improperly compared the Funds' performance to a benchmark index that did not contain any subprime securities such

as ABSs and MBSs, despite the Funds' heavy concentration therein.  Furthermore, the Funds'

financial statements did not accurately reflect the true extent of the losses to the Funds, as the

Funds' NAVs were artificially inflated and did not reflect "fair value."

142.    Indeed, the SEC concluded that Kelsoe and MAM made material misstatements

regarding the Funds' performance directly to the Funds' investors and that the Funds' SEC

filings disclosed neither the Funds' actual performance nor Defendants' improper practices in

connection with the valuation of the Funds' holdings.

### The Funds' NAVs Were Not Accurately Reported

143.    Due to the manipulation of the Funds' NAVs, as discussed herein, the Funds were

forced to restate certain financial statements in accordance with applicable accounting rules and

provisions.  The restatement totaled over $37 million; however, this amount only represents a

fraction of the Funds' total damages due to the misconduct alleged herein.

144.    GAAP provides that financial statements should only be restated in limited

circumstances, *i.e.*, when there is a change in the reporting entity, there is a change in accounting

principles used or to correct an error in previously issued financial statements.  The Funds'

restatements and revisions were not due to a change in reporting entity or a change in accounting

principle, but rather to correct errors in previously issued financial statements.

### The Funds' GAAP Violations Were Material

145.    The Funds' GAAP violations were material, particularly in light of SEC guidance

on materiality.  SEC Staff Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes

GAAP definitions of materiality.[8]   Among other items, SAB Topic 1M says:  "A matter is

---

[8] SAB Topic 1M, Materiality, represents the codification of certain SABs, including SAB No.
99, Materiality, as of May 9, 2003.  SAB No. 99 was effective August 12, 1999.  On September
13, 2006, the SEC issued SAB 108 – new guidance for determining materiality of past errors.
This new standard is effective for financial statements for fiscal years ending after November 15,

'material' if there is a substantial likelihood that a reasonable person would consider it important."   It also stresses that materiality requires qualitative, as well as quantitative, considerations.   For example, if it is expected that a known misstatement would cause a significant market reaction, that expected reaction should be taken into account in determining the materiality of the misstatement.

146.   SAB Topic 1M further states:

Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –

\*        \*        \*

- whether the misstatement masks a change in earnings or other trends

- whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise

147.   SAB Topic 1M also says that an intentional misstatement of even immaterial items may be illegal and constitute fraudulent financial reporting.

148.   Each Fund's statements satisfy these criteria and thus were material from both a quantitative and qualitative perspective.

### The Funds' Financial Statements Violated Fundamental Concepts of GAAP

149.   Due to these accounting improprieties, each Fund presented its financial results and statements in a manner that violated GAAP, which are described by the following statements:

  a.   The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);

---

2006.   Under SAB 108, the fundamental principles surrounding materiality remain consistent with materiality under the prior guidance.   However, this new guidance requires companies to evaluate known errors to a finer degree than in the past.

b. The principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶34);

c. The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶40);

d. The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

e. The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

f. The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

g. The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶95, 97).

150. Further, the information that was not accurately reflected is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

### *The Fiscal Year 2006 Annual Report*

151. On June 7, 2006, the Funds filed with the SEC a combined annual Certified Shareholder Report for the fiscal year ending March 31, 2006 on Form N-CSR (the "FY2006

Annual Report"). The FY2006 Annual Report provided the following "Management Discussion of Fund Performance," signed by defendant Kelsoe as Senior Portfolio Manager at MAM, regarding each of the Funds:

> In spite of a modest level of industry-wide outflows from corporate high yield funds, the high yield corporate market feels pretty good so far this year. ***With little change to underlying asset value, index performance has remained at coupon clipping levels (i.e. prices have held up).*** Importantly, economic conditions continue to remain strong causing the Fed to nudge interest rates ever higher. A strong economy is very good for corporate earnings, cash flows, balance sheets, equity valuations, and, in turn, high yield corporate bonds. Such conditions create more opportunities for corporate bond issuers to refinance or otherwise payoff their bonds, effectively placing an underlying bid for the bonds. In other words, steady bond prices. Unfortunately, strong bids create a scarcity of attractive investment opportunities and that is the challenge we face today. Opportunities exist in every market environment, they just may not be readily apparent.

*     *     *

> In the asset-backed and mortgage-backed arena, market technicals have made a dramatic about face over the last six weeks. The market was very heavy during the fourth quarter of 2005 with very few buyers willing to commit to new positions at the close of a very difficult year. However, beginning in February the demand for "BBB" to "B" floating rate asset-backed bonds picked up dramatically. The prospect of continued rate hikes from the Federal Reserve and the lack of available yield in the fixed income market have forced investors into some of the more "off the run" issues that we have used effectively in the high income fund. We expect floating rate assets to continue to contribute to our net asset value stability and current yield during the next 3 to 6 months as short term rates push higher. Our challenge will be to find enough suitable fixed rate assets as this interest rate cycle nears the point where the Federal Reserve will begin lowering rates.

(Emphasis added).

152.   The FY2006 Annual Report further described each Fund's performance, as follows:

> For the six months and the year ended March 31, 2006, [Helios Advantage] had total returns of 7.35% and 23.28%, respectively, based on market price and reinvested dividends. For the six months and the year ended March 31, 2006, the Fund had total returns of 5.80% and 11.05%, respectively, based on net asset value and reinvested dividends. For the six months and the year ended March 31,

-59-

2006, the Lehman Brothers Ba U.S. High Yield Index had total returns of 2.44% and 6.83%, respectively. ***The Fund's strong performance was primarily due to the Fund's relative yield advantage as evidenced by the monthly dividend distributions and the relative net asset value stability produced by the Fund's allocation to a wide variety of asset types.*** The Fund had an above average yield due to three main factors: an efficient leverage package which allowed the Fund to have additional money invested with limited borrowing costs; an increasing interest rate environment and our overweighting in the floating rate securities sector; and a prospectus that gives the management team latitude to look at sectors that are not in the index.

\*      \*      \*

For the six months and the year ended March 31, 2006, [Helios High] had total returns of 8.08% and 24.15%, respectively, based on market price and reinvested dividends. For the six months and the year ended March 31, 2006, the Fund had total returns of 3.90% and 7.80%, respectively, based on net asset value and reinvested dividends. For the six months and the year ended March 31, 2006, the Lehman Brothers Ba U.S. High Yield Index had total returns of 2.44% and 6.83%, respectively. ***The Fund's strong performance was primarily due to the Fund's relative yield advantage as evidenced by the monthly dividend distributions and the relative net asset value stability produced by the Fund's allocation to a wide variety of asset types.*** The Fund had an above average yield due to three main factors: an efficient leverage package which allowed the Fund to have additional money invested with limited borrowing costs; an increasing interest rate environment and our overweighting in the floating rate securities sector; and a prospectus that gives the management team latitude to look at sectors that are not in the index.

\*      \*      \*

[Helios Multi-Sector] began trading on January 19, 2006 under the ticker symbol RHY after an initial public offering at $15 per share. The Fund had a total return of 7.38% for the period ended March 31, 2006, based on market price and reinvested dividends. The Fund had a total return of 2.27% for the period ended March 31, 2006, based on net asset value and reinvested dividends. From January 19, 2006 until March 31, 2006, the Lehman Brothers Ba U.S. High Yield Index had a total return of 0.97%.

\*      \*      \*

For the six months and the year ended March 31, 2006, [Helios Strategic] had total returns of 7.11% and 22.60%, respectively, based on market price and reinvested dividends. For the six months and the year ended March 31, 2006, the Fund had total returns of 4.26% and 9.95%, respectively, based on net asset value and reinvested dividends. For the six months and the year ended March 31, 2006, the Lehman Brothers Ba U.S. High Yield Index had total returns of 2.44% and

6.83%, respectively.  ***The Fund's strong performance was primarily due to the Fund's relative yield advantage as evidenced by the monthly dividend distributions and the relative net asset value stability produced by the Fund's allocation to a wide variety of asset types.***  The Fund had an above average yield due to three main factors: an efficient leverage package which allowed the Fund to have additional money invested with limited borrowing costs; an increasing interest rate environment and our overweighting in the floating rate securities sector; and a prospectus that gives the management team latitude to look at sectors that are not in the index.

(Emphasis added).

153.    The FY2006 Annual Report compared the performance of the Funds to that of the Lehman Brothers Ba U.S. High Yield Index (the "Lehman Ba Index"), which was not an appropriate benchmark index.

154.    As discussed in the McCann Report, the Lehman Ba Index contains only corporate bonds and does not contain any structured finance securities.

155.    In contrast, by March of 2007, the Funds had invested 65% to 70% of their gross assets in structured finance securities and only 21% to 24% in corporate bonds.  Furthermore, virtually all of the Funds' investments in structured finance securities "were at or near the bottom of the deals' capital structure."

156.    Both the McCann Report and the Ma Report conclude that the comparison of the Funds to the Lehman Ba Index, which contained only corporate bonds, was misleading and improper.  Specifically, as stated in the Ma Report, with "the majority of most of the Funds' assets [ ] allocated to structured product securities, which are substantially different from … the selected benchmark ind[ex] in terms of expected performance, underlying collateral, and risks… the selected performance benchmark ind[ex was] not appropriate and may have misled investors about the risk characteristics of the Funds' investment holdings."

157.    Indeed, Dr. Ma considered the performance of the Funds against the Lehman Ba Index during the period from March 31, 2007 to June 30, 2007, and concluded that the Funds

performed in completely divergent patterns from and performed substantially worse than the Lehman Ba Index.

158.    Furthermore, as set forth in the McCann Report, the Funds "all held heavy concentrations of low-priority tranches in asset-backed and mortgage-backed securities." However, the FY2006 Annual Report classified these risky, illiquid securities as corporate bonds and preferred stocks, making the Funds' holdings appear to be less risky than they actually were.

159.    Specifically, the majority of the securities listed as "Corporate Bonds – Special Purpose Entities" and "Preferred Stocks" in the Funds' SEC filings were actually ABSs.  The ABSs' offering documents and ratings agency releases identify such securities as ABSs.[9]

160.    The FY2006 Annual Report listed the following securities as corporate bonds, when in fact they were ABSs:

| Description of Security | Fund | Principal Amount/Shares | Stated Value |
|---|---|---|---|
| Duane Park I, Zero Coupon Bond 6/27/17 | RMA | 4,000,000 | $4,000,000 |
| | RMH | 4,000,000 | $4,000,000 |
| | RHY | 4,000,000 | $4,000,000 |
| | RSF | 4,000,000 | $4,000,000 |
| Reg Diversified Funding, 10.000% 1/25/36 | RMA | 1,250,000 | $1,250,000 |
| | RSF | 1,000,000 | $1,000,000 |
| INCAPS Funding II, 10.000% 1/15/34 | RMA | 5,000,000 | $4,500,000 |
| | RMH | 2,500,000 | $2,250,000 |
| TPREF Funding III, Zero Coupon Bond 1/15/33 | RMH | 1,316,750 | $1,106,070 |

161.    In addition, the FY2006 Annual Report listed the following securities as preferred stock, when in fact they were ABSs:

---

[9] As explained in the McCann Report, "[p]reference shares are not preferred stock. Preferred stock is typically more risky than corporate bonds but less risky than common stock.  Preference shares in asset-backed securities deals on the other hand are equivalent to purchasing the entire portfolio of underlying assets with a margin loan equal to the face value of the other tranches offered and with margin interest payments equal to the interest paid to investors in the tranches. Preference shares thus are investments in the underlying assets leveraged up 50 or more times."

| Description of Security | Fund | Principal Amount/Shares | Stated Value |
|---|---|---|---|
| Baker Street Funding | RMA | 40,000 | $3,880,000 |
| | RMH | 30,000 | $2,910,000 |
| | RHY | 40,000 | $3,880,000 |
| | RSF | 30,000 | $2,910,000 |
| Credit Genesis CLO 2005 | RMA | 3,000 | $3,000,000 |
| | RMH | 1,000 | $1,000,000 |
| | RSF | 1,000 | $1,000,000 |
| Hewett's Island II | RMA | 2,000 | $1,980,000 |
| | RMH | 1,000 | $990,000 |
| | RSF | 1,000 | $990,000 |
| Marquette Park CLO | RMA | 2,000 | $1,960,000 |
| | RMH | 1,000 | $980,000 |
| | RHY | 2,000 | $1,960,000 |
| | RSF | 1,000 | $980,000 |

162.   Defendants did not correct these classifications until the Funds' FY2008 Annual Report, and even then the corrections were only made to the extent that the Funds still held such securities at that point.

163.   The FY2006 Annual Report was signed by defendants Anthony and Joseph Weller.

164.   In conjunction with the FY2006 Annual Report, defendants Anthony and Joseph Weller assured shareholders that they had investigated and reviewed the Funds' internal controls, processes and financial statements and authorized their inclusion in the Funds' public filings. Indeed, defendants Anthony and Joseph Weller signed certifications pursuant to the Sarbanes-Oxley Act ("SOX") § 302 with respect to each Fund, affirming that:

1.  I have reviewed this report on Form N-CSR of [the respective Fund];

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the

financial condition, results of operations, changes in net assets, and cash flows (if the financial statements are required to include a statement of cash flows) of the Fund as of, and for, the periods presented in this report;

4. The Fund's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Rule 30a-3(c) under the Investment Company Act of 1940) and internal control over financial reporting (as defined in Rule 30a-3(d) under the Investment Company Act of 1940) for the Fund and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Fund, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the Fund's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of a date within 90 days prior to the filing date of this report based on such evaluation; and

(d) Disclosed in this report any change in the Fund's internal control over financial reporting that occurred during the second fiscal quarter of the period covered by this report that has materially affected, or is reasonably likely to materially affect, the Fund's internal control over financial reporting; and

5. The Fund's other certifying officer and I have disclosed to the Fund's auditors and the audit committee of the Fund's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Fund's ability to record, process, summarize, and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Fund's internal control over financial reporting.

165.   Defendants Anthony and Joseph Weller also signed certifications pursuant to

SOX § 906 with respect to each Fund, affirming that:

1. The Fund's periodic report on Form N-CSR for the period ended March 31, 2006 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Fund.

*The Fiscal Year 2007 First Quarter N-Qs*

166.   On August 29, 2006, each of the Funds filed a Form N-Q (collectively, the "FY2007 Q1 N-Qs"), which listed the following securities as corporate bonds, when in fact they were ABSs:

| Description of Security | Fund | Principal Amount/Shares | Stated Value |
|---|---|---|---|
| Duane Park I, Zero Coupon Bond 6/27/16 | RMA | 4,000,000 | $4,000,000 |
| | RMH | 4,000,000 | $4,000,000 |
| | RHY | 4,000,000 | $4,000,000 |
| | RSF | 4,000,000 | $4,000,000 |
| Reg Diversified Funding, 10.000% 1/25/36 | RMA | 1,250,000 | $1,250,000 |
| | RSF | 1,000,000 | $1,000,000 |
| INCAPS Funding II, 10.000% 1/15/34 | RMA | 5,000,000 | $4,500,000 |
| | RMH | 2,500,000 | $2,250,000 |
| MMCAPS Funding, Zero Coupon Bond 12/15/31 | RHY | 5,000,000 | $2,700,000 |
| TPREF Funding III, Zero Coupon Bond 1/15/33 | RMH | 1,316,750 | $1,066,568 |

167.   In addition, the FY2007 Q1 N-Qs listed the following securities as preferred stocks, when in fact they were ABSs:

| Description of Security | Fund | Principal Amount/Shares | Stated Value |
|---|---|---|---|
| Baker Street Funding | RMA | 40,000 | $3,880,000 |
| | RMH | 3,000 | $2,910,000 |
| | RHY | 40,000 | $3,880,000 |
| | RSF | 30,000 | $2,910,000 |
| Credit Genesis CLO 2005 | RMA | 3,000 | $3,000,000 |
| | RMH | 1,000 | $1,000,000 |
| | RSF | 1,000 | $1,000,000 |
| Hewett's Island II | RMA | 2,000 | $1,980,000 |
| | RMH | 1,000 | $990,000 |
| | RSF | 1,000,000 | $990,000 |

| Marquette Park CLO | RMA | 2,000 | $1,960,000 |
| Mountain View Funding | RHY | 40,000 | $3,880,000 |

168.    The FY2007 Q1 N-Qs were signed by defendants Anthony and Joseph Weller.

169.    In conjunction with the FY2007 Q1 N-Qs, defendants Anthony and Joseph Weller assured shareholders that they had investigated and reviewed the Funds' internal controls, processes and financial statements and authorized their inclusion in the Funds' public filings. Indeed, defendants Anthony and Joseph Weller signed certifications pursuant to SOX § 302 with respect to each Fund, affirming that:

1.  I have reviewed this report on Form N-Q of [the respective Fund];

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the schedule of investments included in this report, fairly present in all material respects the investments of the Registrant as of the end of the fiscal quarter for which the report is filed;

4.  The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Rule 30a-3(c) under the Investment Company Act of 1940) and internal control over financial reporting (as defined in Rule 30a-3(d) under the Investment Company Act of 1940) for the Registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of

the disclosure controls and procedures as of a date within 90 days prior to the filing date of this report, based on such evaluation; and

      d)  Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.  The Registrant's other certifying officer and I have disclosed to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

      a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize, and report financial information; and

      b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

<u>*The Fiscal Year 2007 Semi-Annual Report*</u>

170.    On December 7, 2006, the Funds filed with the SEC a combined Semi-Annual Certified Shareholder Report for the first six months of the 2007 fiscal year, ending September 30, 2006, on Form N-CSRS (the "FY2007 Semi-Annual Report").  The FY2007 Semi-Annual Report provided the following "Management Discussion of Fund Performance," signed by defendant Kelsoe as Senior Portfolio Manager at MAM, regarding each of the Funds:

> During the first six months of the 2007 fiscal year, corporate high yield debt and common stocks were the best performing asset categories.  Credit spreads (the yield premium required for risky assets over riskless assets such as U.S. Treasuries) contracted, or shrank significantly in the corporate sector providing meaningful outperformance for corporate securities.  ***In the asset-backed sector, however, concerns over the slow down in housing and real estate in general caused credit spreads to expand and acted to depress overall performance from our portfolio of mortgage related securities.***  Asset-backed bonds secured by aircraft leases, medical equipment leases and ship leases continued to perform very well.

(Emphasis added).

171. The FY2007 Semi-Annual Report further described each Fund's performance, as follows:

During the first half of [Helios Advantage's] fiscal year 2007, which ended September 30, 2006, the Fund had a total return of 11.19%, based on market price and reinvested dividends. For the six months ended September 30, 2006, the Fund had a total return of 3.06%, based on net asset value and reinvested dividends. For the six months ended September 30, 2006, the Lehman Brothers Ba U.S. High Yield Index had a total return of 4.12%. *The Fund's strong market performance is a reflection of investor's desire for cash distributions as well as the stability of the Fund's net asset value offered by a very diverse portfolio.*

\*     \*     \*

During the first half of [Helios High's] fiscal year 2007, which ended September 30, 2006, the Fund had a total return of 10.91%, based on market price and reinvested dividends. For the six months ended September 30, 2006, the Fund had a total return of 3.49%, based on net asset value and reinvested dividends. For the six months ended September 30, 2006, the Lehman Brothers Ba U.S. High Yield Index had a total return of 4.12%. *The Fund's strong market performance is a reflection of investor's desire for cash distributions as well as the stability of the Fund's net asset value offered by a very diverse portfolio.*

\*     \*     \*

[Helios Multi-Sector] *invests in a diversified portfolio* consisting primarily of debt securities that offer attractive yield and capital appreciation potential.

\*     \*     \*

During the first half of [Helios Multi-Sector's] fiscal year 2007, which ended September 30, 2006, the Fund had a total return of 15.39%, based on market price and reinvested dividends. For the six months ended September 30, 2006, the Fund had a total return of 6.16%, based on net asset value and reinvested dividends. For the six months ended September 30, 2006, the Lehman Brothers Ba U.S. High Yield Index had a total return of 4.12%. *The Fund's strong market performance is a reflection of investor's desire for cash distributions as well as the stability of the Fund's net asset value offered by a very diverse portfolio.*

\*     \*     \*

[Helios Strategic] *invests in a diversified portfolio* of securities that offers attractive yield and capital appreciation potential and consists primarily of debt securities and secondarily of equity securities.

\*     \*     \*

-68-

During the first half of [Helios Strategic's] fiscal year 2007, which ended September 30, 2006, the Fund had a total return of 11.40%, based on market price and reinvested dividends.  For the six months ended September 30, 2006, the Fund had a total return of 2.74%, based on net asset value and reinvested dividends.  For the six months ended September 30, 2006, the Lehman Brothers Ba U.S. High Yield Index had a total return of 4.12%.  ***The Fund's strong market performance is a reflection of investor's desire for cash distributions as well as the stability of the Fund's net asset value offered by a very diverse portfolio.***

(Emphasis added).

172.    The FY2007 Semi-Annual Report compared the performance of the Funds to that of the Lehman Ba Index, which, as discussed above, was not an appropriate benchmark index.

173.    In addition, the FY2007 Semi-Annual Report listed the following securities as corporate bonds, when in fact they were ABSs:

| Description of Security | Fund | Principal Amount/Shares | Stated Value |
|---|---|---|---|
| Duane Park I, Zero Coupon Bond 6/27/16 | RMA | 4,000,000 | $4,000,000 |
| | RMH | 4,000,000 | $4,000,000 |
| | RHY | 4,000,000 | $4,000,000 |
| | RSF | 4,000,000 | $4,000,000 |
| Lincoln Park Ref Link 01-1, 8.905% 7/30/31 | RMA | 3,000,000 | $2,670,000 |
| | RMH | 2,000,000 | $1,780,000 |
| | RHY | 3,000,000 | $2,670,000 |
| | RSF | 2,000,000 | $1,780,000 |
| Reg Diversified Funding, 10.000% 1/25/36 | RMA | 1,250,000 | $1,250,000 |
| | RSF | 1,000,000 | $1,000,000 |
| Eirles Two Limited 262, 5.372% 8/3/21 | RMA | 2,500,000 | $2,500,000 |
| | RMH | 1,500,000 | $1,500,000 |
| | RHY | 3,500,000 | $3,500,000 |
| | RSF | 500,000 | $500,000 |
| Eirles Two Limited 263, 5.372% 8/3/21 | RMA | 3,500,000 | $3,500,000 |
| | RMH | 2,300,000 | $2,300,000 |
| | RHY | 3,500,000 | $3,500,000 |
| | RSF | 3,500,000 | $3,500,000 |
| INCAPS Funding II, 1/15/34 | RMA | 5,000,000 | $4,500,000 |
| | RMH | 2,500,000 | $2,250,000 |
| MMCAPS Funding, Zero Coupon Bond 12/15/31 | RHY | 5,000,000 | $2,700,000 |
| TPREF Funding III, Zero Coupon Bond 1/15/33 | RMH | 1,316,750 | $1,066,567 |

174.    In addition, the FY2007 Semi-Annual Report listed the following securities as preferred stocks, when in fact they were ABSs:

| Description of Security | Fund | Principal Amount/Shares | Stated Value |
|---|---|---|---|
| Baker Street Funding | RMA | 4,000 | $3,880,000 |
| | RMH | 30,000 | $2,910,000 |
| | RHY | 4,000 | $3,880,000 |
| | RSF | 30,000 | $2,910,000 |
| Baker Street Funding 2006-1 | RMA | 1,000 | $940,000 |
| | RMH | 10,000 | $940,000 |
| | RHY | 2,150 | $2,021,000 |
| | RSF | 10,000 | $940,000 |
| Credit Genesis CLO 2005 | RMA | 3,000 | $2,970,000 |
| | RMH | 1,000 | $990,000 |
| | RHY | 3,000 | $2,970,000 |
| | RSF | 1,000 | $990,000 |
| Hewett's Island II CDO | RMA | 2,000 | $1,980,000 |
| | RMH | 1,000 | $990,000 |
| | RSF | 1,000,000 | $990,000 |
| Indymac Indx CI-1 Corp | RMA | 67,000 | $1,820,859 |
| | RMH | 67,000 | $1,820,859 |
| | RHY | 67,000 | $1,820,859 |
| | RSF | 67,000 | $1,820,859 |
| Marquette Park CLO | RMA | 2,000 | $1,960,000 |
| | RHY | 2,000 | $1,960,000 |
| Mountain View Funding | RHY | 4,000 | $3,880,000 |

175.    The FY2007 Semi-Annual Report was signed by defendants Sullivan and Thompson Weller.

176.    In conjunction with the FY2007 Semi-Annual Report, defendants Sullivan and Thompson Weller assured shareholders that they had investigated and reviewed the Funds' internal controls, processes and financial statements and authorized their inclusion in the Funds' public filings.  Indeed, defendants Sullivan and Thompson Weller signed certifications pursuant to SOX § 302 with respect to each Fund, affirming that:

   1. I have reviewed this report on Form N-CSR of [the respective Fund] (the "Registrant");

-70-

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, changes in net assets, and cash flows (if the financial statements are required to include a statement of cash flows) of the Registrant as of, and for, the periods presented in this report;

4. The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Rule 30a-3(c) under the Investment Company Act of 1940) and internal control over financial reporting (as defined in Rule 30a-3(d) under the Investment Company Act of 1940) for the Registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of a date within 90 days prior to the filing date of this report based on such evaluation; and

(d) Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the second fiscal quarter of the period covered by this report that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. The Registrant's other certifying officer and I have disclosed to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize, and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

177.   Defendants Sullivan and Thompson Weller also signed certifications pursuant to

SOX § 906 with respect to each Fund, affirming that:

1. The Registrant's periodic report on Form N-CSR for the period ended September 30, 2006 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant.

*The Fiscal Year 2007 Third Quarter N-Qs*

178.   On February 28, 2007, each of the Funds filed a Form N-Q for the quarter ending

December 31, 2006 (collectively the "FY2007 Q3 N-Qs"), which listed the following securities

as corporate bonds, when in fact they were ABSs:

| Description of Security | Fund | Principal Amount/Shares | Stated Value |
|---|---|---|---|
| Duane Park I, Ltd. 7.500% 6/27/16 | RMA | 4,000,000 | $4,000,000 |
| | RMH | 4,000,000 | $4,000,000 |
| | RHY | 4,000,000 | $4,000,000 |
| | RSF | 4,000,000 | $4,000,000 |
| Lincoln Park Referenced Link Notes 2001-1, 8.796% 7/30/31 | RMA | 3,000,000 | $2,670,000 |
| | RMH | 2,000,000 | $1,780,000 |
| | RHY | 3,000,000 | $2,670,000 |
| | RSF | 2,000,000 | $1,780,000 |
| Pyxis Master Trust 2006-7, 10.326% 10/1/37 | RMA | 3,000,000 | $3,000,000 |
| | RMH | 3,000,000 | $3,000,000 |
| | RHY | 3,000,000 | $3,000,000 |
| | RSF | 3,000,000 | $3,000,000 |
| Reg Diversified Funding, 10.000% 1/25/36 | RMA | 1,250,000 | $1,256,250 |
| | RSF | 1,000,000 | $1,005,000 |
| Eirles 2 Limited 262, 10.870% 8/3/21 | RMA | 2,500,000 | $2,500,000 |
| | RMH | 1,500,000 | $1,500,000 |
| | RHY | 3,500,000 | $3,500,000 |
| | RSF | 500,000 | $500,000 |

| | | | |
|---|---|---|---|
| Eirles 2 Limited 263, 13.370% 8/3/21 | RMA | 3,500,000 | $3,500,000 |
| | RMH | 2,300,000 | $2,300,000 |
| | RHY | 3,500,000 | $3,500,000 |
| | RSF | 3,500,000 | $3,500,000 |
| INCAPS Funding II, 10.000% 1/15/34 | RMA | 5,000,000 | $3,750,000 |
| | RMH | 2,500,000 | $1,875,000 |
| MM Community Funding II Ltd., Zero Coupon Bond 12/15/31 | RHY | 5,000,000 | $2,700,000 |
| Preferred Term Securities II, 10.000% 5/22/33 | RMA | 2,000,000 | $1,167,500 |
| | RMH | 1,000,000 | $583,750 |
| | RSF | 1,000,000 | $583,750 |
| Preferred Term Securities XXI, 10.000% 3/22/38 | RMA | 2,000,000 | $1,886,300 |
| | RMH | 1,000,000 | $943,150 |
| | RHY | 2,000,000 | $1,886,300 |
| | RSF | 1,000,000 | $943,150 |
| Preferred Term Securities XXII, 9.700% 9/22/36 | RMA | 5,000,000 | $4,809,850 |
| | RMH | 4,000,000 | $3,847,880 |
| | RHY | 6,000,000 | $5,771,820 |
| | RSF | 4,000,000 | $3,847,880 |
| Preferred Term Securities XXII, 10.000% 9/22/36 | RMA | 1,000,000 | $936,610 |
| | RHY | 1,000,000 | $936,610 |
| Preferred Term Securities XXIII, 10.000% 12/22/36 | RMA | 2,000,000 | $1,904,060 |
| | | 3,000,000 | $2,913,660 |
| | RMH | 2,000,000 | $1,904,060 |
| | | 2,000,000 | $1,942,440 |
| | RHY | 3,000,000 | $2,856,090 |
| | | 3,000,000 | $2,913,660 |
| | RSF | 2,000,000 | $1,904,060 |
| | | 2,000,000 | $1,942,440 |
| Preferred Term Securities XXIV, 10.000% 3/22/37 | RMA | 2,000,000 | $1,960,000 |
| | RMH | 1,000,000 | $980,000 |
| | RHY | 2,000,000 | $1,960,000 |
| | RSF | 1,000,000 | $980,000 |
| Pyxis Master Trust 2006-8, 10.326% 10/1/37 | RMA | 1,000,000 | $1,000,000 |
| | RMH | 1,000,000 | $1,000,000 |
| | RHY | 2,000,000 | $2,000,000 |
| | RSF | 1,000,000 | $1,000,000 |
| TPREF Funding III, 11.000% 1/15/33 | RMH | 1,316,750 | $1,066,567 |

179.   In addition, the FY2007 Q3 N-Qs listed the following securities as preferred stocks, when in fact they were ABSs:

| Description of Security | Fund | Principal Amount/Shares | Stated Value |
|---|---|---|---|
| Baker Street Funding | RMA | 4,000 | $3,880,000 |
| | RMH | 30,000 | $2,910,000 |
| | RHY | 40,000 | $3,880,000 |
| | RSF | 30,000 | $2,910,000 |
| Baker Street Funding 2006-1 | RMA | 1,000 | $940,000 |
| | RMH | 10,000 | $940,000 |
| | RHY | 21,500 | $2,021,000 |
| | RSF | 10,000 | $940,000 |
| Credit Genesis CLO 2005 | RMA | 3,000 | $2,970,000 |
| | RMH | 1,000 | $990,000 |
| | RHY | 3,000 | $2,970,000 |
| | RSF | 1,000 | $990,000 |
| Harborview 2006-8 | RMA | 9 | $1 |
| | RMH | 7 | $1 |
| | RHY | 9 | $1 |
| | RSF | 9 | $1 |
| Hewett's Island II | RMA | 2,000 | $1,980,000 |
| | RMH | 1,000 | $990,000 |
| | RHY | 67,000 | $1,820,859 |
| | RSF | 1,000 | $990,000 |
| Indymac Indx CI-1 Corp. | RMA | 67,000 | $1,820,859 |
| | RMH | 67,000 | $1,820,859 |
| | RHY | 3,150 | $2,646,000 |
| | RSF | 67,000 | $1,820,859 |
| Marquette Park CLO | RMA | 2,000 | $1,960,000 |
| | RMH | 1,000 | $980,000 |
| | RHY | 2,000 | $1,960,000 |
| | RSF | 1,000 | $980,000 |
| Mountain View Funding | RMA | 20,000 | $1,760,000 |
| | RMH | 20,000 | $1,760,000 |
| | RHY | 40,000 | $3,880,000 |
| | RSF | 20,000 | $1,760,000 |
| WEBS CDO 2006-1 PS | RMA | 2,000 | $1,800,000 |
| | RMH | 2,000 | $1,800,000 |
| | RHY | 3,500 | $3,150,000 |
| | RSF | 2,000 | $1,800,000 |

180.    Each Fund's FY2007 Q3 N-Q reported the net assets of the Fund, which were not properly written down and thus were inflated.  As discussed in detail above, the net assets were

purposely manipulated as the values of each Fund's underlying securities were purposely improperly priced.

181.   The FY2007 Q3 N-Qs were signed by defendants Sullivan and Thompson Weller.

182.   In conjunction with the FY2007 Q3 N-Qs, defendants Sullivan and Thompson Weller assured shareholders that they had investigated and reviewed the Funds' internal controls, processes and financial statements and authorized their inclusion in the Funds' public filings. Indeed, defendants Sullivan and Thompson Weller signed certifications pursuant to SOX § 302 with respect to each Fund, affirming that:

1. I have reviewed this report on Form N-Q of [the respective Fund] (the "Registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the schedule of investments included in this report fairly present in all material respects the investments of the Registrant as of the end of the fiscal quarter for which the report is filed;

4. The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Rule 30a-3(c) under the Investment Company Act of 1940) and internal control over financial reporting (as defined in Rule 30a-3(d) under the Investment Company Act of 1940) for the Registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of a date within 90 days prior to the filing date of this report, based on such evaluation; and

d) Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. The Registrant's other certifying officer and I have disclosed to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize, and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

### *The Fiscal Year 2007 Annual Report*

183.    On June 6, 2007, the Funds filed with the SEC a combined annual Certified Shareholder Report for the fiscal year ending March 31, 2007 on Form N-CSR (the "FY2007 Annual Report").  The FY2007 Annual Report provided a "Management Discussion of Fund Performance," signed by defendant Kelsoe as Senior Portfolio Manager of MAM, regarding each of the Funds.  The report finally acknowledged that the Funds' performance had been negatively impacted by the recent turmoil in the mortgage market but attempted to downplay the impact, stating in relevant part as follows:

Since our last report, the Fund[s'] market price share performance has been negatively impacted by the reduction of the monthly distribution rate from $0.15 per share to $0.14 per share.  The Fund[s'] performance has also been negatively impacted by the recent turmoil in the mortgage market. During the months leading up to the reduction of the Fund[s'] distribution rate, portfolio earnings were increasingly under pressure due to consistently rising costs associated with the leverage (borrowed money) employed by the Fund[s] and by a prolonged period of contracting credit spreads.  The combination of these two market forces

resulted in lower net earnings to the Fund[s] and required a reduction in the distribution rate beginning in December 2006.

Since December, the U.S. mortgage-backed securities market has undergone serious turmoil, most notably in the sub-prime home equity arena. *While this downward volatility in the mortgage-backed arena has had a negative impact on the net asset value of the Fund[s], it has also provided an opportunity to buy assets at considerably higher yields than have been available for more than two years. Strategically redeploying assets during this market upheaval may be difficult from a net asset value perspective for a period of time, but this is also the best opportunity we have seen in years to secure better portfolio earnings for quarters to come.*

(Emphasis added).

184. The FY2007 Annual Report further described each Fund's performance, as follows:

For the six months and the fiscal year ended March 31, 2007, [Helios Advantage] had a total return of (8.52)% and 1.53%, respectively, based on market price and reinvested dividends and other distributions. For the six months and the fiscal year ended March 31, 2007, the Fund had a total return of 3.24% and 6.21%, respectively, based on net asset value and reinvested dividends and other distributions. For the six months and the twelve months ended March 31, 2007, the Lehman Brothers Ba U.S. High Yield Index had a total return of 5.37% and 9.71%, respectively.

*        *        *

For the six months and the fiscal year ended March 31, 2007, [Helios High] had a total return of (12.71)% and (3.26)%, respectively, based on market price and reinvested dividends and other distributions. For the six months and the twelve months ended March 31, 2007, the Fund had a total return of 2.56% and 6.05%, respectively, based on net asset value and reinvested dividends and other distributions. For the six months and the twelve months ended March 31, 2007, the Lehman Brothers Ba U.S. High Yield Index had a total return of 5.37% and 9.71%, respectively.

*        *        *

For the six months and the fiscal year ended March 31, 2007, [Helios Multi-Sector] had a total return of (3.84)% and 10.96%, respectively, based on market price and reinvested dividends and other distributions. For the six months and the fiscal year ended March 31, 2007, the Fund had a total return of 3.09% and 9.45%, respectively, based on net asset value and reinvested dividends and other distributions. For the six months and the twelve months ended March 31, 2007,

the Lehman Brothers Ba U.S. High Yield Index had a total return of 5.37% and 9.71%, respectively.

*     *     *

For the six months and the fiscal year ended March 31, 2007, [Helios Strategic] had a total return of (11.06)% and (1.09)%, respectively, based on market price and reinvested dividends and other distributions.  For the six months and the fiscal year ended March 31, 2007, the Fund had a total return of 3.52% and 6.18%, respectively, based on net asset value and reinvested dividends and other distributions.  For the six months and the twelve months ended March 31, 2007, the Lehman Brothers Ba U.S. High Yield Index had a total return of 5.37% and 9.71%, respectively.

(Emphasis added).

185.    The FY2007 Annual Report compared the performance of the Funds to that of the

Lehman Ba Index, which, as discussed above, was not an appropriate benchmark index.

186.    In addition, the FY2007 Annual Report listed the following securities as corporate

bonds, when in fact they were ABSs:

| Description of Security | Fund | Principal Amount/Shares | Stated Value |
|---|---|---|---|
| Canal Pointe II LLC., 5.340% 6/25/14 | RMA | 2,000,000 | $2,000,000 |
| | RMH | 2,000,000 | $2,000,000 |
| | RHY | 2,000,000 | $2,000,000 |
| | RSF | 2,000,000 | $2,000,000 |
| Lincoln Park Referenced Link Notes 2001-1, 8.780% 7/30/31 | RMA | 3,000,000 | $2,730,000 |
| | RMH | 2,000,000 | $1,820,000 |
| | RHY | 3,000,000 | $2,730,000 |
| | RSF | 2,000,000 | $1,820,000 |
| Pyxis Master Trust 2006-7, 10.320% 10/1/37 | RMA | 3,000,000 | $3,000,000 |
| | RMH | 3,000,000 | $3,000,000 |
| | RHY | 3,000,000 | $3,000,000 |
| | RSF | 3,000,000 | $3,000,000 |
| Steers Delaware Business Trust 2007-A, 7.599% 6/20/18 | RMA | 5,000,000 | $5,000,000 |
| | RMH | 4,000,000 | $4,000,000 |
| | RHY | 6,000,000 | $6,000,000 |
| | RSF | 4,000,000 | $4,000,000 |
| Sterling Chemicals Inc., 10.250% 4/1/15 | RMA | 1,025,000 | $1,025,000 |
| | RMH | 750,000 | $750,000 |
| | RHY | 1,125,000 | $1,125,000 |

| | | | |
|---|---|---|---|
| Regional Diversified Funding, 10.000% 1/25/36 | RMA | 1,250,000 | $1,253,125 |
| | RSF | 1,000,000 | $1,002,500 |
| Antares Fund LP, 13.413% 12/14/11 | RMA | 1,875,444 | $2,006,725 |
| | RMH | 1,875,444 | $2,006,725 |
| | RHY | 1,875,444 | $2,006,725 |
| | RSF | 2,813,166 | $3,010,088 |
| Eirles Two Ltd. 262, 10.860% 8/3/21 | RMA | 2,500,000 | $2,500,000 |
| | RMH | 1,500,000 | $1,500,000 |
| | RHY | 3,500,000 | $3,500,000 |
| | RSF | 500,000 | $500,000 |
| Eirles Two Ltd. 263, 13.360% 8/3/21 | RMA | 3,500,000 | $3,500,000 |
| | RMH | 2,300,000 | $2,300,000 |
| | RHY | 3,500,000 | $3,500,000 |
| | RSF | 3,500,000 | $3,500,000 |
| InCaps Funding II Ltd., Zero Coupon Bond 1/15/34 | RMA | 5,000,000 | $2,575,000 |
| | RMH | 2,500,000 | $1,287,500 |
| | RHY | 3,300,000 | $1,699,500 |
| MM Community Funding II Ltd., Zero Coupon Bond 12/15/31 | RHY | 5,000,000 | $2,550,000 |
| Preferred Term Securities II, Ltd., 10.000% 5/22/33 | RMA | 2,000,000 | $1,111,520 |
| | RMH | 1,000,000 | $555,760 |
| | RSF | 1,000,000 | $555,760 |
| Preferred Term Securities XVIII, Ltd., 10.000% 9/23/35 | RMA | 2,000,000 | $1,710,000 |
| | RMH | 2,000,000 | $1,710,000 |
| | RHY | 2,000,000 | $1,710,000 |
| | RSF | 2,000,000 | $1,710,000 |
| Preferred Term Securities XXI, Ltd., 10.000% 3/22/38 | RMA | 2,000,000 | $1,941,500 |
| | RMH | 1,000,000 | $970,750 |
| | RHY | 2,000,000 | $1,941,500 |
| | RSF | 1,000,000 | $970,750 |
| Preferred Term Securities XXII, Ltd., 15.000% 9/22/36 | RMA | 4,000,000 | $3,855,160 |
| | RMH | 2,400,000 | $2,313,097 |
| | RHY | 4,600,000 | $4,433,434 |
| | RSF | 2,400,000 | $2,313,096 |
| Preferred Term Securities XXIII, Ltd., 15.000% 12/22/36 | RMA | 3,800,000 | $3,610,000 |
| | RMH | 3,200,000 | $3,040,000 |
| | RHY | 4,800,000 | $4,560,000 |
| | RSF | 3,200,000 | $3,040,000 |
| Preferred Term Securities XXIV, Ltd., 10.000% 3/22/37 | RMA | 2,000,000 | $1,960,000 |
| | RMH | 1,000,000 | $980,000 |
| | RHY | 2,000,000 | $1,960,000 |
| | RSF | 1,000,000 | $980,000 |

| | | | |
|---|---|---|---|
| Preferred Term Securities XXV, Ltd., 10.000% 6/22/37 | RMA | 1,000,000 | $990,000 |
| | RMH | 1,000,000 | $990,000 |
| | RHY | 1,000,000 | $990,000 |
| | RSF | 1,000,000 | $990,000 |
| Pyxis Master Trust, 10.320% 10/1/37 | RMA | 1,000,000 | $1,000,000 |
| | RMH | 1,000,000 | $1,000,000 |
| | RHY | 2,000,000 | $2,000,000 |
| | RSF | 1,000,000 | $1,000,000 |
| TPref Funding III Ltd., 11.000% 1/15/33 | RMH | 1,316,750 | $934,893 |

187.    The FY2007 Annual Report listed the following securities as preferred stocks, when in fact they were ABSs:

| Description of Security | Fund | Principal Amount/Shares | Stated Value |
|---|---|---|---|
| Baker Street Funding | RMA | 4,000 | $3,880,000 |
| | RMH | 30,000 | $2,910,000 |
| | RHY | 4,000 | $3,880,000 |
| | RSF | 3,000 | $2,910,000 |
| Baker Street Funding 2006-1 | RMA | 1,000 | $940,000 |
| | RMH | 10,000 | $940,000 |
| | RHY | 2,150 | $2,021,000 |
| | RSF | 1,000 | $940,000 |
| Centurion VII | RMA | 2,000 | $1,515,000 |
| | RMH | 2,000 | $1,515,000 |
| | RHY | 2,000 | $1,515,000 |
| | RSF | 2,000 | $1,515,000 |
| Credit Genesis CLO 2005 | RMA | 3,000 | $2,970,000 |
| | RMH | 1,000 | $990,000 |
| | RHY | 3,000 | $2,970,000 |
| | RSF | 1,000 | $990,000 |
| Harborview 2006-8 | RMA | 9 | $1 |
| | RMH | 7 | $1 |
| | RHY | 9 | $1 |
| | RSF | 9 | $1 |
| Hewett's Island II | RMA | 2,000 | $1,980,000 |
| | RMH | 1,000 | $990,000 |
| | RSF | 1,000 | $990,000 |
| Indymac Indx CI-1 Corp. | RMA | 67,000 | $1,820,858 |
| | RMH | 67,000 | $1,820,859 |
| | RHY | 67,000 | $1,820,858 |
| | RSF | 67,000 | $1,820,859 |

| | | | |
|---|---|---|---|
| Marquette Park CLO Ltd. | RMA | 2,000 | $1,920,000 |
| | RMH | 1,000 | $960,000 |
| | RHY | 2,000 | $1,920,000 |
| | RSF | 1,000 | $960,000 |
| Mountain View Funding | RMA | 20,000 | $1,760,000 |
| | RMH | 20,000 | $1,760,000 |
| | RHY | 2,000 | $1,760,000 |
| | | 4,000 | $3,880,000 |
| | RSF | 2,000 | $1,760,000 |
| WEBS CDO 2006-1 PS | RMA | 2,000 | $1,800,000 |
| | RMH | 2,000 | $1,800,000 |
| | RHY | 3,500 | $3,150,000 |
| | RSF | 2,000 | $1,800,000 |

188.    The FY2007 Annual Report also reported the net assets of each Fund, which were not properly written down and thus were inflated.  As discussed in detail above, the net assets were purposely manipulated as the values of each Fund's underlying securities were purposely improperly priced.

189.    The FY2007 Annual Report was signed by defendants Sullivan and Thompson Weller.

190.    In conjunction with the FY2007 Annual Report, defendants Sullivan and Thompson Weller assured shareholders that they had investigated and reviewed the Funds' internal controls, processes and financial statements and authorized their inclusion in the Funds' public filings.  Indeed, defendants Sullivan and Thompson Weller signed certifications pursuant to SOX § 302 with respect to each Fund, affirming that:

1. I have reviewed this report on Form N-CSR of [the respective Fund] (the "Registrant");

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, changes in net assets, and cash flows (if the financial statements are required to include a statement of cash flows) of the Registrant as of, and for, the periods presented in this report;

4. The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Rule 30a-3(c) under the Investment Company Act of 1940) and internal control over financial reporting (as defined in Rule 30a-3(d) under the Investment Company Act of 1940) for the Registrant and have:

(a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)  Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of a date within 90 days prior to the filing date of this report based on such evaluation; and

(d)  Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the second fiscal quarter of the period covered by this report that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. The Registrant's other certifying officer and I have disclosed to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

(a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize, and report financial information; and

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

191.    Defendants Sullivan and Thompson Weller also signed certifications pursuant to

SOX § 906 with respect to each Fund, affirming that:

1. The Fund's periodic report on Form N-CSR for the period ended March 31, 2007 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Fund.

*The Fiscal Year 2008 First Quarter N-Qs*

192.    On August 29, 2007, each of the Funds filed a Form N-Q (collectively, the

"FY2008 Q1 N-Qs"), which listed the following securities as corporate bonds, when in fact they

were ABSs:

| Description of Security | Fund | Principal Amount/Shares | Stated Value |
|---|---|---|---|
| Canal Pointe II LLC., 8.838% 6/25/14 | RMA | 2,000,000 | $1,990,000 |
|  | RMH | 2,000,000 | $1,990,000 |
|  | RHY | 2,000,000 | $1,990,000 |
|  | RSF | 2,000,000 | $1,990,000 |
| Duane Park I Ltd., 7.840% 6/27/16 | RMA | 4,000,000 | $4,015,600 |
|  | RMH | 3,000,000 | $3,011,700 |
|  | RHY | 5,000,000 | $5,019,500 |
|  | RSF | 3,000,000 | $3,011,700 |
| Lincoln Park Referenced Link Notes 2001-1, 8.775% 7/30/31 | RMA | 3,000,000 | $2,670,000 |
|  | RMH | 2,000,000 | $1,780,000 |
|  | RHY | 3,000,000 | $2,670,000 |
|  | RSF | 2,000,000 | $1,780,000 |
| Parcs-R 2007-8, 5.321% 1/25/46 | RMA | 2,000,000 | $2,000,000 |
|  | RMH | 1,500,000 | $1,500,000 |
|  | RHY | 2,000,000 | $2,000,000 |
|  | RSF | 1,500,000 | $1,500,000 |
| Pyxis Master Trust 2006-7, 10.320% 10/1/37 | RMA | 3,000,000 | $3,000,000 |
|  | RMH | 3,000,000 | $3,000,000 |
|  | RHY | 3,000,000 | $3,000,000 |
|  | RSF | 3,000,000 | $3,000,000 |
| Steers Delaware Business Trust 2007-A, 7.610% 6/20/18 | RMA | 5,000,000 | $5,000,000 |
|  | RMH | 4,000,000 | $4,000,000 |
|  | RHY | 6,000,000 | $6,000,000 |
|  | RSF | 4,000,000 | $4,000,000 |

| | | | |
|---|---|---|---|
| Regional Diversified Funding, 10.000% 1/25/36 | RMA | 1,250,000 | $1,253,125 |
| | RSF | 1,000,000 | $1,002,500 |
| Antares Fund LP, 13.413% 12/14/11 | RMA | 1,875,444 | $2,025,480 |
| | RMH | 1,875,444 | $2,025,480 |
| | RHY | 1,875,444 | $2,025,480 |
| | RSF | 2,813,166 | $3,038,219 |
| Eirles Two Ltd. 262, 10.855% 8/3/21 | RMA | 2,500,000 | $2,487,500 |
| | RMH | 1,500,000 | $1,492,500 |
| | RHY | 3,500,000 | $3,482,500 |
| | RSF | 500,000 | $497,500 |
| Eirles Two Ltd. 263, 13.355% 8/3/21 | RMA | 3,500,000 | $3,473,750 |
| | RMH | 2,300,000 | $2,282,750 |
| | RHY | 3,500,000 | $3,473,750 |
| | RSF | 3,500,000 | $3,473,750 |
| MM Community Funding II Ltd., Zero Coupon Bond 12/15/31 | RHY | 5,000,000 | $2,550,000 |
| Preferred Term Securities II, Ltd., 10.000% 5/22/33 | RMA | 2,000,000 | $1,046,520 |
| | RMH | 1,000,000 | $523,260 |
| | RSF | 1,000,000 | $523,260 |
| Preferred Term Securities XVIII, Ltd., 10.000% 9/23/35 | RMA | 1,000,000 | $827,470 |
| | RMH | 1,000,000 | $827,470 |
| | RHY | 1,000,000 | $827,470 |
| | RSF | 1,000,000 | $827,470 |
| Preferred Term Securities XIX, Ltd., 10.000% 12/22/35 | RMA | 1,000,000 | $830,000 |
| | RMH | 1,000,000 | $830,000 |
| | RHY | 1,000,000 | $830,000 |
| | RSF | 1,000,000 | $830,000 |
| Preferred Term Securities XXI, Ltd., 10.000% 3/22/38 | RMA | 1,000,000 | $880,000 |
| | RMH | 1,000,000 | $880,000 |
| | RHY | 1,000,000 | $880,000 |
| | RSF | 1,000,000 | $880,000 |
| Preferred Term Securities XXI-2TR, 9.999% 3/22/38 | RMA | 1,000,000 | $957,500 |
| | RMH | 1,000,000 | $957,500 |
| | RHY | 1,000,000 | $957,500 |
| | RSF | 1,000,000 | $957,500 |
| Preferred Term Securities XXII, Ltd., 15.000% 9/22/36 | RMA | 4,000,000 | $3,720,000 |
| | RMH | 2,400,000 | $2,232,000 |
| | RHY | 4,600,000 | $4,278,000 |
| | RSF | 2,400,000 | $2,232,000 |
| Preferred Term Securities XXIII, Ltd., 15.000% 12/22/36 | RMA | 3,800,000 | $3,600,500 |
| | RMH | 3,200,000 | $3,032,000 |
| | RHY | 3,800,000 | $3,600,500 |
| | RSF | 3,200,000 | $3,032,000 |

| | | | |
|---|---|---|---|
| Preferred Term Securities XXIV, Ltd., 10.000% 3/22/37 | RMA | 2,000,000 | $1,979,740 |
| | RMH | 1,000,000 | $989,870 |
| | RHY | 2,000,000 | $1,979,740 |
| | RSF | 1,000,000 | $989,870 |
| Preferred Term Securities XXV, Ltd., 10.000% 6/22/37 | RMA | 1,000,000 | $976,960 |
| | RMH | 1,000,000 | $976,960 |
| | RHY | 1,000,000 | $976,960 |
| | RSF | 1,000,000 | $976,960 |
| Pyxis Master Trust, 10.320% 10/1/2037 | RMA | 1,000,000 | $1,000,000 |
| | RMH | 1,000,000 | $1,000,000 |
| | RHY | 2,000,000 | $2,000,000 |
| | RSF | 1,000,000 | $1,000,000 |
| TPref Funding I Ltd., 11.000% 1/15/33 | RMH | 1,316,750 | $994,146 |

193.    In addition, the FY2008 Q1 N-Qs listed the following securities as preferred stocks, when in fact they were ABSs:

| Description of Security | Fund | Principal Amount/Shares | Stated Value |
|---|---|---|---|
| Baker Street Funding | RMA | 40,000 | $3,680,000 |
| | RMH | 30,000 | $2,760,000 |
| | RHY | 40,000 | $3,680,000 |
| | RSF | 3,000 | $2,760,000 |
| Baker Street Funding 2006-1 | RMA | 10,000 | $935,000 |
| | RMH | 10,000 | $935,000 |
| | RHY | 21,500 | $2,010,250 |
| | RSF | 1,000 | $935,000 |
| Centurion VII | RMA | 2,000 | $1,515,000 |
| | RMH | 2,000 | $1,515,000 |
| | RHY | 2,000 | $1,515,000 |
| | RSF | 2,000 | $1,515,000 |
| Credit Genesis CLO 2005 | RMA | 3,000 | $2,955,000 |
| | RMH | 1,000 | $985,000 |
| | RHY | 3,000 | $2,955,000 |
| | RSF | 1,000 | $985,000 |
| Global Leveraged | RMA | 1,000 | $920,000 |
| | RMH | 1,000 | $920,000 |
| | RHY | 1,000 | $920,000 |
| | RSF | 1,000 | $920,000 |

| | | | |
|---|---|---|---|
| Harborview 2006-8 | RMA | 9 | $1 |
| | RMH | 7 | $1 |
| | | 1,000 | $925,000 |
| | | 78,400 | $1,313,200 |
| | | 67,000 | $1,820,859 |
| | RHY | 9 | $1 |
| | RSF | 9 | $1 |
| Hewett's Island II | RMA | 2,000 | $1,850,000 |
| | RSF | 1,000 | $925,000 |
| Indymac Indx CI-1 Corp. | RMA | 67,000 | $1,820,859 |
| | RHY | 67,000 | $1,820,859 |
| | RSF | 67,000 | $1,820,859 |
| Marquette Park CLO | RMA | 2,000 | $1,880,000 |
| | RMH | 1,000 | $940,000 |
| | RHY | 2,000 | $1,880,000 |
| | RSF | 1,000 | $940,000 |
| Mountain View Funding | RMA | 20,000 | $1,840,000 |
| | RMH | 20,000 | $1,840,000 |
| | RHY | 20,000 | $1,840,000 |
| | | 40,000 | $3,880,000 |
| | RSF | 2,000 | $1,840,000 |
| Rockwall CDO | RMA | 2,000 | $1,970,000 |
| | RMH | 1,000 | $985,000 |
| | RHY | 2,000 | $1,970,000 |
| | RSF | 1,500 | $1,477,500 |
| WEBS CDO 2006-1 PS | RMA | 2,000 | $1,550,000 |
| | RMH | 2,000 | $1,550,000 |
| | RHY | 3,500 | $2,712,500 |
| | RSF | 2,000 | $1,550,000 |

194. Each Fund's FY2008 Q1 N-Q reported the net assets of the Fund, which were not properly written down and thus were inflated. As discussed in detail above, the net assets were purposely manipulated as the values of each Fund's underlying securities were purposely improperly priced.

195. The FY2008 Q1 N-Qs were signed by defendants Sullivan and Thompson Weller.

196. In conjunction with the FY2008 Q1 N-Qs, defendants Sullivan and Thompson Weller assured shareholders that they had investigated and reviewed the Funds' internal controls,

processes and financial statements and authorized their inclusion in the Funds' public filings. Indeed, defendants Sullivan and Thompson Weller signed certifications pursuant to SOX § 302 with respect to each Fund, affirming that:

1. I have reviewed this report on Form N-Q of [the respective Fund] (the "Registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the schedule of investments included in this report fairly present in all material respects the investments of the Registrant as of the end of the fiscal quarter for which the report is filed;

4. The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Rule 30a-3(c) under the Investment Company Act of 1940) and internal control over financial reporting (as defined in Rule 30a-3(d) under the Investment Company Act of 1940) for the Registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of a date within 90 days prior to the filing date of this report, based on such evaluation; and

d) Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. The Registrant's other certifying officer and I have disclosed to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize, and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

*The Fiscal Year 2008 Semi-Annual Report*

197. On December 5, 2007, the Funds filed with the SEC a combined Semi-Annual Certified Shareholder Report for the first six months of the 2008 fiscal year, ending September 30, 2007, on Form N-CSRS (the "FY2008 Semi-Annual Report").

198. The FY2008 Semi-Annual Report compared the performance of the Funds to that of the Lehman Ba Index, which, as discussed above, was not an appropriate benchmark index.

199. The FY2008 Semi-Annual Report listed the following securities as corporate bonds, when in fact they were ABSs:

| Description of Security | Fund | Principal Amount/Shares | Stated Value |
|---|---|---|---|
| Canal Pointe II LLC, 5.310% 6/25/14 | RMA | 2,000,000 | $1,460,000 |
| | RMH | 2,000,000 | $1,460,000 |
| | RHY | 2,000,000 | $1,460,000 |
| | RSF | 2,000,000 | $1,460,000 |
| Duane Park I Ltd., 7.840% 6/27/16 | RMA | 4,000,000 | $3,800,000 |
| | RMH | 3,000,000 | $2,850,000 |
| | RHY | 5,000,000 | $4,750,000 |
| | RSF | 3,000,000 | $2,850,000 |
| Lincoln Park Referenced Link Notes 2001-1, 8.780% 7/30/31 | RMA | 3,000,000 | $2,250,000 |
| | RMH | 2,000,000 | $1,500,000 |
| | RHY | 3,000,000 | $2,250,000 |
| | RSF | 2,000,000 | $1,500,000 |

| | | | |
|---|---|---|---|
| Parcs-R 2007-8, 7.631% 1/25/46 | RMA | 2,000,000 | $2,000,000 |
| | RMH | 1,500,000 | $1,500,000 |
| | RHY | 2,000,000 | $2,000,000 |
| | RSF | 1,500,000 | $1,500,000 |
| Pyxis Master Trust 2006-7, 10.128% 10/1/37 | RMA | 3,000,000 | $3,000,000 |
| | RMH | 3,000,000 | $3,000,000 |
| | RHY | 3,000,000 | $3,000,000 |
| | RSF | 3,000,000 | $3,000,000 |
| Steers Delaware Business Trust 2007-A, 7.494% 6/20/18 | RMA | 8,000,000 | $7,960,000 |
| | RMH | 6,000,000 | $5,970,000 |
| | RHY | 9,000,000 | $8,955,000 |
| | RSF | 6,000,000 | $5,970,000 |
| Regional Diversified Funding, 10.000% 1/25/36 | RMA | 1,250,000 | $1,225,000 |
| | RSF | 1,000,000 | $980,000 |
| Eirles Two Ltd. 262, 10.860% 8/3/21 | RMA | 3,000,000 | $2,910,000 |
| | RMH | 1,500,000 | $1,455,000 |
| | RHY | 4,000,000 | $3,880,000 |
| | RSF | 2,000,000 | $1,940,000 |
| Eirles Two Ltd. 263, 13.360% 8/3/21 | RMA | 3,500,000 | $3,325,000 |
| | RMH | 2,300,000 | $2,185,000 |
| | RHY | 3,500,000 | $3,325,000 |
| | RSF | 3,500,000 | $3,325,000 |
| MM Community Funding II Ltd., Zero Coupon Bond 12/15/31 | RHY | 5,000,000 | $595,000 |
| Preferred Term Securities II, Ltd., 10.000% 5/22/33 | RMA | 2,000,000 | $1,180,000 |
| | RMH | 1,000,000 | $590,000 |
| | RHY | 3,000,000 | $1,770,000 |
| | RSF | 1,000,000 | $590,000 |
| Preferred Term Securities XVIII, Ltd., 20.000% 9/23/35 | RMA | 1,000,000 | $605,000 |
| | RMH | 1,000,000 | $605,000 |
| | RHY | 1,000,000 | $605,000 |
| | RSF | 1,000,000 | $605,000 |
| Preferred Term Securities XIX, Ltd., 10.000% 12/22/35 | RMA | 1,000,000 | $745,000 |
| | RMH | 1,000,000 | $745,000 |
| | RHY | 1,000,000 | $745,000 |
| | RSF | 1,000,000 | $745,000 |
| Preferred Term Securities XXI, Ltd., 24.250% 3/22/38 | RMA | 3,000,000 | $1,200,000 |
| | RMH | 3,000,000 | $1,200,000 |
| | RHY | 3,000,000 | $1,200,000 |
| | RSF | 3,000,000 | $1,200,000 |
| Preferred Term Securities XXI-2TR, 9.999% 3/22/38 | RMA | 999,070 | $829,228 |
| | RMH | 999,070 | $829,228 |
| | RHY | 999,070 | $829,228 |
| | RSF | 999,070 | $829,228 |

| | | | |
|---|---|---|---|
| Preferred Term Securities XXII, Ltd., 22.900% 9/22/36 | RMA | 4,000,000 | $1,600,000 |
| | RMH | 2,400,000 | $960,000 |
| | RHY | 4,600,000 | $1,840,000 |
| | RSF | 2,400,000 | $960,000 |
| Preferred Term Securities XXIII, Ltd., 24.000% 12/22/36 | RMA | 3,800,000 | $1,900,000 |
| | RMH | 3,200,000 | $1,600,000 |
| | RHY | 3,800,000 | $1,900,000 |
| | RSF | 3,200,000 | $1,600,000 |
| Preferred Term Securities XXIV, Ltd., 20.000% 3/22/37 | RMA | 2,000,000 | $1,859,200 |
| | RMH | 1,000,000 | $929,600 |
| | RHY | 2,000,000 | $1,859,200 |
| | RSF | 1,000,000 | $929,600 |
| Preferred Term Securities XXV, Ltd., 20.000% 6/22/37 | RMA | 1,000,000 | $830,000 |
| | RMH | 1,000,000 | $830,000 |
| | RHY | 1,000,000 | $830,000 |
| | RSF | 1,000,000 | $830,000 |
| Pyxis Master Trust, 10.128% 10/1/37 | RMA | 1,000,000 | $1,000,000 |
| | RMH | 1,000,000 | $1,000,000 |
| | RHY | 2,000,000 | $2,000,000 |
| | RSF | 1,000,000 | $1,000,000 |
| TPref Funding I Ltd., 25.000% 1/15/33 | RMH | 1,316,750 | $895,390 |

200.    In addition, the FY2008 Semi-Annual Report listed the following securities as preferred stocks, when in fact they were ABSs:

| Description of Security | Fund | Principal Amount/Shares | Stated Value |
|---|---|---|---|
| Credit Genesis CLO 2005 | RMA | 3,000 | $2,610,000 |
| | RMH | 1,000 | $870,000 |
| | RHY | 3,000 | $2,610,000 |
| | RSF | 1,000 | $870,000 |
| Global Leveraged Capital Credit Opportunity Fund | RMA | 1,000 | $920,000 |
| | RMH | 1,000 | $920,000 |
| | RHY | 1,000 | $920,000 |
| | RSF | 1,000 | $920,000 |
| Harborview 2006-8 | RMA | 9 | $1 |
| | RMH | 7 | $1 |
| | RHY | 9 | $1 |
| | RSF | 9 | $1 |
| Hewett's Island II | RMA | 2,000 | $1,070,000 |
| | RMH | 1,000 | $535,000 |
| | RSF | 1,000 | $535,000 |

| | | | |
|---|---|---|---|
| Indymac Indx CI-1 Corp. | RMA | 67,000 | $73,700 |
| | RMH | 67,000 | $73,700 |
| | RHY | 67,000 | $73,700 |
| | RSF | 67,000 | $73,700 |
| WEBS CDO 2006-1 PS | RMA | 2,000 | $300,000 |
| | RMH | 2,000 | $300,000 |
| | RHY | 3,500 | $525,000 |
| | RSF | 2,000 | $300,000 |

201.    The FY2008 Semi-Annual Report was signed by defendants Sullivan and Thompson Weller.

202.    In conjunction with the FY2008 Semi-Annual Report, defendants Sullivan and Thompson Weller assured shareholders that they had investigated and reviewed the Funds' internal controls, processes and financial statements and authorized their inclusion in the Funds' public filings.  Indeed, defendants Sullivan and Thompson Weller signed certifications pursuant to SOX § 302 with respect to each Fund, affirming that:

1. I have reviewed this report on Form N-CSR of [the respective Fund] (the "Fund");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, changes in net assets, and cash flows (if the financial statements are required to include a statement of cash flows) of the Fund as of, and for, the periods presented in this report;

4. The Fund's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Rule 30a-3(c) under the Investment Company Act of 1940) and internal control over financial reporting (as defined in Rule 30a-3(d) under the Investment Company Act of 1940) for the Fund and have:

     (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Fund, including its consolidated

-91-

subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)  Evaluated the effectiveness of the Fund's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of a date within 90 days prior to the filing date of this report based on such evaluation; and

(d)  Disclosed in this report any change in the Fund's internal control over financial reporting that occurred during the second fiscal quarter of the period covered by this report that has materially affected, or is reasonably likely to materially affect, the Fund's internal control over financial reporting; and

5.  The Fund's other certifying officer and I have disclosed to the Fund's auditors and the audit committee of the Fund's board of directors (or persons performing the equivalent functions):

(a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Fund's ability to record, process, summarize, and report financial information; and

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the Fund's internal control over financial reporting.

203.    Defendants Sullivan and Thompson Weller also signed certifications pursuant to

SOX § 906 with respect to each Fund, affirming that:

1.  The Fund's periodic report on Form N-CSR for the period ended September 30, 2007 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Fund.

*The Fiscal Year 2008 Third Quarter N-Qs*

204.    On February 28, 2008, each of the Funds filed a Form N-Q (collectively the "FY 2008 Q3 N-Qs"), which listed the following securities as corporate bonds, when in fact they were ABSs:

| Description of Security | Fund | Principal Amount/Shares | Stated Value |
|---|---|---|---|
| Duane Park I Ltd., Zero Coupon Bond 6/27/16 | RMA | 4,436,523 | $1,685,879 |
| | RMH | 1,250,000 | $475,000 |
| | RHY | 2,500,000 | $950,000 |
| | RSF | 1,750,000 | $665,000 |
| Lincoln Park Referenced Link Notes 2001-1, 8.404% 7/30/31 | RMA | 3,000,000 | $2,119,320 |
| | RMH | 2,000,000 | $1,412,880 |
| | RHY | 3,000,000 | $2,119,320 |
| | RSF | 2,000,000 | $1,412,880 |
| Parcs-R 2007-8, 7.365% 1/25/46 | RMA | 2,000,000 | $1,512,800 |
| | RMH | 1,500,000 | $1,134,600 |
| | RHY | 2,000,000 | $1,512,800 |
| | RSF | 1,500,000 | $1,134,600 |
| Pyxis Master Trust 2006-7, 9.631% 10/1/37 | RMA | 2,991,609 | $239,329 |
| | RMH | 2,991,609 | $239,329 |
| | RHY | 2,991,609 | $239,329 |
| | RSF | 2,991,609 | $239,329 |
| Steers Delaware Business Trust 2007-A, 7.243% 6/20/18 | RMA | 8,000,000 | $7,700,000 |
| | RMH | 6,000,000 | $5,775,000 |
| | RHY | 9,000,000 | $8,662,500 |
| | RSF | 6,000,000 | $5,775,000 |
| Regional Diversified Funding, Zero Coupon Bond, 1/25/36 | RMA | 1,250,000 | $400,000 |
| | RSF | 1,000,000 | $320,000 |
| Eirles Two Ltd. 262, 10.378% 8/3/21 | RMA | 3,000,000 | $2,250,000 |
| | RMH | 1,500,000 | $1,125,000 |
| | RHY | 4,000,000 | $3,000,000 |
| | RSF | 2,000,000 | $1,500,000 |
| Eirles Two Ltd. 263, 12.878% 8/3/21 | RMA | 3,500,000 | $2,380,000 |
| | RMH | 2,300,000 | $1,564,000 |
| | RHY | 3,500,000 | $2,380,000 |
| | RSF | 3,500,000 | $2,380,000 |
| Preferred Term Securities II, Ltd., 10.000% 5/22/33 | RMA | 2,000,000 | $980,000 |
| | RMH | 1,000,000 | $490,000 |
| | RHY | 3,000,000 | $1,470,000 |
| | RSF | 1,000,000 | $490,000 |

| | | | |
|---|---|---|---|
| Preferred Term Securities XXI, Ltd., 24.250% 3/22/38 | RMA | 3,000,000 | $840,000 |
| | RMH | 3,000,000 | $840,000 |
| | RHY | 3,000,000 | $840,000 |
| | RSF | 3,000,000 | $840,000 |
| Preferred Term Securities XXI-2TR, 9.999% 3/22/38 | RMA | 999,070 | $569,470 |
| | RMH | 999,070 | $569,470 |
| | RHY | 999,070 | $569,470 |
| | RSF | 999,070 | $569,470 |
| Preferred Term Securities XXII, Ltd., 10.000% 9/22/36 | RMA | 4,000,000 | $1,514,000 |
| | RMH | 2,400,000 | $908,400 |
| | RHY | 4,600,000 | $1,741,000 |
| | RSF | 2,400,000 | $908,400 |
| Preferred Term Securities XXIII, Ltd., 10.000% 12/22/36 | RMA | 3,800,000 | $1,734,700 |
| | RMH | 3,200,000 | $1,460,800 |
| | RHY | 3,800,000 | $1,734,700 |
| | RSF | 3,200,000 | $1,460,800 |
| Pyxis Master Trust, 9.631% 10/1/37 | RMA | 997,523 | $79,802 |
| | RMH | 997,523 | $79,802 |
| | RHY | 1,995,046 | $159,604 |
| | RSF | 997,523 | $79,802 |
| TPref Funding I Ltd., Zero Coupon Bond 1/15/33 | RMH | 1,316,750 | $727,504 |

205.    In addition, the FY2008 Q3 N-Qs listed the following securities as preferred stocks, when in fact they were ABSs:

| Description of Security | Fund | Principal Amount/Shares | Stated Value |
|---|---|---|---|
| Credit Genesis CLO 2005 | RMA | 3,000 | $1,950,000 |
| | RMH | 1,000 | $650,000 |
| | RHY | 3,000 | $1,950,000 |
| | RSF | 1,000 | $650,000 |
| Global Leveraged Credit Opportunity Fund | RMA | 1,000 | $900,000 |
| | RHY | 1,000 | $900,000 |
| Harborview 2006-8 | RMA | 9 | $1 |
| | RMH | 7 | $1 |
| | RHY | 9 | $1 |
| | RSF | 9 | $1 |
| Indymac Indx CI-1 Corp. | RMA | 67,000 | $82,410 |
| | RMH | 67,000 | $82,410 |
| | RHY | 67,000 | $82,410 |
| | RSF | 67,000 | $82,409 |

| WEBS CDO 2006-1 PS | RMA | 2,000 | $20 |
| | RMH | 2,000 | $20 |
| | RHY | 3,500 | $35 |
| | RSF | 2,000 | $20 |

206.    The FY2008 Q3 N-Qs were signed by defendants Sullivan and Thompson Weller.

207.    In conjunction with the FY2008 Q3 N-Qs, defendants Sullivan and Thompson Weller assured shareholders that they had investigated and reviewed the Funds' internal controls, processes and financial statements and authorized their inclusion in the Funds' public filings. Indeed, defendants Sullivan and Thompson Weller signed certifications pursuant to SOX § 302 with respect to each Fund, affirming that:

1. I have reviewed this report on Form N-Q of [the respective Fund] (the "Fund");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the schedule of investments included in this report fairly present in all material respects the investments of the Fund as of the end of the fiscal quarter for which the report is filed;

4. The Fund's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Rule 30a-3(c) under the Investment Company Act of 1940) and internal control over financial reporting (as defined in Rule 30a-3(d) under the Investment Company Act of 1940) for the Fund and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Fund, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the Fund's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of a date within 90 days prior to the filing date of this report, based on such evaluation; and

d) Disclosed in this report any change in the Fund's internal control over financial reporting that occurred during the Fund's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the Fund's internal control over financial reporting; and

5. The Fund's other certifying officer and I have disclosed to the Fund's auditors and the audit committee of the Fund's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Fund's ability to record, process, summarize, and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Fund's internal control over financial reporting.

208.    In addition to defendants Anthony, Kelsoe, Sullivan, Joseph Weller and Thomas Weller signing the various SEC filings discussed above, defendant Wood, as Chief Compliance Officer of the Funds, reviewed these filings:

Q.    Ms. Wood, a final question for you.  In your compliance function did you have any role in the preparation or review or approval of any of the shareholder commentaries written by Jim Kelsoe?

A.    Well, those were part of the, you know, annual report or semi-annual report documents as a whole.  And I received copies of the whole – of drafts of that whole document.  So, yes, that would have been part of that.

209.    The above SEC filings: (a) touted the diversification of the Funds' portfolios; and (b) did not accurately reflect the Funds' over-concentration in MBSs, ABSs, and other illiquid risky securities, the extent of the risks associated therewith or the resulting losses to the Funds.

### *MAM's False and Misleading Sales Materials*

210.    Finally, MAM made false and misleading statements in the Funds' sales materials.

-96-

211.    As alleged in the FINRA Complaint, MAM and Morgan Keegan issued false and misleading sales materials from January 1, 2006 through December 31, 2007, which made the Funds appear more diversified, and therefore less risky, than they actually were, and failed to adequately disclose the risks to which the Funds were subject.  They also made false and misleading statements in direct response to customer and broker inquiries, which downplayed the risks and effects of market conditions on the Funds.  For example, MAM's Director of Marketing, Courtney H. Nash ("Nash"), responded to inquiries with the following reassurances:

a.    After expressing confidence in Helios Strategic and optimism going forward, Nash concluded, "In [Kelsoe's] and my opinion, this is an excellent buying opportunity." (March 16, 2007);

b.    "Nothing specific going on with the portfolio or the income that it produces that would dictate such a sell off.  Purely, supply and demand." (June 14, 2007; regarding all of the Funds);

c.    "The volatility in the closed end funds is strictly based on supply and demand."  (July 2, 2007);

d.    In response to a question from a financial advisor, Nash stated, "I assume we are to stay the course with our clients . . . . I think so.  A long term objective should not be forgotten, over a 10 or 15 year period clients will have more in the way of total return in our fund than others because of the high level of income generated."  (July 3, 2007); and

e.    In response to a question from a financial advisor, Nash stated, "[Kelsoe] thinks we may be close to the end of re-pricing, but who knows about the bottom for the market prices.  I think the market is driving the price in anticipation of a dividend cut, that at this time we don't feel is necessary . . . so I think this is a buying opportunity.  We are posting a Q&A with [Kelsoe] on the website, hopefully by tomorrow . . . . I think this will do a good job of calming the fears."  (July 16, 2007)

212.    In addition, MAM created quarterly "glossies" for each of the Funds.  The glossies were false and misleading in two ways:  (1) they contained misleading pie charts that made the Funds' portfolios look more diversified than they actually were; and (2) failed to adequately disclose the risks to which the Funds were subjected.

213.    Specifically, the pie charts in the Funds' glossies created by MAM, the Funds'

structured finance securities holdings were broken down into multiple subclasses, making the

asset allocation appear more divers than it actually was.  MAM did not break down the corporate

bonds category the same way.  As the McCann Report concluded, "[i]f the structured finance

securities in the pie chart were grouped together like the corporate bonds [were], the

concentration in structured finance would have been apparent."

214.    For example, MAM published glossies for the Funds containing the following pie

charts, as of September 30, 2006:

**Helios Advantage:**



**Helios High:**



**Helios Multi-Sector:**



**Helios Strategic:**



215.    Defendant Wood testified that, as Chief Compliance Officer for the Funds and MAM, she reviewed these types of sales materials before they were printed.  However, in practice, defendant Wood's review was cursory at best.  "For instance, if there is a pie chart," Wood would review to confirm "that the numbers came to a hundred percent, things of that sort." Wood further testified that she did not know what the source of the percentages was and that she never attempted to compare the information in the pie charts with what appeared in the Funds' SEC filings.

### Revelation of Defendants' Misconduct and Admissions

216.    On August 10, 2007, defendant Kelsoe wrote an open letter to investors published on Morgan Keegan's website, admitting, for the first time, that the Funds were having problems valuing their assets:

> I am careful to note the specific timing of this market commentary to provide appropriate context for my remarks given the dramatic market movements taking place hour to hour, and even moment to moment.  Because the investment environment is changing so rapidly, I felt it appropriate to provide our shareholders with an update on the impact these conditions are having on the four

RMK closed end funds, as well as the RMK Select High Income and Intermediate open end funds.

One need only look at this morning's headlines to appreciate the global impact of this pervasive de-leveraging event we are now experiencing. What began as a credit event a few months ago mainly affecting sub-prime mortgages has quickly become an unprecedented liquidity issue for the broader financial markets.

So why is this happening, and what is the impact on our closed end and open end funds? In my opinion, the de-leveraging, or sell-off of securities, by hedge funds and other financial institutions has created an excessive supply of all types of fixed income securities. This oversupply has pressured the balance sheets of all of Wall Street such that bid/offer spreads have widened and liquidity has dramatically declined over the last 30 to 60 days. Not only is supply higher than demand, but it exceeds the capacity to take these fixed income securities. Additionally, the rating agencies' sudden and drastic actions in downgrading securities have exacerbated these problems by triggering covenant violations and margin calls and creating even more supply in a very thin market.

Just this week, we've learned that a number of mortgage companies are having major problems, including American Home Mortgage, C-Bass, Luminent Mortgage and, most recently, Home Bank. These are not sub-prime lenders, but they are still finding it difficult to get financing to originate loans. Their problems have a direct or indirect impact on the market for all mortgage securities due to their size in the loan origination and servicing arenas.

At the annual shareholder meeting for our closed end funds just four weeks ago, we talked about the distinction between Net Asset Value (NAV) and market value. At that time, market values on all the funds had dropped to be more in line with the underlying NAV, or market value of the securities held in the portfolio. In the past few weeks there has been more volatility and downward pressure on the NAVs as a result of the difficulties in valuing these securities. Unlike stocks that trade openly on exchanges and whose value can easily be determined at any point of the day, mortgage-related securities and CDOs trade via individual bids and offers made on trading desks across Wall Street. As I mentioned earlier, the spreads between bid and offer prices continue to widen.

The lower valuations are no longer just showing up in the sub-prime mortgage securities as we have seen the pressure move further up the credit ladder to impact even AAA-rated bonds. Every fixed income security is subject to being devalued in this market, without regard to credit quality. Even bonds which continue to meet their payment schedules are under pricing pressure now. Commercial and corporate credit are feeling the crunch, and it is even beginning to touch stock values.

As has been our practice with regard to the dividend, we will provide information to our board in the coming weeks in regard to the income expectations of the

portfolios for the next few months.  The board is scheduled to meet later this month to determine the dividend payout rate for the near term.

During my 20 year career, these are truly unprecedented times.  Amidst these difficult circumstances, I assure you of my continuing commitment to do all that I can to take care of our shareholders' best interests.

217.    Then just four days later, on August 14, 2007, the Funds issued near identical

Form 8-Ks reporting that:

An independent valuation consultant has been retained to assist in determining the fair value of certain portfolio securities of [the Funds].  Recent instability in the markets for fixed income securities, particularly mortgage-backed and asset-backed securities, has made it more difficult to obtain realistic values for some of the Fund[s'] portfolio securities.  In the absence of reliable market quotations, portfolio securities are valued by the Fund[s'] investment adviser at their "fair value" under procedures established and monitored by the Fund[s'] Board of Directors.  The "fair value" of securities may be difficult to determine and thus judgment plays a greater role in this valuation process.  Fair valuation procedures have been used to value a substantial portion of the assets of the Fund[s] with input from the valuation consultant and these valuations are reflected in the daily net asset value of the Fund[s'] shares.

218.    In the FY2008 Semi-Annual Report filed with the SEC on December 5, 2007, the

Funds disclosed the massive losses in the Funds' MBS and ABS investments and a significant

drop in the Funds' NAVs.  Specifically, defendant Kelsoe reported that, during the six months

ending September 30, 2007:

- Helios Advantage had a total return of (38.79)%, based on market price and reinvested dividends and had a total return of (37.96)%, based on net asset value and reinvested dividends.  The fund paid total distributions from net investment income of $0.82 per share during the six-month period.

- Helios High had a total return of (37.29)%, based on market price and reinvested dividends and had a total return of (37.70)%, based on net asset value and reinvested dividends.  The fund paid total distributions from net investment income of $0.82 per share during the six-month period.

- Helios Multi-Sector had a total return of (36.83)%, based on market price and reinvested dividends and had a total return of (41.82)%, based on net asset value and reinvested dividends.  The fund paid total distributions

from net investment income of $0.84 per share during the six-month period.

- Helios Strategic had a total return of (39.25)%, based on market price and reinvested dividends and other distributions and had a total return of (37.55)%, based on net asset value and reinvested dividends and other distributions. The fund paid total distributions of $0.82 per share during the six-month period, of which $0.81 per share is derived from net investment income and the remainder of the distribution, or $0.01 per share, is deemed a return of capital.

- Comparatively, the Lehman Brothers Ba U.S. High Yield Index(1) had a total return of 0.74%.

219.    The FY2008 Semi-Annual Report further stated:

The turmoil in the mortgage market that began in December 2006 and the credit crunch that began during the Fund[s'] first fiscal quarter has continued to plague the performance of both the Fund[s'] net asset value and market valuation. Although below investment grade corporate debt has held up reasonably well, any asset related to residential real estate has been materially devalued. This is especially true for mortgage-backed securities and collateralized debt obligations.

The market's appetite for credit sensitive assets has totally reversed course from the prevailing environment of 2006. A massive unwind of leverage has literally evaporated market liquidity in all structured finance assets and put selling pressure on virtually all credit-sensitive assets. Although this has been a sector of the fixed income markets that has provided very satisfying results in past periods, 2007 has proven to be much more difficult than we could have anticipated.

At any available opportunity, we are attempting to reposition the Fund[s'] portfolio with a preference for safer, more liquid assets in order to create some stability in the Fund[s'] net asset value and to provide as much income as possible. Certainly this type of market chaos provides ample opportunities to capture value for future periods; however, given the extreme illiquidity and volatility of credit-sensitive assets, we expect to favor corporate assets and somewhat straightforward structures until the credit markets begin to gain some sustained stability. We expect more rate cuts by the Federal Open Market Committee in the fourth calendar quarter of 2007 and during 2008, which we anticipate will have a positive impact on liquidity and valuations of credit-sensitive assets.

220.    The extreme losses in the Funds were noted in several news articles. For example, Andy Meek of *The Daily News* stated that the Funds found themselves "more bloodied than almost all of [their] rivals."

221.   According to the McCann Report, the Funds collectively lost more than $1 billion in market value in 2007, as follows:

| Decline in the Funds' NAVs | | | | |
|---|---|---|---|---|
| Fund | Net Assets (millions) | | Decrease (millions) | 2007 Returns | |
| | As of 12/31/2006 | As of 12/31/2007 | | Capital Appreciation | Total Return |
| RMH | $311.6 | $115.5 | ($196.1) | (70.7%) | (65.5%) |
| RSF | $366.0 | $134.2 | ($231.8) | (72.1%) | (67.2%) |
| RMA | $423.8 | $161.9 | ($261.9) | (71.6%) | (66.8%) |
| RHY | $478.8 | $159.5 | ($319.3) | (72.2%) | (65.4%) |
| Total | $1,580.2 | $571.1 | ($1,009.1) | | |

222.   On June 10, 2010, each of the Funds issued a Form NT-NCSR Notice of Late Filing, announcing, among other things, non-reliance on previously issued financial statements:

If certain allegations in the [SEC Complaint] against the Respondents are found to be true at the conclusion of the Administrative Proceeding or otherwise, the financial statements and financial highlights [of each Fund's] four fiscal years ended March 31, 2009, March 31, 2008, March 31, 2007 and March 31, 2006 may be impacted. The [Funds are] currently undertaking an investigation of the underlying allegations in the Order.  It is unclear at this time, however, whether [each Fund's] financial statements and highlights covering these fiscal periods are impacted and, if so, whether the impact is material.

By correspondence dated May 27, 2010, PricewaterhouseCoopers LLP ("PwC"), [the Funds'] independent registered public accounting firm for the fiscal years ended March 31, 2008, 2007 and 2006, informed the [Funds] that PwC's audit reports dated May 29, 2008, May 21, 2007 and May 22, 2006, on the [Funds'] financial statements should no longer be relied upon.  Certain of the [Funds'] authorized officers have discussed the … matters [disclosed in this filing] with PwC.

In addition, by correspondence dated May 28, 2010, BBD, LLP ("BBD"), the [Funds'] independent registered public accounting firm for the six-month period ended September 30, 2008 and the fiscal year ended March 31, 2009, informed the [Funds] that BBD's audit reports dated November 26, 2008 and May 28, 2009, on the [Funds'] financial statements should no longer be relied upon in view of PwC's May 27, 2010 correspondence regarding non-reliance on its previously issued audit reports because BBD relied upon PwC's audit report on the March 31, 2008 financial statements.  The [Funds'] Audit Committee[s], Board[s] of Directors and authorized officers have discussed the … matters [disclosed in this filing] with BBD.

Based upon the actions of PwC and BBD, the financial statements and financial highlights covering these fiscal periods should not be relied upon until such time that the [Funds'] investigation of the underlying allegations in the Order has been completed and the issues surrounding the audit reports have been resolved.

223.   On August 25, 2010, in a current report on Form 8-K, the Funds released restated financial statements for the fiscal year ended March 31, 2009.  The reductions in net assets for fiscal year 2008 were more than $10.3 million for Helios Advantage, $7.8 million for Helios High, $11 million for Helios Multi-Sector, and $8.7 million for Helios Strategic.

224.   As Defendants slowly disclosed the true condition of the Funds, each of the Funds' share prices declined dramatically, from approximately $80 per share to below $10 per share, as demonstrated below:









**Governmental Actions Against Certain Defendants**

225.   On April 7, 2010, the SEC instituted administrative proceedings against MAM, Morgan Keegan, Kelsoe and Thompson Weller by filing the SEC Complaint, in connection with which it issued a press release stating, in relevant part:

> The Securities and Exchange Commission today announced administrative proceedings against Memphis, Tenn.-based firms Morgan Keegan & Company and Morgan Asset Management and two employees accused of fraudulently overstating the value of securities backed by subprime mortgages.
>
> The SEC's Division of Enforcement alleges that Morgan Keegan failed to employ reasonable procedures to internally price the portfolio securities in five funds managed by Morgan Asset, and consequently did not calculate accurate "net asset values" (NAVs) for the funds.   Morgan Keegan recklessly published these inaccurate daily NAVs, and sold shares to investors based on the inflated prices.
>
> "This scheme had two architects — a portfolio manager responsible for lies to investors about the true value of the assets in his funds, and a head of fund accounting who turned a blind eye to the fund's bogus valuation process," said Robert Khuzami, Director of the SEC's Division of Enforcement.
>
> William Hicks, Associate Director in the SEC's Atlanta Regional Office, said, "This misconduct masked from investors the true impact of the subprime mortgage meltdown on these funds."

According to the Commission's order instituting administrative proceedings, the SEC's Enforcement Division alleges that James C. Kelsoe, Jr., the portfolio manager of the funds and an employee of Morgan Asset and Morgan Keegan, arbitrarily instructed the firm's Fund Accounting department to make "price adjustments" that increased the fair values of certain portfolio securities. The price adjustments ignored lower values for those same securities quoted by various dealers as part of the pricing validation process. The Enforcement Division further alleges that Kelsoe actively screened and manipulated the pricing quotes obtained from at least one broker-dealer. With many of the funds' securities backed by subprime mortgages, Kelsoe's actions fraudulently prevented a reduction in the NAVs of the funds that otherwise should have occurred as a result of the deterioration in the subprime securities market.

The SEC's Division of Enforcement additionally alleges that Joseph Thompson Weller, a CPA who was head of the Fund Accounting Department and a member of the Valuation Committee, did nothing to remedy the deficiencies in Morgan Keegan's valuation procedures, nor did he otherwise make sure that fair-valued securities were being accurately priced and NAVs were being accurately calculated.

According to the SEC's order initiating proceedings, Morgan Keegan priced each portfolio's securities and calculated its daily NAV through its Fund Accounting Department. The NAV of an investment company is its total assets minus its total liabilities. An investment company calculates the NAV of a single share by dividing its NAV by the number of shares that are outstanding.

According to the SEC's order, each fund held various amounts of securities backed by subprime mortgages and lacked readily available market quotations. Therefore, the securities were internally priced using fair value methods to determine the amount that the funds would reasonably expect to receive on a current sale of the security. In SEC filings, the funds stated that the fair value of securities would be determined by a valuation committee using procedures adopted by the funds. In fact, the responsibility was essentially delegated to Morgan Keegan, which along with the valuation committee failed to comply with the funds' procedures in several ways.

The SEC's Division of Enforcement alleges that from at least January 2007 to July 2007, Kelsoe had his assistant send approximately 262 "price adjustments" to Fund Accounting. In many instances, these adjustments were arbitrary and did not reflect fair value. Despite the lack of any supporting documentation, Kelsoe's price adjustments were routinely entered into a spreadsheet used to calculate the NAVs of the funds. Kelsoe also routinely instructed Fund Accounting to ignore month-end quotes from broker-dealers that were supposed to be used to validate the prices the firm had assigned to the funds' securities.

226.   On the same date, FINRA filed the FINRA Complaint against Morgan Keegan.

FINRA issued a press release stating, in relevant part:

The Financial Industry Regulatory Authority (FINRA) announced today that it has filed a complaint against Morgan Keegan & Company, Inc., charging the firm with marketing and selling seven affiliated bond funds to investors using false and misleading sales materials – costing investors well over $1 billion.  In addition to an unspecified fine, FINRA is seeking disgorgement of all ill-gotten profits and full restitution for affected investors.

From Jan. 1, 2006, through Dec. 31, 2007, Morgan Keegan sold over $2 billion of the bond funds.  The funds were invested heavily in risky structured products – particularly, subordinated tranches of asset- and mortgage-backed securities, including sub-prime products.  Those investments caused the funds to experience serious financial difficulties beginning in early 2007 and led to their collapse later that year.

In its complaint, FINRA alleges that the misleading sales materials, combined with the firm's misleading and deficient internal guidance and failure to train its brokers about the risks, led Morgan Keegan's brokers to make material misrepresentations to investors.  This was particularly acute with respect to one of the funds – the Regions Morgan Keegan Select Intermediate Bond Fund – which was marketed as a relatively safe and conservative fixed income mutual fund investment when, in fact, the fund was exposed to undisclosed risks associated with its investment in mortgage- and asset-backed securities and subordinated tranches of structured products.

FINRA also alleges that, despite the negative impact on the bond funds in early 2007 – caused by the turmoil in the mortgage-backed securities market, most notably in the sub-prime home equity arena – Morgan Keegan failed, in any of its 2007 sales materials related to any of the bond funds, to disclose this to customers or that a substantial portion of the bond funds' portfolios were acutely affected by then-current economic conditions.

In its complaint, FINRA further alleges that Morgan Keegan failed to establish, maintain and enforce an adequate supervisory system, including written supervisory procedures, reasonably designed to achieve compliance with federal securities laws and FINRA rules.

Specifically, FINRA's complaint alleges that:

•       In its research, investment advice and performance updates to its brokers regarding the Intermediate Fund, Morgan Keegan failed to disclose the material characteristics and risks of investing in the fund, misstated the appropriate use of the fund and otherwise portrayed the fund as a safer investment than it was, even

though the firm was aware of material, special risks that made the fund unsuitable for many retail investors.

• Morgan Keegan failed to ensure the accuracy of the advertising materials prepared by the fund manager and distributed by the firm, and failed to ensure that those materials disclosed all material risks, were not misleading and did not contain exaggerated claims.

• Morgan Keegan failed to train its brokers regarding the features, risks and suitability of the fund and, in its communications with its brokers, the firm failed to adequately describe the nature of the holdings and material risks of the Intermediate Fund.

• When Morgan Keegan became aware, beginning in early 2007, of the adverse market effects on the bond funds, the firm failed to timely warn its brokers or revise its advertising materials to reflect the disproportionately adverse effect the market was having on the performance of the securities that comprised the bond funds – which Morgan Keegan brokers continued to sell widely. At this time, the firm reassured, rather than warned, its sales force about the riskiness of the bond funds. As a result, some of the firm's brokers were unaware of the then-turbulent market's effects on the funds and failed to disclose the negative effects caused by market forces.

227. Also on April 7, 2010, the Alabama Securities Commission, the Kentucky Department of Financial Institutions, the Mississippi Secretary of State's Office and the South Carolina Office of the Attorney General filed the Joint State Action as the result of a multistate investigation by a task force of thirteen state securities regulators.[10]  In their Joint Notice of Intent to Revoke Registration and Impose Administrative Penalty (the "Joint State Complaint"), a copy of which is attached hereto as Exhibit T, the state regulators accused MAM, Morgan Keegan and four individuals – defendants Kelsoe, Sullivan and Wood and Gary Stringer (director of investments for the Wealth Management Services division of Morgan Keegan) of violating the Alabama Securities Act, Ala. Code § 8-6-1, *et seq.*, the Kentucky Securities Act, K.R.S. § 292 *et seq.*, the Mississippi Securities Act, Miss. Code Ann. § 75-71-101, *et seq.*, and

---

[10] Authorities in the states of Alabama, Arkansas, Florida, Georgia, Illinois, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, South Carolina, Tennessee and Texas participated in the multi-state task force investigation.

the South Carolina Uniform Securities Act of 2005, S.C. Code Ann. § 35-1-101 to § 35-1-702, and various rules promulgated thereunder.

228.   Specifically, the Joint State Complaint alleged that the defendants, among other violations of law, "misled investors by failing to disclose the risks associated with the Funds; misrepresenting the nature of the Funds; misclassifying the securities held within the Funds; comparing the performance of the Funds to inappropriate peer groups (benchmarks); failing to accurately represent the amount of structured debt securities held in the Funds; and after the collapse of the Funds, recommending that investors should hold and/or continue to buy the Funds."

229.   On June 22, 2011, it was announced that Morgan Keegan, MAM, Kelsoe, Weller and the various authorities had reached a settlement of the Governmental Actions.  In connection therewith, a consent order was entered in each of the Governmental Actions containing certain findings of fact made by the respective authorities.

230.   For example, as set forth in the SEC Consent Order, by engaging in the misconduct described above:  (a) MAM had willfully violated, and Kelsoe had willfully aided, abetted and caused violations of, the Investment Advisers Act of 1940; and (b) MAM, Morgan Keegan, Kelsoe and Thompson Weller had willfully violated and/or willfully aided, abetted and caused violations of the Investment Company Act of 1940 and the rules promulgated thereunder.

231.   Likewise, the states of Alabama, Kentucky, Mississippi, South Carolina and Tennessee entered into near-identical consent orders with the defendants resolving their respective administrative proceedings, copies of which are attached as Exhibits U-Y, respectively.  In a joint press release issued on June 22, 2011, the states discussed their allegations and the highlights of the consent orders:

-111-

These actions are a direct result of intensive multi-state, federal, and self-regulatory organization (SRO) investigations.  The States' task force was led by Alabama, Kentucky, Mississippi, South Carolina and Tennessee in cooperation with state securities regulators from Arkansas, Florida, Georgia, Illinois, Louisiana, Missouri, North Carolina, and Texas.

The investigation centered around seven proprietary mutual funds sold by Morgan Keegan broker dealers to over 30,000 account holders.  Those seven mutual funds lost approximately $1.5 billion from March 31, 2007 to March 31, 2008.  The states' joint administrative actions against Morgan Keegan, Morgan Asset Management and certain employees, alleged that the firms:

- Made material omissions and misrepresentations in marketing materials;
- Made material omissions and misrepresentations in regulatory filings;
- Withheld information from and misrepresented information concerning the funds to the Morgan Keegan sales force;
- Provided preferential treatment to certain customers;
- Failed to make suitable recommendations concerning purchases and concentration of the funds in customer accounts;
- Failed to adequately supervise their agents and employees; and,
- Obstructed the due diligence process.

*       *       *

Highlights/excerpts of the consent orders [ ]:

1.      MKC and MAM are ordered to pay a total of $200 million.  Of this $100 million will go to establish an "SEC Fair Fund" and $100 million will go to establish a "States' Fund" both for the benefit of investors.  All costs, expenses, and charges associated with the Fair Fund and the States' Fund management and distributions shall be paid by MKC and MAM in addition to the funds established for investors.

2.      MKC and MAM are prohibited from creating, offering or selling any proprietary funds for a period of two years.

3.      In addition to regular audits and examinations[,] State regulatory authorities may conduct additional audits or examinations of the offices and branch offices of MKC and MAM; and, for the next two years, appropriate costs associated with these special audits or examinations will be paid by MKC/MAM.

4.      If MKC/MAM forms and sells any proprietary investment products before January 1, 2016, for three years the firms are required to retain an independent auditor, at their expense.  This auditor must be acceptable to a representative selected by state securities regulators from Alabama, Kentucky, Mississippi, South Carolina and Tennessee, and the SEC.

5.     For the next three years, MKC and MAM will provide special mandatory training to all firm registered agents and investment adviser representatives which is required to be comprehensive for each of the products and offerings sold or recommended to clients.  Further, MKC and MAM must also conduct training on suitability and risks of investments. MKC and MAM shall develop and implement course evaluations in order to assess the effectiveness of the training.

6.     MKC and MAM are prohibited from having one person simultaneously hold the positions of general counsel and chief compliance officer.

7.     State securities regulators will continue the cases and charges against Brian B. Sullivan, Gary S. Stringer and Michele F. Wood, who were named in the States' proceedings and who have not entered into the consent orders.

8.     MKC and MAM are required to fully cooperate in current and future administrative proceedings against Sullivan, Stringer or Wood.

9.     James Kelsoe, the fund manager named in the states' and SEC actions, settled charges with the States and was ordered to pay a total of $500,000.00 ($250,000.00 to States and $250,000.00 to SEC).  Furthermore, Kelsoe agreed to the revocation of all of his existing registrations and/or licenses and to an order of permanent bar from involvement in the securities industry.  Kelsoe cannot serve as an officer, director, or manager of, or issuer of interests in, a mutual fund, money market fund, pooled-investments or similar securities and investment vehicles which are publicly offered or sold.

232.     Thereafter, securities regulators in additional states that participated in the multi-state task force investigation entered into similar consent orders with MAM and Morgan Keegan. Specifically, the Commissioner of Securities for the State of Georgia entered an Administrative Consent Order dated October 17, 2011, a copy of which is attached hereto as Exhibit Z, resolving the state's investigation (the "Georgia Action") and concluding, *inter alia*, that MAM and Morgan Keegan violated the Georgia Securities Act of 1973, the Georgia Uniform Securities Act of 2008, and the rules promulgated thereunder.

233.     Similarly, the Arkansas Securities Commission entered a Consent Order dated October 19, 2011, a copy of which is attached hereto as Exhibit AA, resolving its investigation (the "Arkansas Action") and concluding, *inter alia*, that MAM and Morgan Keegan violated the Arkansas Securities Act, Ark. Code Ann. §§ 23-42-101 *et seq.*, and the rules promulgated

thereunder and, as stated in a concurrent press release, "engage[ed] in dishonest and unethical practices."

234.    Under the terms of the settlement of the Governmental Actions, Morgan Keegan and MAM were required to pay a total of $210,000 million to the SEC and the states of Alabama, Arkansas, Georgia, Kentucky, Mississippi, South Carolina and Tennessee, and defendants Kelsoe and Thompson Weller were required to pay penalties of $500,000 and $50,000, respectively.

235.    In addition, Morgan Keegan and MAM are each prohibited from being involved in the valuation of portfolio securities for three years, defendant Kelsoe has been banned from the securities industry for life and defendant Weller is suspended from certain activities for periods of one to two years.

236.    Upon information and belief, the Joint State Action remains pending against defendants Sullivan and Wood.

## DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

237.    The Funds' overconcentration in MBSs and other risky securities and violation of the Funds' policies were the direct result of the Individual Defendants' and MAM's breaches of fiduciary duties.

238.    As stated herein, Defendants breached their fiduciary duties by, among other things:

> a.    causing the Funds to invest heavily in ABSs, MBSs, CDOs and other risky securities;
>
> b.    failing to accurately disclose the full extent of the risk associated with overconcentration in MBSs and ABSs and of the losses to the Funds;
>
> c.    violating the Funds' concentration policy by investing more than 25% of the Funds' assets in one industry;

-114-

      d.      manipulating the Funds' NAVs particularly in connection with their illiquid securities;

      e.      disseminating statements that did not fully disclose the foregoing information; and

      f.      granting excessive compensation to MAM and Kelsoe based on inflated financials.

239.    As a result of Defendants' breaches of fiduciary duties, the Funds have suffered severe losses in value and have paid MAM and Kelsoe excessive management fees, as alleged in detail herein.

## DERIVATIVE AND DEMAND ALLEGATIONS

240.    Plaintiffs bring this action derivatively in the right and for the benefit of the Funds to redress Defendants' breaches of fiduciary duties, unjust enrichment and other violations of law.

241.    Plaintiff Cannaday is a shareholder of Helios Advantage, Helios High and Helios Strategic, was a shareholder of such Funds at the time of the wrongdoing alleged herein, and has been a shareholder of such Funds continuously since that time.

242.    Plaintiff Godfrey is a shareholder of Helios Advantage, Helios Multi-Sector and Helios Strategic, was a shareholder of such Funds at the time of the wrongdoing alleged herein, and has been a shareholder of such Funds continuously since that time.

243.    Plaintiffs will adequately and fairly represent the interests of the Funds and their shareholders in enforcing and prosecuting the rights of the Funds.

244.    On November 23, 2009, plaintiff Cannaday made demands on the Boards of Helios Advantage, Helios High and Helios Strategic to take action against Defendants.  Copies of such demands are attached hereto as Exhibits D, E and F, respectively.

245.    On November 25, 2009, plaintiff Godfrey made demands on the Boards of Helios Advantage, Helios Multi-Sector and Helios Strategic to take action against Defendants.  Copies of such demands are attached hereto as Exhibits G, H and I, respectively.

246.    On January 12, 2010, John J. Feeny, Jr. ("Feeny"), then President of the Funds, sent identical letters to Plaintiffs' counsel acknowledging receipt of each of the Demands and stating that the Boards were conducting an investigation:

> [I]n the course of related pending derivative litigation involving the former directors and/or officers and the former investment advisor of the Funds, the current Boards of Directors of the Funds are conducting an investigation to determine whether the Boards of Directors of the Funds should take action against the Funds' former directors, officers or investment advisor with respect to similar allegations.

*See* Exhibits J-K.

247.    On October 12, 2011, the Funds' counsel sent Plaintiffs' counsel a letter stating that, "following the [ ] Board's investigation, the [ ] Board has determined that [ ] Plaintiffs' counsel should continue to pursue the derivative actions on behalf of the [Funds]."  *See* Exhibit M.

## COUNT I

**Against Defendants MAM, Alderman, Anthony, Gamble, Kelsoe, Maxwell, Morgan, Sullivan, Tannehill, Joseph Weller, Thompson Weller and Wood for Breach of Fiduciary Duties of Loyalty and Good Faith**

248.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

249.    As alleged in detail herein, Defendants owed the Funds the fiduciary duties of loyalty and good faith.

250.    Defendants breached their fiduciary duties of loyalty and good faith, as alleged herein by: (a) overstating and manipulating the values of the securities in the Funds' portfolios,

-116-

thereby overstating each Fund's NAV; (b) violating the Funds' Offering Materials, which imposed a cap on the percentage of Fund assets that could be concentrated in any one industry, by over-concentrating the percentage of the Funds' assets in violation of such policies; and (c) violating the Funds' Offering Materials by failing to seek shareholder approval before investing in certain illiquid structured debt instruments in contravention of the Funds' Offering Materials.

251.    As a direct and proximate result of their breaches of fiduciary duties, the Funds have sustained damages, as alleged herein.

## COUNT II

**Against Defendants MAM, Anthony, Gamble, Kelsoe, Maxwell, Sullivan, Tannehill, Joseph Weller, Thompson Weller and Wood for Breach of Fiduciary Duties of Loyalty and Good Faith for Dissemination of Statements in Violation of GAAP**

252.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

253.    As alleged in detail herein, defendants MAM, Anthony, Gamble, Kelsoe, Maxwell, Sullivan, Tannehill, Joseph Weller, Thompson Weller and Wood owed the Funds the fiduciary duties of loyalty and good faith.

254.    Defendants MAM, Anthony, Gamble, Kelsoe, Maxwell, Sullivan, Tannehill, Joseph Weller, Thompson Weller and Wood breached their fiduciary duties of loyalty and good faith, as alleged herein by purposely disseminating and/or allowing to be disseminated statements in violation of GAAP regarding: (a) the true financial condition of the Funds; (b) the appropriate benchmark index; (c) the proper classification of ABSs by misclassifying them as less risky investments such as corporate bonds and preferred stocks; (d) the Funds' true NAVs; and (e) the extent of the Funds' exposure to such securities and the risks associated therewith to the Funds' shareholders and the investing public.

255.    Defendants Anthony, Sullivan, Joseph Weller and Thompson Weller further breached their fiduciary duties of loyalty and good faith by purposely disseminating false SOX certifications.

256.    As a direct and proximate result of the breaches of fiduciary duties by defendants MAM, Anthony, Gamble, Kelsoe, Maxwell, Sullivan, Tannehill, Joseph Weller, Thompson Weller and Wood, the Funds have sustained damages, as alleged herein.

## COUNT III

**Against Defendants MAM, Anthony, Gamble, Kelsoe, Maxwell, Sullivan, Tannehill, Joseph Weller, Thompson Weller and Wood for Negligence**

257.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

258.    Defendants MAM, Anthony, Gamble, Kelsoe, Maxwell, Sullivan, Tannehill, Joseph Weller, Thompson Weller and Wood had fiduciary duties of loyalty and good faith, which required them to properly manage the Funds.

259.    Defendants MAM, Anthony, Gamble, Kelsoe, Maxwell, Sullivan, Tannehill, Joseph Weller, Thompson Weller and Wood breached and recklessly disregarded their duties of loyalty and good faith, as alleged herein by: (a) overstating and manipulating the values of the securities in the Funds' portfolios, thereby overstating each Fund's NAV; (b) violating the Funds' Offering Materials, which imposed a cap on the percentage of Fund assets that could be concentrated in any one industry, by over-concentrating the percentage of the Funds' assets in violation of such policies; and (c) violating the Funds' Offering Materials by failing to seek shareholder approval before investing in certain illiquid structured debt instruments in contravention of the Funds' Offering Materials.

260.    As a direct and proximate result of the breaches and reckless disregard of duties by defendants MAM, Anthony, Gamble, Kelsoe, Maxwell, Sullivan, Tannehill, Joseph Weller, Thompson Weller and Wood, the Funds have sustained damages, as alleged herein.

## COUNT IV

### Against Defendants MAM and Kelsoe for Unjust Enrichment

261.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

262.    Defendants MAM and Kelsoe were unjustly enriched by their receipt of excessive fees based on improperly inflated asset values, as alleged herein.

263.    The receipt of such fees constituted a benefit conferred by the Funds, the true plaintiffs in interest, upon defendants MAM and Kelsoe, who had knowledge thereof, as alleged herein.  It would be unconscionable and inequitable to allow defendants MAM and Kelsoe to retain such benefits.

264.    To remedy the unjust enrichment of defendants MAM and Kelsoe, the Court should order defendants MAM and Kelsoe to disgorge to the Funds the excessive fees they received.

## COUNT V

### Against Defendant MAM for Breach of Contract

265.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

266.    Pursuant to the Advisory Agreements between defendant MAM and each of the Funds, defendant MAM was required to "furnish a continuous investment program for the Fund's portfolio of securities consistent with the Fund's investment objectives, policies and

limitations, the 1940 Act, the applicable rules and regulations of the Securities and Exchange Commission and other applicable federal and state laws."

267.   In addition, the Advisory Agreements provided that MAM was to "oversee the maintenance of all books and records with respect to the Fund[s'] securities transactions and the Fund[s'] books of account in accordance with all applicable federal and state laws and regulations."

268.   Defendant MAM materially breached the Advisory Agreements by failing to invest the Funds' assets in a manner consistent with the Funds' investment objectives, policies and limitations.  Specifically, MAM violated the investment objectives, policies and limitations set forth in the Funds' Offering Materials, which imposed a cap on the percentage of Fund assets that could be concentrated in any one industry, by over-concentrating the percentage of the Funds' assets in violation of such policies, as alleged herein.

269.   In addition, MAM materially breached the Advisory Agreements by failing to maintain the Funds' books and records in good faith and in accordance with all applicable federal and state laws and regulations, as alleged herein.

270.   MAM's conduct was in negligent or in bad faith or grossly negligent in its performance of its duties or in reckless disregard of its obligations and duties under the Agreements.

271.   MAM further breached its duty of good faith and fair dealing with respect to each of the Advisory Agreements, as alleged herein.

272.   As a direct and proximate result of the breaches of the Advisory Agreements by defendant MAM, the Funds have sustained damages, as alleged herein.

## COUNT VI

### Against Defendant MAM for Negligent Supervision

273. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

274. At all times relevant hereto, defendants Kelsoe and Tannehill were employed as portfolio managers at MAM.

275. As alleged, herein, defendants Kelsoe and Tannehill: (a) overstated and manipulated the values of the securities in the Funds' portfolios, thereby overstating each Fund's NAV; (b) violated the Funds' Offering Materials, which imposed a cap on the percentage of Fund assets that could be concentrated in any one industry, by over-concentrating the percentage of the Funds' assets in violation of such policies; (c) violated the Funds' Offering Materials by failing to seek shareholder approval before investing in certain illiquid structured debt instruments in contravention of the Funds' Offering Materials; and (d) purposely disseminated and/or allowed to be disseminated statements in violation of GAAP regarding: (i) the true financial condition of the Funds; (ii) the appropriate benchmark index; (iii) the proper classification of ABSs by misclassifying them as less risky investments such as corporate bonds and preferred stocks; (iv) the Funds' true NAVs; and (v) the extent of the Funds' exposure to such securities and the risks associated therewith to the Funds' shareholders and the investing public.

276. As a direct and proximate result of the misconduct committed by defendants Kelsoe and Tannehill, the Funds have sustained damages, as alleged herein.

277. Defendant MAM knew or should have known by the exercise of diligence and reasonable care that defendants Kelsoe and Tannehill were capable of inflicting harm upon the Funds, as alleged herein.

278.   Defendant MAM recklessly disregarded its duty to supervise defendants Kelsoe and Tannehill as portfolio managers, as alleged herein.  Indeed, MAM's President, defendant Anthony, told investigators that he did not know what defendant Kelsoe invested the Funds' assets in, and that MAM's policy was to leave defendant Kelsoe alone.

279.   As a direct and proximate result of MAM's breach and reckless disregard of such duty, the Funds have sustained damages, as alleged herein.

WHEREFORE, Plaintiffs demand judgment as follows:

A.   Awarding each of the Funds the amount of damages sustained by such Fund as a result of Defendants' breaches of fiduciary duties and other violations of law and MAM's breaches of the Advisory Agreements;

B.   Ordering defendants MAM and Kelsoe to disgorge to the Funds the excessive fees they received;

C.   Granting appropriate equitable relief to remedy Defendants' breaches of fiduciary duties and other violations of law;

D.   Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accounts' and experts' fees, costs and expenses; and

E.   Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: November 15, 2011                    Respectfully submitted,

**BRAMLETT LAW OFFICES**
**By:**

**/s/Paul Kent Bramlett_____**
**PAUL KENT BRAMLETT TN#7387**

Paul Kent Bramlett   TN #7387/MS #4291
Robert Preston Bramlett   TN #25895
**BRAMLETT LAW OFFICES**
2400 Crestmoor Road
P. O. Box 150734
Nashville, TN  37215
Telephone:      (615) 248-2828
Facsimile:      (866) 816-4116
E-mail :         pknashlaw@aol.com
                    Robert@BramlettLawOffices.com


**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Eric L. Zagar
Robin Winchester
Kristen L. Ross
280 King of Prussia Road
Radnor, PA 19087
Phone:  (610) 667-7706
Fax:  (267) 948-2512
E-mail:          ezagar@ktmc.com
                    rwinchester@ktmc.com
                    kross@ktmc.com

*Attorneys for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

      This is to certify that I have this date filed the above and foregoing ***Verified Amended***

***Shareholder Derivative Complaint with all Exhibits*** on the ECF system, and that by virtue of

this filing, the following attorneys have been served with true and exact copies via the ECF

system and/or to their e-mail addresses shown below:

Britt K. Latham
**BASS, BERRY & SIMS PLC**
150 Third Avenue South, Suite 2800
Nashville, TN  37201
E-mail:          blatham@bassberry.com

Larry Polk
**SUTHERLAND ASBILL & BRENNAN LLP**
999 Peachtree Street, NE
Atlanta, GA  30309
E-mail:          larry.polk@sutherland.com

Jeffrey Maletta
**K & L GATES, LLP**
1601 K Street, NW
Washington, DC 20006
E-mail:          jeffrey.maletta@klgates.com

Harold Meeks
**PURSLEY LOWERY & MEEKS, LLP**
260 Peachtree Street, Suite 200
Atlanta, GA  30303
E-mail:          hmeeks@plmllp.com

      **SO CERTIFIED** this **15th** day of **NOVEMBER 2011.**

                    */s/Paul Kent Bramlett*
                    PAUL KENT BRAMLETT